**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

```
_____ :
                             :
GIUSEPPE TEDESCO,            :    Hon. Claire C. Cecchi,
                             :    U.S.D.J.
          Petitioner,        :
                             :    Civil Action No. 18-13642(CCC)
     v.                      :
                             :    On Petition For A
STEVEN JOHNSON,              :    Writ of Habeas Corpus
WARDEN, NEW JERSEY STATE     :
PRISON and                   :
GURBIR S. GREWAL,            :
ATTORNEY GENERAL OF THE      :
STATE OF NEW JERSEY,         :
                             :
          Respondents.       :
_____ :
```

────────────────────────────────

## *PETITIONER GIUSEPPE TEDESCO'S REPLY/TRAVERSE BRIEF IN SUPPORT OF HIS 28 U.S.C. § 2254 PETITION [Habeas Rule 5e]*

────────────────────────────────

JOHN VINCENT SAYKANIC, ESQ.
NJ BAR ID NO. 045801984
1135 Clifton Avenue
Clifton, New Jersey 07013
TEL: (973) 779-1124
FAX: (973) 614-0386
E-MAIL: JohnVincentEsq@aol.com
Attorney for Petitioner
Giuseppe Tedesco

John Vincent Saykanic, Esq.
On the Traverse/Reply Brief

## TABLE OF CONTENTS

Page No.

TRANSCRIPT CITATIONS . . . . . . . . . . . . . . . . . . . . . iv

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . v

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . 3

LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 6

POINT I

THE RAMPANT PROSECUTORIAL MISCONDUCT BOTH PRETRIAL AND
THROUGHOUT THE TRIAL VIOLATED PETITIONER TEDESCO'S
FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL
WARRANTING ISSUANCE OF THE HABEAS WRIT, AS THE STATE
COURT'S DECISIONS ARE CONTRARY TO, OR INVOLVE AN
UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED FEDERAL
LAW; THE ADMISSION, OVER DEFENSE OBJECTION, OF PRIOR BAD
ACT EVIDENCE OF TWO PURPORTED TIRE-SLASHING INCIDENTS
VIOLATED THE PETITIONER'S DUE PROCESS RIGHTS . . . . . . . 6

POINT II

THE PROSECUTORIAL MISCONDUCT THROUGHOUT THE TRIAL
(INCLUDING THE IMPROPER CROSS-EXAMINATION OF
PETITIONER) ALONG WITH A MISLEADING, INNACURATE AND
HIGHLY PREJUDICIAL CLOSING STATEMENT VIOLATED
PETITIONER'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT
TO A FAIR TRIAL, FIFTH AMENDMENT RIGHT TO REMAIN
SILENT, AND SIXTH AMENDMENT CONFRONTATION CLAUSE
RIGHT WARRANTING ISSUANCE OF THE WRIT. . . . . . . . . . 35

POINT III

THE TRIAL COURT'S ADMISSION OF PETITIONER'S INTOXI-
CATED STATEMENT TO HIS FRIENDS, THE FAILURE TO GRANT
AN EVIDENTIARY HEARING, AND SUBSEQUENT IMPROPER JURY
INSTRUCTION VIOLATED PETITIONER'S FOURTEENTH AMENDMENT
RIGHT TO DUE PROCESS . . . . . . . . . . . . . . . . . . 152

POINT IV

THE EX PARTE CONVERSATIONS BETWEEN THE JURY AIDE
AND JURORS IMPERILED THE PETITIONER'S FOURTEENTH
AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL
WARRANTING ISSUANCE OF THE WRIT . . . . . . . . . . . . 154

i

<u>POINT V</u>

REBUTTAL TESTIMONY ABOUT THE VICTIM'S STATE OF
MIND WAS HEARSAY AND DID NOT SATISFY ANY EXCEPTION
MERITING EXCLUSION; PETITIONER'S FOURTEENTH
AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL
WAS VIOLATED WARRANTING ISSUANCE OF THE WRIT . . . . . . 157

<u>POINT VI</u>

THE STATE'S EXPERT TESTIFIED WELL BEYOND HIS
REPORT OVER OBJECTION OF PETITIONER RESULTING
IN PREJUDICE AND A VIOLATION OF HIS FOURTEENTH
AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL AND
SIXTH AMENDMENT CONFRONTATION RIGHT WARRANTING
ISSUANCE OF THE WRIT . . . . . . . . . . . . . . . . . 159

<u>POINT VII</u>

THE COURT IMPOSED AN EXCESSIVE SENTENCE IN VIOLATION
OF PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT DUE
PROCESS RIGHTS . . . . . . . . . . . . . . . . . . . . 163

<u>POINT VIII</u>

THE INTRODUCTION OF PETITIONER'S FACEBOOK PAGE
AND QUOTE FROM <u>THE SOPRANOS</u> TELEVISION SHOW WAS
ERRONEOUS AND DEPRIVED PETITIONER OF HIS FOUR-
TEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL . . . 166

<u>POINT IX</u>

GROUNDS ONE, THREE, FIVE, SIX AND EIGHT DO STATE
CLAIMS UPON WHICH HABEAS RELIEF CAN BE GRANTED (THIS
POINT ADDRESSES <u>POINT I</u> OF THE STATE'S AFFIRMATIVE
DEFENSES) . . . . . . . . . . . . . . . . . . . . . . 171

<u>POINT X</u>

PETITIONER'S ALLEGATIONS REGARDING HIS
SENTENCE DO NOT FAIL TO STATE A CLAIM
UPON WHICH RELIEF MAY BE GRANTED (THIS
POINT ADDRESSES <u>POINT II</u> OF THE STATE'S
AFFIRMATIVE DEFENSES) . . . . . . . . . . . . . . . . 171


CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 171

<u>APPENDIX (PREVIOUSLY FILED)</u>

Indictment No. 10-08-00289-I (filed August 19, 2010) . . .  1a-3a
Verdict Sheet (dated January 10, 2013) . . . . . . . . . .  4a-5a

Notice of Appeal (dated August 26, 2013) . . . . . . . . . 6a-9a
Judgment of Conviction/Statement of Reasons (dated
   July 18, 2013) . . . . . . . . . . . . . . . . . . . . 10a-19a
Pretrial Motion Order (filed October 25, 2012) . . . . . 20a-22a
Autopsy Report (dated April 28, 2010) . . . . . . . . . 21a-35a
State's Summation Slide Presentation . . . . . . . . . . 36a-128a
Jury Charge . . . . . . . . . . . . . . . . . . . . . . 129a-172a
Order of Judge Conforti Granting Motion to Compel
   Defendant's Presence at the time of Sentencing (filed
   March 12, 2013) . . . . . . . . . . . . . . . . . . . . 173a
Appellate Division Order on Emergent Application
   Granting Leave to Appeal and Affirming Order Granting
   Motion to Compel (filed March 18, 2013) . . . . . . . 174a-177a
Opinion of New Jersey Supreme Court Affirming Order
   Granting Motion to Compel, State v. Tedesco, 214
   N.J. 177 (2013) . . . . . . . . . . . . . . . . . . . 178a-190a
Unpublished Opinion of Appellate Division, State v.
   Giuseppe Tedesco, 2017 WL 876339 (App. Div.,
   Decided March 6, 2017) . . . . . . . . . . . . . . . . 191a-208a
Order of New Jersey Supreme Court Denying
   Certification, State v. Tedesco, 230 N.J. 547 (2017) . . . 209a
"County of Sussex — Supplementary Investigation
   Report" (dated July 18, 2012) . . . . . . . . . . . . 201a-211a

## TRANSCRIPT CITATIONS

1T - October 24, 2012 transcript (State's Ex. 15).
2T - December 4, 2012 transcript (State's Ex. 16).
3T - December 5, 2012 transcript (Volume 1: 1-200;
    Vol. 2: 201-219) (State's Ex. 17).
4T - December 6, 2012 transcript (State's Ex. 18).
5T - December 11, 2012, transcript (State's Ex. 19).
6T - December 12, 2012, transcript (State's Ex. 20) .
7T - December 13, 2012, transcript (State's Ex. 21).
8T - December 18, 2012, transcript (State's Ex. 22).
9T - December 19, 2012, transcript (Volume 1: 1-200; Vol. 2:
    201-290) (State's Ex. 23).
10T - December 20, 2012 transcript (State's Ex. 24).
10(a)T – January 3, 2013 transcript (State's Ex. 25).
11T - January 8, 2013 transcript (summations; charge) (State's
    Ex. 26).
11(a)T – January 10, 2013 transcript (verdict) (State's Ex.
    27).
11(b)T – March 13, 2013 transcript (hearing) (State's Ex. 28).
12T - July 17, 2013 sentencing transcript (State's Ex. 29).

iv

## TABLE OF AUTHORITIES

Agard v. Portuondo, 117 F.3d 696 (2d Cir. 1997) . . . . . . .   16

Arizona v. Washington, 434 U.S. 497, 98 S.Ct. 824,
   54 L.Ed.2d 717 (1977) . . . . . . . . . . . . . . . . . .   35

Arrieta-Agressot v. United States, 3 F.3d 525 (1st Cir.
   1993) . . . . . . . . . . . . . . . . . . . . . . . . . .   16

Berger v. United States, 295 U.S. 78 (1935) . . . . . . . . 12,15

Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710,
   123 L.Ed2d 353 (1993) (1993) . . . . . . . . . . 6,26,34,43,149

Brown v. Borg, 951 F.2d 1011 (9th Cir. 1991) . . . . . . . .   23

Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620,
   20 L.Ed.2d 476 (1968) . . . . . . . . . . . . . . . . . .  151

Caldwell v. Mississippi, 472 U.S. 320 (1985) . . . . . . . .   15

Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038,
   35 L.Ed.2d 297 (1973) . . . . . . . . . . . . . . . . . .  149

Chapman v. California, 386 U.S. 18 (1967) . . . . . . . . . .   6

Commonwealth v. Guess, 273 Pa. Super. 72 (1979) . . . . . . .  160

Commonwealth v. Mendiola, 976 F.2d 475 (9th Cir. 1993) . . .   22

Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464,
   91 L.Ed.2d 144 (1986) . . . . . . . . . . . . . . . 11-12,14-15

Davis v. Zant, 959 F.2d 1524 (11th Cir. 1992) . . . . . . . .   24

Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974) . .  11,43,14

Dowling v. United States, 493 U.S. 342, 110 S.Ct. 668,
   107 L.Ed.2d 708 (1990) . . . . . . . . . . . . . . . . . .   33

Doyle v. Ohio, 426 U.S. 610 (1976) . . . . . . . . .   108,115

Duncan v. Louisiana, 391 U.S. 145 (1968) . . . . . . . . . .  155

Dunn v. United States, 307 F.2d 883 (5th Cir. 1962) . . . . .  150

Eddleman v. McKee, 471 F.3d 576 (6th Cir. 2006) . . . . . . .   19

Eley v. Erickson, 712 F.3d 837 (3d Cir. 2013) . . . . . .   7-8,18

Floyd v. Meachum, 907 F.2d 347 (2d Cir. 1990) . . . . . .  17,116

Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992)  . . . . . . .  21

Fry v. Pliler, 551 U.S. 112, 127 S.Ct. 2321,
    168 L.Ed.2d 16 (2007) . . . . . . . . . . . . . . . . .  34

Gardner v. Florida, 430 U.S. 349 (1977) . . . . . . . . . . 13-14

George v. Camacho, 119 F.3d 1393 (9th Cir. 1997) . . . . . . . 22

Government of Virgin Islands v. Fonseca, 274
    F.3d 760 (3d Cir. 2001) . . . . . . . . . . . . . . . . . 158

Gravley v. Mills, 87 F.3d 779 (6th Cir. 1996) . . . . . .  19,116

Greer v. Miller, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d
    618 (1987) . . . . . . . . . . . . . . . . . . . . . . . 26

Griffin v. California, 380 U.S. 609 (1965) . . . . . . . .  115

Harrington v. Richter, ___ U.S. ___, 131 S.Ct. 770,
    178 L.Ed.2d 624 (2011) . . . . . . . . . . . . . . . . . 8-9

Irvin v. Dowd, 366 U.S. 717 (1961) . . . . . . . . . . . .  155

Kamienski v. Hendricks, 332 Fed. Appx. 740 (3d Cir. 2009) . . . 9

Kotteakos v. United States, 328 U.S. 750 (1946) . . . . . . . . 8

Krulewich v. United States, 336 U.S. 440 (1949) . . . . . . . 150

Lambert v. Blackwell, 387 F.2d 210 (3d Cir. 2004),
    cert. denied 544 U.S. 1063 (2005) . . . . . . . . . . . . . 9

Lesko v. Lehman, 925 F.2d 347 (3d Cir. 1991) . . . . . 17,116,148

Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280,
    86 L.Ed. 166 (1941) . . . . . . . . . . . . . . . . . . 33

Mahorney v. Wallman, 917 F.2d 469 (10th Cir. 1990) . . . . . . 23

Martin v. Parker, 11 F.3d 613 (6th Cir. 1993) . . . . . . . . 19

Matteo v. Superintendent, 171 F.3d 877 (3d Cir. 1999) . . . . . 9

Matter of Seaman, 133 N.J. 67 (1993) . . . . . . . . . . . . 29

Miller v. Lockhart, 65 F.3d 676 (8th Cir. 1995) . . . . 21,116-17

Miller v. Pate, 386 U.S. 1 (1967)  . . . . . . . . . . . . . 34

vi

Miranda v. Arizona, 384 U.S. 436 (1966) . . . . . . . . . 108,116

Moore v. DiGuglielmo, 489 F.App'x 618 (3d Cir. 2012) . . . . 8-9

Moore v. Morton, 547 F.3d 191 (3d Cir. 2008) . . . . . . . . 148

Nelson v. Nagle, 995 F.2d 1549 (11th Cir. 1993) . . . . . . . 24

O'Neal v. McAninch, 513 U.S. 432 (1995) . . . . . . . . . . . 6

Parker v. Matthews, __ U.S. __, 132 S.Ct. 2148,
  183 L.Ed.2d 32 (2012) . . . . . . . . . . . . . . . . . . 12,34

People v. Hill, 952 P.2d  673 (Cal. 1998) . . . . . . . . . . 149

Perry v. New Hampshire, __ U.S. __, 132 S.Ct. 716,
  181 L.Ed.2d 694 (2012) . . . . . . . . . . . . . . . . . . . 33

Presnell v. Zant, 959 F.2d 1524 (11th Cir. 1992) . . . . . . . 24

Renico v Lett, 130 S.Ct. 1855 (2010) . . . . . . . . . . . . . 8

Richardson v. Marsh, 481 U.S. 200, 107 S.Ct. 1702,
  95 L.Ed.2d 176 (1987) . . . . . . . . . . . . . . . . . . . 151

Sizemore v. Fletcher, 921 F.2d 667 (6th Cir. 1990) . . . . . . 20

Smith v. Phillips, 455 U.S. 209 (1982) . . . . . . . . . . . 156

State v. Baluch, 341 N.J. Super. 141 (App. Div.),
  certif. denied, 170 N.J. 89 (2001) . . . . . . . . . . . . 159

State v. Basit, 378 N.J. Super. 125 (App. Div. 2005) . . . . 154

State v. Blackmon, 202 N.J. 283 (2010) . . . . . . . . . . . 163

State v. Brown, 275 N.J. Super. 329 (App. Div. 1994) . . . . 156

State v. Cassady, 198 N.J. 165 (2009) . . . . . . . . . . . . 163

State v. Chavies, 345 N.J. Super. 254 (App. Div. 2001) . . . 157

State v. Cofield, 127 N.J. 328 (1992) . . . . . . . . . . . . 29

State v. Hawk, 327 N.J. Super. 85, 89 (App. Div. 1994) . . . 38

State v. Jamerson, 153 N.J. 318 (1998) . . . . . . . . . . . 160

State v. Matulewicz, 115 N.J. 191 (1989) . . . . . . . . . . 164

State v. Messina, 378 N.J. Super. 559 (App. Div.),
  certif. denied, 185 N.J. 297 (20050 . . . . . . . . . . . 169

State v. Michaels, 264 N.J. Super. 579 (App. Div. 1993),
  aff'd, 136 N.J. 299 (1994) . . . . . . . . . . . . . . . 43

State v. Moore, 585 A.2d 864 (N.J. 1991) . . . . . . . . . 160

State v. Morais, 359 N.J. Super. 123 (App. Div.), certif.
  denied, 177 N.J. 572 (2003) . . . . . . . . . . . . . . . 38

State v. Ramseur, 106 N.J. 123 (1987) . . . . . . . . . 163-165

State v. Rivera, 437 N.J. Super. 434 (App. Div. 2014) . . . . 35

State v. Roth, 95 N.J. 334 (1984) . . . . . . . . . . . . . 163

State v. Vellejo, 198 N.J. 122 (2009) . . . . . . . . . . 56

State v. Whitaker, 79 N.J. 503 (1979) . . . . . . . . . . . 163

State v. W.L., 292 N.J. Super. 100 (App. Div. 1996) . . . . . 39

Taylor v. Kentucky, 436 U.S. 478, 98 S.Ct. 1930,
  56 L.Ed.2d 468 (1978) . . . . . . . . . . . . . . . . . 149

United States v. Alzate, 47 F.3d 1103 (11th Cir. 1995) . . . 24

United States v. Antonelli Fireworks Co., 155 F.2d 631
  (2d Cir. 1946) . . . . . . . . . . . . . . . . . . . . 10

United States v. Blakey, 14 F.3d 1557 (11th Cir. 1994) . . . . 24

United States v. Cannon,  88 F.3d 1495 (8th Cir. 1996) . . . 21

United States v. Carroll, 26 F.3d 1380 (6th Cir. 1994) . . . 19

United States v. Cotnam, 88 F.3d 487 (7th Cir. 1996) . . . 20,116

United States v. Crutchfield, 26 F.3d 1098 (11th Cir.
  1994) . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Doe, 903 F.2d 16 (D.C.Cir. 1990) . . . . . . 25

United States v. Donato, 99 F.2d 426 (D.C.Cir. 1996) . . . . . 24

United States v. Flores-Chapa, 48 F.3d 156 (5th Cir.
  1995) . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. Forlorma, 94 F.3d 91 (2d Cir. 1996) . . . . . 16

**United States v. Foster**, 985 F.2d 466 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 22,117

**United States v. Frederick**, 78 F.3d 1370 (9th Cir. 1996) . . . 22

**United States v. Friedman**, 909 F.2d 705 (2d Cir. 1990) . . . . 16

**United States v. Hale**, 422 U.S. 171 (1975) . . . . . . . . . 115

**United States v. Hardy**, 37 F.3d 753 (1st Cir. 1994) . . . 15,116

**United States v. Johnson**, 968 F.2d 768 (8th Cir. 1992) . . . 21

**United States v. Johnston**, 127 F.3d 380 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 18,116

**United States v. Kerr**, 981 F.2d 1050 (9th Cir. 1992) . . . . . 23

**United States v. Kojoyan**, 9 F.3d 1135 (9th Cir. 1993) . . . . 22

**United States v. Liburd**, 607 F.3d 339 (3d Cir. 2010) . . . . . 17

**United States v. Manning**, 23 F.3d 570 (1st Cir. 1994) . . . . 15

**United States v. Mitchell**, 1 F.3d 235 (4th Cir. 1993) . . . . 18

**United States v. Molina-Guevara**, 96 F.3d 698 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 17,148

**United States v. Morena**, 547 F.3d 193 (3d Cir. 2008) . . . . . 18

**United States v. Novak**, 918 F.2d 107 (10th Cir. 1990) . . . 23

**United States v. Payne**, 2 F.3d 706 (6th Cir. 1993) . . . . . . 19

**United States v. Repak**, 852 F.3d 230 (3d Cir. 2017) . . . . . 38

**United States v. Riley**, 621 F.3d 312 (3d Cir. 2010) . . . . . 38

**United States v. Roark**, 924 F.2d 1426 (8th Cir. 1991) . . 21-22

**United States v. Roberts**, 119 F.3d 1006 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 15,116

**United States v. Smith**, 962 F.2d 923 (9th Cir. 1992) . . . . . 23

**United States v. Solivan**, 937 F.2d 1146 (6th Cir. 1991) . . . 20

**United States v. Teffera**, 985 F.2d 1082 (D.C. Cir. 1993) . . . 24

**United States v. Udechukwu**, 11 F.3d 1101 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 15-16

**United States v. Wilson**, 135 F.3d 291 (4th Cir. 1998) . . . 18,34

**United States v. Young**, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) . . . . . . . . . . . . . . . . . . 12-13

**Virgin Islands v. Toto**, 529 F.2d 278 (3d Cir. 1976) . . . . . 150

**Williams v. Artus**, 2013 WL 4761120 (E.D.N.Y. 2013) . . . 25-26,34

**Williams v. Taylor**, 529 U.S. 362 (2000) . . . . . . . . . . . 7-8

## STATUTES CITED

28 <u>U.S.C.</u> § 2254 (d) . . . . . . . . . . . . . . . . . . . . . 7

x

<u>**PRELIMINARY STATEMENT**</u>

Petitioner Giuseppe Tedesco was deprived of his Fourteenth Amendment due process right to a fair trial due to the pervasive, deliberate, and extremely prejudicial prosecutorial misconduct that occurred throughout his trial.  This includes the manipulation of State's witnesses and the improper cross-examination of petitioner, and culminated in the State's egregiously false closing argument, all to the extreme prejudice of petitioner.  Petitioner was also deprived of his Fifth Amendment right to remain silent and Sixth Amendment confrontation right and right to a fair and impartial jury.

The State began its pattern of misconduct when it successfully moved pretrial to admit two purported bad acts of petitioner—two purported tire slashings of Allison's car in the week prior to her death.  The State used this evidence throughout the trial to try to establish a pattern of escalating violence towards Allison (Ground One).

The State also committed prosecutorial misconduct at trial by improperly utilizing Dr. Shaikh, the doctor who conducted the autopsy.  Over objection, the State intentionally utilized Dr. Shaikh to present misleading, inaccurate, and highly inflammatory opinion testimony of Dr. Sheikh to the extreme prejudice of petitioner.  While both the State's medical and scientific experts did not contradict petitioner's version of events on the stairway, the prosecutor improperly inserted her expert opinion

1

and advised the jury that "There is no way, physically, medically or scientifically possible that what he said is true." (11T88-21).  The prosecutor, through Dr. Shaikh, deprived petitioner of his Sixth Amendment Confrontation Clause rights, along with his Fourteenth Amendment due process right to a fair trial.  The prosecutor also improperly utilized an innocent Facebook posting by petitioner from the popular television show The Sopranos to his extreme detriment.

The case was and should have been about the events of March 27, 2010.  It turned into a trial about petitioner being drunk in January, 2010; Allison getting a flat tire in March of 2010, for which petitioner was blamed; the State's experts' testimony being distorted, twisted, and utilized to create a false narrative; and petitioner being improperly cross-examined.

This pervasive pattern of prosecutorial misconduct continued throughout the trial and the prosecutor manipulated not only the law witnesses but the expert witnesses, as well.

The constitutional errors (either individually or in the aggregate) were not harmless.  There were no witnesses to the death of Allison except for the petitioner, who testified that her death was the result of self-defense.  In spite of this, the prosecutor manipulated the State's witnesses and testimony during her closing statement in such an egregious fashion that no fairminded jurist could disagree that her conduct was not "harmless" error, warranting the granting of habeas relief.

2

<u>PROCEDURAL HISTORY</u>

Petitioner relies upon the procedural history stated in his "Petition for a Writ of Habeas Corpus" ("Petition") filed September 7, 2018 (Doc. 1).  The State filed its Answer on January 28, 2019. (Doc. 6).

<u>STATEMENT OF FACTS</u>

Petitioner relies upon the "Supporting facts" stated in his Petition in GROUND ONE with the following additional comments. Petitioner points out the following inaccuracies in the State's Answer.  On page 4, the State writes in its recitation of facts that petitioner "told [Jerry] that he was mad because Allison had a boyfriend." (RA[1]4).  The word "boyfriend" was never used in J.D.'s testimony.

The State writes in its recitation of facts:

> This was not the first time petitioner had been aggressive about Allison.  <u>Several weeks</u> before the murder, petitioner, Allison, and petitioner's friends, [David], [Jerry], and [Martha], were at a nightclub in New York City. (Exhibit 17; 3T207-10 to 209-8) (emphasis supplied). (Ra4).

Contrary to the State's claims, they were at the nightclub <u>months</u>, nor weeks, prior to March 27, 2010.

The State writes in its recitation of facts:

> On March 23, 2010, Allison was visiting her boyfriend at his home. (Exhibit 19; 5T100-7 to 8).  After she left, Allison called her boyfriend and said she had <u>a flat tire</u>. (Exhibit 19; 5T108-5 to 13) (emphasis supplied). (RA5).

---

[1] "RA" denotes State's Answer filed January 28, 2019.

That Allison stated she had a flat tire supports petitioner's contention that there was no slashed tire.

The State writes: "While petitioner sounded frightened in his conversation, Barber also recalled that he seemed proud of what he had just done. (Exhibit 19; 5T167-1 to 4)." (Ra5).  That Barber could not recall not recall 10½ minutes of the conversation is extremely suspect.

The State writes:

> As he ran to his car parked around the corner instead of in the vacant driveway of Allison's house, the Parisi family was traveling down the street and crossed paths with petitioner at approximately 8:30 P.M. (4T32-23 to 25). (RA7).

The cars were in the driveway as shown on the police dash cam video.

The State writes: "When petitioner arrived at home, he parallel-parked his SUV in the driveway and went inside. (Exhibit 23; 9T115-7 to 24)." (RA7).  Petitioner did not parallel park (as reflected in the photos).  The State incorrectly implies that petitioner had not been injured as he was purportedly able to parallel park when, in fact, he was badly injured with a gunshot wound to his left hand (5T9-20; 5T18-10 to 19-3), with injuries to the right side of his neck and shoulder. (5T26-4).

The State writes:

> During the autopsy, Dr. Junaid Shaikh observed all six gunshot wounds on Allison's body and noted that the wound to her hand was not fatal, the wounds to her face and head were immediately fatal, the wounds to her

4

torso were <u>fatal within minutes of sustaining them</u>, and the bullet that entered through her stomach severed her spine <u>causing her to be paralyzed</u>. (Exhibit 22; 8T22-23 to 25-2; 8T26-24 to 27-12; 8T28-12 to 19; 8T32-4 to 33-8; 8T35-6 to 23; 8T38-23 to 24) (RA8) (emphasis supplied).

Contrary to this statement, Dr. Shaikh did not testify as to any length.  In addition, there was partial paralysis of the legs (though not immediate).

## LEGAL ARGUMENT

### POINT I

**THE RAMPANT PROSECUTORIAL MISCONDUCT BOTH PRETRIAL AND THROUGHOUT THE TRIAL VIOLATED PETITIONER TEDESCO'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL WARRANTING ISSUANCE OF THE HABEAS WRIT, AS THE STATE COURT'S DECISIONS ARE CONTRARY TO, OR INVOLVE AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED FEDERAL LAW; THE ADMISSION, OVER DEFENSE OBJECTION, OF PRIOR BAD ACT EVIDENCE OF TWO PURPORTED TIRE-SLASHING INCIDENTS VIOLATED THE PETITIONER'S DUE PROCESS RIGHTS**

### THE LAW REGARDING HABEAS REVIEW OF STATE CONVICTIONS[2]

This federal habeas review is circumscribed by the

Antiterrorism and Effective Death Penalty Act ("AEDPA").  As

amended by the Antiterrorism and Effective Death Penalty Act of

---

[2] In <u>Chapman v. California</u>, 386 U.S. 18 (1967), the Court held that constitutional error is grounds for reversal unless the prosecution can prove beyond all reasonable doubt that the error did not contribute to the defendant's conviction.  In <u>Chapman</u>, the prosecutor's extensive comments on petitioner's failure to testify (though allowed by a state constitutional provision at the time), violated the Fifth and Fourteenth Amendments warranting a reversal of murder, kidnapping and robbery convictions.  However, the Supreme Court's decision in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed 353 (1993), altered the standard for harmless error in habeas cases involving constitutional trial flaws and established that the <u>Kotteakos v. United States</u>, 328 U.S. 750 (1946); the <u>Brecht</u> standard is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 623. 113 S.Ct. 1710.   <u>Brecht</u> held that the State's references in summation to Brecht's post-Miranda silence violated <u>Doyle v. Ohio</u>, 426 U.S. 610 (1976), but did not have a substantial and injurious effect or influence in determining the jury's verdict.

Under <u>O'Neal v. McAninch</u>, 513 U.S. 432 (1995), the key case interpreting <u>Brecht</u>, on federal habeas review of a state conviction, the petitioner is required to make some showing that the constitutional error had an effect on the jury.

1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), 28

<u>U.S.C.</u> § 2254 now provides, in pertinent part:

> (a)  The Supreme Court, a Justice thereof, a
> circuit judge, or a district court shall
> entertain an application for a writ of
> habeas corpus in behalf of a person in
> custody pursuant to the judgment of a
> State court only on the ground that he
> is in custody in violation of the
> Constitution or laws or treaties of the
> United States.

<u>STANDARD OF REVIEW</u>

With respect to any claim adjudicated on the merits in state

court proceedings, the writ shall not issue unless the

adjudication of the claim:

> (1)  resulted in a decision that was <u>contrary
> to</u>, or involved an <u>unreasonable
> application of</u>, <u>clearly established
> Federal law</u>, as determined by the
> <u>Supreme Court of the United States</u>; or
>
> (2)  resulted in a decision that was based on
> an unreasonable determination of the
> facts in light of the evidence presented
> in the State court proceeding.

28 U.S.C. § 2254(d). (Emphasis supplied).

<u>"CONTRARY TO . . ."</u>

"Contrary to clearly established Federal law" means the

state court applied a rule that contradicted the governing law

set forth in U.S. Supreme Court precedent or that the state court

confronted a set of facts that were materially indistinguishable

from United States Supreme Court precedent and arrived at a

different result than the Supreme Court. <u>Eley v. Erickson</u>, 712

F.3d 837, 846 (3d Cir. 2013) (citing <u>Williams v. Taylor</u>, 529 U.S.

362, 405-06 (2000)).[3]

## "UNREASONABLE APPLICATION" STANDARD

Elaborating on the "unreasonable application" standard, the Supreme Court has held that a habeas court may only "issue the writ in cases where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." <u>Harrington v. Richter</u>, __ U.S. __, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011).  An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. <u>Eley</u>, 712 F.3d at 846 (quoting <u>Renico v Lett</u>, 130 S.Ct. 1855, 1862 (2010).  A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Id</u>. at 407-09. <u>See also</u> <u>Moore v.</u>

_____

[3] As explained by Justice O'Connor, a state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent," <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000), cited in <u>Ely v. Erickson</u>, 712 F.3d 837 (3d Cir. 2013).

<u>DiGuglielmo</u>, 489 F.App'x 618, 624 n. 2 (3d Cir. 2012). To be an "unreasonable application" of clearly established federal law, or that the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. <u>Matteo v. Superintendent</u>, 171 F.3d 877, 890 (3d Cir. 1999). As further explained in <u>Kamienski v. Hendricks</u>, 332 Fed. Appx. 740 (3rd Cir. 2009):

> "[A]n <u>unreasonable</u> application of federal law
> is different from an <u>incorrect</u> application of
> federal law." <u>Williams</u>, 529 U.S. at 410, 120
> S.Ct. 1495 (emphasis in original).

In <u>Kamienski</u>, the Third Circuit granted petitioner's habeas application, holding that the evidence did not support the criminal conviction for first degree murder and felony murder.

### "CLEARLY ESTABLISHED FEDERAL LAW"

The phrase "clearly established Federal law" "refers to the holdings, as opposed to the dicta" of the United States Supreme Court's decisions. <u>Williams</u>, 529 U.S. at 412. As further explained in <u>Lambert v. Blackwell</u>, 387 F.2d 210, 234 (3d Cir. 2004), <u>cert.</u> <u>denied</u> 544 U.S. 1063 (2005) (quoting <u>Williams v.</u> <u>Taylor</u>, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)), "A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'" In <u>Harrington v. Richter</u>, __ U.S.

9

___, 131 S.Ct. at 786, the Supreme Court held that the petitioner must show that there is "no possibility fair-minded jurists would disagree that the state court's decision conflicts with" Supreme Court case law.

As petitioner Tedesco's main argument concerns the pervasive, deliberate, and extremely prejudicial prosecutorial misconduct throughout his trial (culminating in the State's closing argument), an analysis of habeas law as to prosecutorial misconduct (and improper closing statements) follows.

PROSECUTORIAL MISCONDUCT AS GROUNDS FOR HABEAS RELIEF

Ninety years ago Roscoe Pound observed that;

> The number of new trials for grave misconduct of the public prosecutor which may be found in the reports throughout the land in the past two decades is significant.  We must go back to the seventeenth century-to the trial of Raleigh or to the prosecution under Jeffreys-to find parallels for the abuse and disregard of forensic propriety which threatens to become staple in American prosecutions. Roscoe Pound, Criminal Justice in America 187 (1930).

See Bennett L. Gershman, Prosecutorial Misconduct § 10.1, at 10-2 (updated 1996) (noting misconduct has in fact "become staple in American prosecutions" and "such misconduct shows no sign of abating or being checked by institutional or other sanctions."

Judge Jerome Frank reiterated his concern for prosecutorial misconduct more than 70 years ago in United States v. Antonelli Fireworks Co., 155 F.2d 631, 661 (2d Cir. 1946) Frank, J., dissenting:

10

> This court has several times used vigorous language in denouncing government counsel for such conduct as that of the United States Attorney here. But, each time, it has said that, nevertheless, it would not reverse. Such an attitude of helpless piety is, I think, undesirable . . . If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it . . . Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice of this court-recalling the bitter tear shed by the Walrus as he ate the oysters-breeds a deplorably cynical attitude towards the judiciary.

## STANDARD OF REVIEW -- PROSECUTORIAL MISCONDUCT

The most basic rule as to the limits of closing argument is that it must be confined to the record evidence and reasonably drawn inferences. ABA Standards for Criminal Justice 3-5.9, cmt. at 107 (1993). The appropriate standard of review for a habeas corpus claim alleging prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." See Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974)). In 1986 the Supreme Court in Darden addressed the issue of habeas review of inflammatory rhetoric during a prosecutor's closing argument. The Court considered whether a due process violation had occurred when a prosecutor made extremely inflammatory comments in summation, including calling defendant "an animal" while comparing his brutality with the goodness of the victims. Id. at 179 n. 7. While the

11

prosecutor described the crime in emotive terms prior to unleashing a shocking tirade against the defendant, the majority of justices found harmless error, though the dissenting opinion characterized "a relentless and single-minded attempt to inflame the jury." Id. at 192 (Blackmun, J., dissenting).

The Darden test considers "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Parker v. Matthews, __ U.S. __, 132 S.Ct. 2148, 2143, 183 L.Ed.2d 32 (2012) (quoting Darden, 477 U.S. at 181).   The court must look at the totality of the circumstances in deciding whether the egregiousness of the prosecutor's alleged misconduct justifies relief. United States v. Young, 470 U.S. 1, 11-12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (noting the importance of context, including defense counsel's conduct).   In Young the prosecutor's remarks (stating his opinion that defendant was guilty and urging the jury to "do its job") made in rebuttal argument to defense counsel's impugning the integrity of prosecutor, though error, did not constitute "plain error" (absent a timely objection by defense counsel) and the challenged argument did not undermine the fairness of the trial.

The Supreme Court has described prejudicial appeals to the jury as "foul blows" that "are apt to carry much weight against the accused." Berger v. United States, 295 U.S. 78, 88 (1935). As explained in Berger, a prosecutor "is the representative not of an ordinary party to a controversy . . . It is as much his

12

duty to refrain from improper methods calculated to produce a
wrongful conviction as it is to use every legitimate means to
bring about a just one." 295 U.S. at 88. See Young, 470 U.S. at
26 n. 4 (1985) (Brennan, J., dissenting) (criticizing the notion
"that a trial is something like a schoolyard brawl between two
children.  Such an excuse smacks of the 'sporting theory of
justice,' a theory long recognized as 'only a survival of the
days when a lawsuit was a fight between two clans'").  In Young
the Supreme Court recognized that "the prosecutor's opinion
carries with it the imprimatur of the Government and may induce
the jury to trust the government's judgment rather than its own
view of the evidence." 470 U.S. at 18-19 (holding that "the
prosecutor's remarks unfairly prejudiced the jury's deliberations
or explained the Government's prestige in the eyes of the jury."

In Gardner v. Florida, 430 U.S. 349 (1977), a plurality of
the United States Supreme Court concluded that "petitioner was
denied due process of law when the death sentence was imposed, at
least in part, on the basis of information which he had no
opportunity to deny or explain." (Id. at p. 362.)  In reaching
that conclusion, the court stated:

>                It is now clear that the sentencing
>      process, as well as the trial itself, must
>      satisfy the requirements of the Due Process
>      Clause. Even though the defendant has no
>      substantive right to a particular sentence
>      within the range authorized by statute, the
>      sentencing is a critical stage of the
>      criminal proceeding at which he is entitled
>      to the effective assistance of counsel. The
>      defendant has a legitimate interest in the

13

> character of the procedure which leads to the
> imposition of sentence even if he may have no
> right to object to a particular result of the
> sentencing process. (Id. at p. 358.)

Generally, a prosecutor's improper remarks require reversal of a state conviction only if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. at 643. Alternatively, if the alleged prosecutorial misconduct denied the petitioner a specific constitutional right (rather than the general due process right to a fair trial), a valid habeas corpus claim may be established without proof that the entire trial was rendered fundamentally unfair. Paxton v. Ward, 199 F.3d 1217 (10th Cir. 1999).  Inquiry into fundamental fairness requires examination of the entire proceedings, including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase. Donnelly, 416 U.S. at 643.  Any cautionary steps—such as instructions to the jury—offered by the court to counteract improper remarks may also be considered. Darden, 477 U.S. at 183.

### FACTORS TO BE CONSIDERED UNDER SUPREME COURT DECISIONS WHEN CONSIDERING PROECUTORIAL MISCONDUCT DURING SUMMATIONS

The Supreme Court has considers several factors to determine whether comments at trial are fundamentally unfair:

> (1) whether the comments were isolated
> or pervasive; (2) whether they were
> deliberately or accidentally placed before
> the jury, (3) the degree to which the remarks
> had a tendency to mislead and prejudice the

defendant, (4) whether the prosecutor manipulated or misstated the evidence, (5) the strength of the overall proof establishing guilty, (6) whether the remarks were objected to by counsel, and (7) whether a curative instruction was given by the court. <u>Darden v. Wainright</u>, 477 U.S. 168, 182-83 & n. 14 (1986); <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 339 (1985); <u>United States v. Young</u>, 470 U.S. 1, 12-13 (1985); <u>Donelly v. DeChristoforo</u>, 416 U.S. 637, 646-47 (1974); <u>Berger v. United States</u>, 295 U.S. 78, 84-85 (1935).

### FEDERAL APPEALS REVERSALS DUE TO PROSECUTORIAL MISCONDUCT IN CLOSING STATEMENTS

The following federal appellate courts have overturned convictions based (at least in part) on improper summations:

First Circuit: <u>United States v. Roberts</u>, 119 F.3d 1006 (1st Cir. 1997) (unanimous plain error reversal for cumulative errors, including prosecutor's misstatement of burden of proof and government's duty to prove guilt beyond a reasonable doubt, where prosecutor told jury that when the defense does go forward with the evidence, "the defendant has the same responsibility [as the government] and that is to present a compelling case"; court saw this as a deliberate attempt to call attention to defendant's failure to testify); <u>United States v. Hardy</u>, 37 F.3d 753 (1st Cir. 1994) (unanimous reversal for indirectly commenting on defendant's failure to testify where prosecutor argued that defendant was "still running and hiding" during trial); <u>United States v. Manning</u>, 23 F.3d 570 (1st Cir. 1994) (unanimous reversal for, among other improper arguments, argument—without evidence in record to support it-that partial prints on drugs and

15

weapons implicated defendants; <u>United States v. Udechukwu</u>, 11 F.3d 1101 (1st Cir. 1993) (knowing use of false evidence); <u>Arrieta-Agressot v. United States</u>, 3 F.3d 525 (1st Cir. 1993) (unanimous reversal for plain error when prosecutor used "150-proof" war on drugs rhetoric in light of two previous decisions condemning such argument; "Almost any argument made in summation can be described as deliberate, but that several paragraphs of 150-proof rhetoric in this case oversteps the bounds by a wide margin").

Second Circuit: <u>Agard v. Portuondo</u>, 117 F.3d 696 (2d Cir. 1997) (Confrontation Clause violation for prosecutor to argue that defendant in a rape case was the only witness who got to listen to the other witnesses and therefore could fabricate his testimony to match theirs; this violated right to confrontation, penalizing him for exercising his right to be present at trial, his right to testify and his right to due process); <u>United States v. Forlorma</u>, 94 F.3d 91 (2d Cir. 1996) (unanimous reversal because prosecutor repeatedly claimed incorrectly that evidence showed that clothes found in suitcase carried by defendant fit defendant where defendant claimed he was carrying case for someone else); <u>United States v. Friedman</u>, 909 F.2d 705 (2d Cir. 1990) (unanimous reversal where prosecutor told jury some people "go out and investigate drug dealers and prosecute" while "there are others who defend them, try to get them off, perhaps even for high fees"-a remark that "undermine[d] the presumption of

innocence, the Government's obligation to prove guilty beyond a
reasonable doubt; and the standards of propriety applicable to
public prosecutors"); <u>Floyd v. Meachum</u>, 907 F.2d 347, 355-56 (2d
Cir. 1990) (unanimous granting of habeas because defendant denied
a fundamentally fair trial by cumulative errors; that repeated
references to the defendant as a liar were clearly excessive and
inflammatory, and prosecutor's improper vouching that "invited
the jury to view its verdict as a vindication of the prosecutor's
integrity rather than as an assessment of guilt or innocence
based upon the evidence presented at trial"; prosecutor
juxtaposed "Fifth Amendment burden of proof beyond a reasonable
doubt" with the argument that "if there was confusion in this
case, from whence did that come?"; court found these references
to the Fifth Amendment "puzzling," and that in context the
references "could well have been interpreted by the jury as
comment on Floyd's failure to testify" and were a violation of
due process).

Third Circuit: <u>United States v. Molina-Guevara</u>, 96 F.3d 698
(3d Cir. 1996) (discussed <u>infra</u>); <u>Lesko v. Lehman</u>, 925 F.2d 347
(1991) (holding as improper without discussion of intent a
comment that defendant did not say he was sorry at penalty phase
and that jury should show him same mercy he showed victims);
<u>United States v. Liburd</u>, 607 F.3d 339 (3d Cir. 2010) (prosecutor
acted improperly in introducing evidence that defendant told an
airport security officer that the two masses of organic matter in

17

his luggage were cheese and defendant was deprived of a fair trial; **United States v. Morena**, 547 F.3d 191 (3d Cir. 2008) (government's systematic injection of evidence of drug use and dealing by defendant amounted to prosecutorial misconduct in violation of due process); **Moore v. Morton**, 255 F.3d 95 (3d Cir.2001) (habeas granted due to prosecutor's prejudicial references to race); **Eley v. Erickson**, 712 F.3d 837 (habeas granted as state court unreasonably applied Confrontation Clause law by approving admission of non-testifying codefendant's redacted statement).

Fourth Circuit: **United States v. Wilson**, 135 F.3d 291 (4th Cir. 1998) (holding that the prosecutor's decision to argue that defendant had committed an uncharged, unproven and essentially irrelevant murder "appears to have been a deliberate, calculated decision to assert facts not in evidence in order to divert the jury from the real issues in the case."; **United States v. Mitchell**, 1 F.3d 235 (4th Cir. 1993) (unanimous plain error reversal for cross-examination and argument that defendant's brother had been convicted of the same crime and jury obviously had not believed brother's testimony at brother's trial, so this jury should not believe him either, and also that prior conviction of brother was substantive evidence against defendant, when brother's conviction was admitted solely for impeachment).

Fifth Circuit: **United States v. Johnston**, 127 F.3d 380, 393-402 (5th Cir. 1997) (reversal of conviction of one defendant in

multi-defendant trial because (1) closing argument telling jury not to consider defendant's silence was intended to call attention to defendants' failure to testify and (2) deliberate questioning was designed to bring out inadmissible hearsay prejudicial to that defendant); <u>United States v. Flores-Chapa</u>, 48 F.3d 156 (5th Cir. 1995) (unanimous plain error reversal and acquittal because of prosecutor's improper reference both in summation and in questioning of witnesses to excluded post-arrest hearsay statement by son-in-law implicating the alleged co-conspirator father-in-law where statement was virtually only evidence linking father-in-law to conspiracy).

Sixth Circuit: <u>Eddleman v. McKee</u>, 471 F.3d 576 (6th Cir. 2006) (state court determination that erroneous admission of confession was harmless was unreasonable application of federal law); <u>Gravley v. Mills</u>, 87 F.3d 779 (6th Cir. 1996) (2-1 overturning of state conviction on habeas because of prosecutor's repeated references to post-Miranda silence (Doyle error) in cross-examination of defendant and in closing argument); <u>United States v. Carroll</u>, 26 F.3d 1380 (6th Cir. 1994) (unanimous reversal for arguing that plea agreement by government witness ensured that his testimony was truthful); <u>Martin v. Parker</u>, 11 F.3d 613 (6th Cir. 1993); (state child molestation conviction overturned on habeas because prosecutor compared defendant to Adolf Hitler and made repeated references, despite trial judge's warnings, to prior sexual misconduct by defendant and made racial

19

remarks as well); <u>United States v. Payne</u>, 2 F.3d 706 (6th Cir. 1993) (unanimous reversal because prosecutor's references to the plight of poor children, Christmas time, and the GM layoff were inflammatory and prejudicial in postal employee's trial for obstruction and desertion of mails); <u>United States v. Solivan</u>, 937 F.2d 1146 (6th Cir. 1991) (unanimous reversal because prosecutor's appeal to community conscience—"tell her and all of the other drug dealers like her . . . that we don't want that stuff in Northern Kentucky"- in context of war on drugs and suggestion that drug problem facing jurors' community would be increased if they did not convict violated defendant's constitutional right to a fair trial); <u>Sizemore v. Fletcher</u>, 921 F.2d 667 (6th Cir. 1990) (unanimous overturning of state murder conviction on habeas where, among other improprieties, prosecutor implied that defendant's attorneys were helping him to generate an alibi and to "get . . . [his] story straight" and prosecutor appealed to class biases against defendant's wealth, which allowed him to afford seven lawyers; Court stated: "repeated and deliberate statements clearly designed to inflame the jury and prejudice the rights of the accused") .

    Seventh Circuit: <u>United States v. Cotnam</u>, 88 F.3d 487 (7th Cir. 1996) (unanimous reversal for prosecutor's improper reference to defendant's failure to testify and for improper vouching, where prosecutor told jury that "[p]art of the plea agreement is also that Mr. Martin testify truthfully," submitted

20

that "he has testified truthfully," and on at least four other
occasions argued that Martin was credible or forthright);
prosecutor also improperly argued that government evidence was
uncontroverted and reminding jury that defendant "doesn't have to
put evidence on"); <u>Freeman v. Lane</u>, 962 F.2d 1252 (7th Cir. 1992)
(unanimous overturning of state conviction on habeas for repeated
remarks that evidence was "unrebutted and uncontradicted").

Eighth Circuit: <u>United States v. Cannon</u>, 88 F.3d 1495 (8th
Cir. 1996) (unanimous reversal because of argument that twice
called defendants "bad people" and made thinly veiled reference
to them not being locals in rebuttal closing argument where
objections were overruled); <u>Miller v. Lockhart</u>, 65 F.3d 676 (8th
Cir. 1995) (death penalty conviction unanimously overturned on
habeas because of racial discrimination in jury selection, but
court goes no to rule that closing argument I penalty phase was
due process violation as well because of numerous improper
arguments including: (1) with no evidence of it, that family of
victims was waiting for death verdict; (2) cost of incarceration
should not be borne by taxpayers; (3) defendant never said he was
sorry; (4) argument with no evidence that defendant had escaped
from prison previously; (5) argument that defendant was a mad dog
who could escape; and (6) urging jury not to reach a compromise
and give him life without parole because he could escape);
<u>United States v. Johnson</u>, 968 F.2d 768 (8th Cir. 1992) (unanimous
reversal of drug convictions because of prosecutor's appeal to

21

jury to be "bulwark" against drug dealing); <u>United States v. Roark</u>, 924 F.2d 1426, 1434 n. 10 (8th Cir. 1991) (unanimous reversal because of "government's attempt to tie the Appellant's guilt directly to his association with the Hells Angels Motorcycle Club constitutes reversible error").

Ninth Circuit: <u>United States v. Frederick</u>, 78 F.3d 1370 (9th Cir. 1996) (unanimous reversal of a conviction for aggravated sexual assault because of cumulative errors, including the prosecutor's use during closing argument of testimony previously stricken by the court; prosecutor backhandedly complimented defense counsel on his skill in confusing the alleged victim of sexual assault when cross-examining her, and telling the jury that defense counsel will ask the jury to "look at little bits and pieces "of the evidence, while the government and the judge will ask the jury to consider" all of the evidence-a "serious misstep" contributing to reversal); <u>United States v. Kojayan</u>, 8 F.3d 1315 (9th Cir. 1993) (repeated and deliberate false denials and argument by government that it was unable to produce key witness for cross examination); <u>United States v. Foster</u>, 985 F.2d 466 (9th Cir. 1993) (reversal based on improper questioning of defendant regarding post-arrest silence (<u>Doyle</u> error); reference to silence in closing argument cured by admonition following timely objection); <u>Commonwealth v. Mendiola</u>, 976 F.2d 475 (9th Cir. 1993), overruled on other grounds by <u>George v. Camacho</u>, 119 F.3d 1393 (9th Cir. 1997) (unanimous reversal for among other

things, prosecutorial misconduct in implicitly threatening the jury's safety, holding "[t]he prosecutor's suggestions that Mendiola would walk out of the courtroom right behind them, if acquitted, and would presumably retrieve the missing murder weapon was particularly improper because the prosecutor knew that his witness, the informer Reyes, was responsible for the missing gun"); United States v. Kerr, 981 F.2d 1050 (9th Cir. 1992) (unanimous plain error reversal where prosecutor asked jury whether they asked if the witnesses were "hoodwinking me" when he presented their testimony, and also gave his personal opinion of the credibility of witnesses); United States v. Smith, 962 F.2d 923 (9th Cir. 1992) (plain error reversal for "repeated comments aimed at establishing his own veracity and credibility as a representative of the government," particularly the comment that "if I did anything wrong in this trial, I wouldn't be here.  The court wouldn't allow that to happen," which "placed the imprimatur of the judicial system on" prosecutor's credibility); Brown v. Borg, 951 F.2d 1011 (9th Cir. 1991).

Tenth Circuit: United States v. Novak, 918 F.2d 107 (10th Cir. 1990) (misconduct during opening statement; court found prosecutor violated good faith standard by intentional conduct stating in opening argument "a citizen reported and provided information to various DEA agents that the defendant . . . was selling cocaine from his house" and also stated he would introduce evidence that cocaine was 91% pure  but failed to back

up either claim); <u>Mahorney v. Wallman</u>, 917 F.2d 469 (10th Cir. 1990) (state conviction unanimously overturned because of broad range of improper remarks by the prosecutor including misstatement of law of what constitutes proof beyond a reasonable doubt).

Eleventh Circuit: <u>United States v. Alzate</u>, 47 F.3d 1103 (11th Cir. 1995) (knowing false argument while deliberately suppressing exculpatory evidence that would demonstrate fairness); <u>Davis v. Zant</u>, 36 F.3d 1538 (11th Cir. 1994) (knowingly false argument); <u>United States v. Crutchfield</u>, 26 F.3d 1098 (11th Cir. 1994) (misconduct during opening statement); <u>United States v. Blakey</u>, 14 F.3d 1557 (11th Cir. 1994) (unanimous reversal for arguing facts not in evidence-that defendant was a professional criminal); <u>Nelson v. Nagle</u>, 995 F.2d 1549 (11th Cir. 1993) (unanimous overturning of state death sentence on habeas where prosecutor read capital jury a portion of state supreme court opinion urging no mercy for murderers in violation of Eight Amendment); <u>Presnell v. Zant</u>, 959 F.2d 1524 (11th Cir. 1992) (same).

D.C. Circuit: <u>United States v. Donato</u>, 99 F.3d 426 (D.C.Cir. 1996) (unanimous reversal for prosecutor's inaccurate statement of evidence concerning the motive of defendant to commit crime; court also holds that judge's comments to defendant and constant criticism of defense counsel were reversible) ; <u>United States v. Teffera</u>, 985 F.2d 1082, 1089 n. 6 (D.C.Cir.

24

1993) (holding that alternate ground for reversal was
prosecutor's repeated references in closing argument to alleged
eye contact between codefendants at time of arrest—an argument
that was not supported by evidence, was clearly improper, and
would merit reversal despite any curative instructions because
"phantom evidence" was a key part of closing argument); <u>United
States v. Doe</u>, 903 F.2d 16 (D.C.Cir. 1990) (unanimous reversal
for constitutional error when prosecutor made summation referring
to Jamaicans taking over Washington, D.C. drug trade).

<u>EASTERN DISTRICT OF NEW YORK REVERSAL<br>
DUE TO PROSECUTORIAL MISCONDUCT</u>

In <u>Williams v. Artus</u>, 2013 WL 4761120 (E.D.N.Y. 2013), the
Honorable John Gleeson, U.S.D.J. of the United States District
Court, Eastern District of New York granted Eric Williams' habeas
petition.  Petitioner and his girlfriend, Rebecca Madigan, were
involved in a high-speed drug-related car chase.  Williams was
driving his car; Madigan was his passenger.  They were chasing a
car driven by Melissa Singh; Candace Arena and Melissa Weiner
were her passengers.  A shot was fired from Williams's car at
Singh's car, which lost control and crashed, killing Arena and
seriously injury Singh and Weiner. <u>Id.</u> at 1.  Williams went to
trial for depraved indifference murder--the issue was who fired
the shot: Madigan testified for the State that it was fired by
Williams; Williams testified that Madigan fired the shot. <u>Id.</u>

At trial, prior bad act evidence was accidentally elicited:
specifically, Madigan testified that Williams had told her on

25

multiple occasions that "this isn't the first time he's killed somebody.  That he's done it before."  The trial judge gave a curative instruction that they should "completely disregard what that witness said . . . It has no part in this case.  You are to completely disregard [it]."  The prosecutor then stated in summation that Williams had told Madigan that "he had killed people before." Id. at 2.  The District Court granted the writ finding petitioner was deprived of his right to a fair trial by the prosecutor's misconduct in deliberately eliciting inadmissible evidence of a prior uncharged murder by Williams (with inadequate curative instructions).

It should be stated that while the Supreme Court in Brecht denied habeas relief, in Footnote 9 the Court stated a position that is applicable in Tedesco:

> Our holding does not foreclose the
> possibility that in an unusual case, a
> deliberate and especially egregious error of
> the trial type, or one that is combined with
> a pattern of prosecutorial misconduct, might
> so infect the integrity of the proceeding as
> to warrant the grant of habeas relief, even
> if it did not substantially influence the
> jury's verdict. Cf. Greer v. Miller, 483 U.S.
> 756, 769, 107 S.Ct. 3102, 3110, 97 L.Ed.2d
> 618 (1987) (STEVENS, J., concurring in
> judgment).

While the above-cited cases primarily address prosecutorial misconduct as to closing arguments, these cases are included in this ("bad acts") point as it is petitioner's argument that the State's misconduct began with the erroneous admission of the prior bad acts evidence and continued throughout the trial.

26

## THE FACTS SUPPORTING GROUND ONE

Petitioner relies upon the facts stated in his Petition at pages 15-24 with the additional comments.  Gary gave a statement to the Sussex County Prosecutor's Office on July 17, 2012 (nearly 2½ years after the incident), in which Gary stated that when Allison left his residence on Tuesday, March 23, 2010, "she got a flat tire on her company vehicle." (See "County of Sussex — Supplementary Investigation Report" dated July 18, 2012 at 210a). Gary stated that both he and Allison "both thought road construction caused the flat tire." (210a).  Gary stated that when Allison left his resident on Friday, March 26, 2010, "they both noticed that the two tires on the driver side of her vehicle, which were facing the road, were punctured." (210a). Gary stated that "he thought his neighbor may have been the person who punctured the tires and confronted the neighbor about the incident." (Emphasis supplied) (211a).  In spite of this, law enforcement never pursued the neighbor as a suspect in the tire slashings.  This is significant to the 404(b) hearing and motive evidence.  Law enforcement did not investigate Gary's claim related to the neighbor slashing the tires for over two years. The initial flat was never confirmed as a "slash," Gary never saw the tire in the first incident as Allison drove away (she noticed the flat while driving on Route 280).

In addition, Judy did not report the purported admission by petitioner on the evening of March 23, 2010 that he had slashed

27

Allison's tires until the eve of trial more than two years later (at the behest of the Sussex County Prosecutor's Office). (5T169-1).  At trial, petitioner denied slashing the tires and denied making any such admission to Judy. (9T54-7; 9T56-9).  Allison texted petitioner on March 24th stating: "IDK drove over something"—contradicting Judy.

At the conclusion of the testimony, and without any further evidence, the trial court reversed its prior decision and permitted the testimony of both incidents in the State's case-in-chief. (1T93-22 to 94-23).  The trial court indicated that despite no further testimony or evidence on the subject the Court now had sufficient evidence.  In his decision (20a), the trial court relied upon evidence beyond the scope of the hearing.  The trial court indicated that, despite no direct evidence that petitioner committed the act, the circumstantial evidence was strong because of the temporal proximity.  The trial court also indicated that the State's discovery[4] was strong and contained multiple statements allegedly made by petitioner wherein he admitted to having a desire to kill himself or harm anyone who would date Allison.  The court made its determination premised solely on evidence well outside the scope of evidence at the 104 hearing.

---

[4] "Discovery" not introduced at the 104 hearing and not subject to any cross-examination by petitioner consisted entirely of hearsay declarations at a time that he was too drunk to stand or walk himself to the restroom.

The State argued that the tire slashing is relevant to the material issue of who was the aggressor in Allison's residence. The State alleged that since the petitioner filed a notice to claim justification by self-defense that evidence that the petitioner was violent or aggressive towards Allison was a material issue in dispute.  Issues like these are the reason that other bad act evidence is best left for rebuttal, if at all.  The trial court's decision to permit same in the case-in-chief without any knowledge of the petitioner's claims regarding the incident is itself error.  This applies to both incidents as neither is relevant to the narrow question presented in this trial neither "slashing" should survive the first prong.  As discussed by the trial court the second prong may be disregarded if the prior act does not closely mirror the issues in <u>Cofield</u>.[5]

The crux of the argument here rests on the third prong requiring the State to demonstrate by clear and convincing evidence that the other bad act was actually committed by peititioner.  Clear and convincing evidence is "clear, direct and weighty and convincing as to enable either a judge or jury to come to a clear conviction without hesitancy of the precise facts at issue." <u>Matter of Seaman</u>, 133 <u>N.J.</u> 67, 74 (1993).

---

[5]  To be admissible in New Jersey state court, other bad act evidence must be analyzed through the four prong test established in <u>State v. Cofield</u>, 127 <u>N.J.</u> 328 (1992): (1) the other act must be relevant to a generally-disputed material issue; (2) must be of a similar nature to the pending charge and reasonably close in time; (3) must be shown by clear and convincing evidence; and (4) the probative value must not be outweighed by its prejudice.

The record below is devoid of any evidence, direct or circumstantial, tying the petitioner to the tire slashing of March 26.  Even the victim of the slashing told police that she had no idea who committed the act.  The State's argument, which was ultimately accepted, was that the second incident can be "bootstrapped" into the record by the first. (1T85-17).  Permitting the State to do so here was unduly prejudicial and enabled the State to argue that petitioner stalked Allison for a week, and was violent towards her a day before.

Other crimes evidence is highly charged and is rife with the possibility for inappropriately influencing a jury.  The fourth prong is conducting a N.J.R.E. 403 analysis.  Here, the potential for prejudice is exacerbated by the senseless violence of the alleged acts and mitigates against introduction especially in light of the New Jersey Supreme Court's instruction that 404b be a rule of exclusion.

The proffered incidents are highly prejudicial and have few indicia of reliability indicating commission by petitioner.  The only evidence of the first incident is an incredible alleged admission by the petitioner from a woman who did not share this conversation until more than two years had passed and could not remember the date or any of the specific contents of the call.  There is no connection to the events of March 27.  The first tire issue was several days prior to the incident and the alleged victim of the "slashing", the only person known who may have even

30

viewed the tire, left the impression with her paramour that it was the result of a tire defect or road construction.  There was no evidence presented at the hearing that Allison believed her tire was even slashed, let alone that petitioner did it (as reflected in the police report, Gary first suspected his neighbor might have done it; 211a).  The State presented no evidence linking petitioner to the second incident.  They could not establish he was at the scene, they lacked even an alleged admission and when Allison was asked by police if she suspected anyone was responsible she did not indicate anyone.

The Court's reliance on statements, wholly outside the record, as the basis for its admission ruling is plainly improper and merits reversal as the other crime evidence has such a potential for prejudice the admission of same without the appropriate supportive evidence is a manifest denial of justice. There is no doubt that the jury used this evidence against the petitioner as it was implored to do by the State.

The State used this evidence throughout the trial to try to establish a pattern of escalating violence towards Allison.  The commentary regarding the pattern was highly prejudicial and the admission of the evidence in the State's case-in-chief that the night prior to the incident the petitioner slashed the tires of Allison coupled with testimony that petitioner admitted doing same only days before was overwhelmingly prejudicial.  These alleged prior bad acts, despite a profound lack of corroborative

evidence, permitted the jury to view the petitioner in a bad light when he strode to the witness stand based solely on these acts.  This is especially prejudicial in a case where his credibility when testifying is at the crux of the matter.

The 404b evidence was not offered for any purpose permitted under the rule.  It was not sufficiently proximate temporally to have bene part of the charged offense and was certainly unduly prejudicial.  Despite the above, the trial court's actions in making its decision demonstrate a total misinterpretation of N.J.R.E. 404b.  The conduct at the hearing also deprived petitioner of his fundamental Fourteenth Amendment due process right to a fair trial as the Court essentially indicated to the parties that it had made a ruling and would not change same absent new evidence.  New evidence was not introduced and the Court, without providing the defense an opportunity to further probe the area in light of its change of heart, bootstrapped the second incident based upon facially incompetent evidence.  The trial court's supplemental decision makes clear that it premised its ruling of admission on evidence never presented at the 104 hearing and not subject to any scrutiny by petitioner (in direct contravention to the procedures established to meet the dictates of N.J.R.E. 404b).  The trial court abused its discretion.

<u>THE APPELLATE DIVISION'S DECISION</u>

The Appellate Division found "no abuse of discretion . . . for the limited purpose of determining defendant's motive and

intent . . . whether he intended to harm Allison and whether he had a motive for the killing . . .” and “limiting instructions were sufficient.” (<u>Tedesco</u> op. at 8; 198a).

**THE STATE'S ANSWER**

The State writes:

> Here, the Appellate Court found that the trial court properly admitted evidence of the tire-slashing incidents. (Exhibit 10, pages 15 to 23).  The trial court and Appellate Court properly applied state law, which conforms with federal law.  Therefore, the state court decision is not objectively unreasonable as state and federal courts have reached the same conclusion.  Petitioner has failed to demonstrate that the decision of the state courts on this issue was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. (RA14).

**REASONS FOR GRANTING THE WRIT AS TO GROUND ONE**

Petitioner incorporates by reference the cases cited, <u>supra</u>, and submits that due process demands that “state courts conducting criminal trials . . . proceed consistently with that fundamental fairness which is ‘essential to the very concept of justice.’” <u>Lisenba v. California</u>, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)), abrogated on other grounds by <u>Perry v. New Hampshire</u>, __ U.S. __, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012). While “[t]he introduction of unfairly prejudicial evidence against a defendant in a criminal trial” does deprive a petitioner of due process if “the evidence ‘is so extremely unfair that its admission violates fundamental conceptions of justice.’” <u>Dowling v. United States</u>, 493 U.S. 342, 352, 110 S.Ct.

33

668, 107 L.Ed.2d 708 (1990).  In Tedesco, there can be little doubt that the prosecutorial misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Parker v. Matthews, __ U.S. __ , __ , 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012) quoting Darden, 477 U.S. at 181). The evidence of the tire slash went right to the heart of the purposeful murder charge. See Williams v. Artus, supra, in which Judge Gleeson granted the habeas petition due to the prosecutor eliciting prior bad act evidence (that petitioner had killed before) and utilizing that improper evidence in summation.  The constitutional error cannot be considered harmless as it unquestionably would have "a substantial and injurious effect or influence in determining the jury's verdict." Fry v. Pliler, 551 U.S. 112, 116, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (quoting Brecht). See United States v. Wilson, 135 F.3d 291 (4th Cir. 1998) (prosecutor's argument that defendant had committed uncharged, unproven and irrelevant murder improper).[6]  The state court decisions constitute an unreasonable application of established federal law, warranting issuance of the habeas writ.

---

[6] In Miller v. Pate, 386 U.S. 1 (1967), the Supreme Court held that the use by the prosecutor of evidence known to be false was a serious violation of due process of law.  The Court held it was a denial of due process for prosecutor to knowingly introduce underwear supposedly belong to defendant with red stains on it and argue falsely that underwear was stained with blood when the prosecutor knew the stains were red paint.  By "deliberately misrepresent[ing] the truth," the prosecutor violated the "Fourteenth Amendment [which] cannot tolerate a state criminal conviction obtained by the knowing use of false evidence." Id. at 6, 7.

## POINT II

THE PROSECUTORIAL MISCONDUCT THROUGHOUT THE TRIAL
(INCLUDING THE IMPROPER CROSS-EXAMINATION OF PETITIONER)
ALONG WITH A MISLEADING, INNACURATE AND HIGHLY PREJUDICIAL
CLOSING STATEMENT VIOLATED PETITIONER'S FOURTEENTH AMENDMENT
DUE PROCESS RIGHT TO A FAIR TRIAL, FIFTH AMENDMENT RIGHT TO
REMAIN SILENT, AND SIXTH AMENDMENT CONFRONTATION
CLAUSE RIGHT WARRANTING ISSUANCE OF THE WRIT

The State conducted its closing statement on January 8, 2013.  On October 10, 2014, the Superior Court of New Jersey, Appellate Division, in State v. Rivera, 437 N.J. Super. 434 (App. Div. 2014)[7], reversed defendant's aggravated assault convictions on the grounds of prosecutorial misconduct including the use of a PowerPoint presentation in opening and closing statements which displayed the text: "Defendant GUILTY OF: ATTEMPTED MURDER." Though a New Jersey state case, Rivera cited the United States Supreme Court decision in Arizona v. Washington, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1977).  The prosecutor in Tedesco relied extensively on a PowerPoint presentation (the slides of which are annexed at 36a to 128a).  As will be shown, these PowerPoint slides are even worse (both in quantity and quality) than those presented in Rivera.

Prior to the State's summation, the prosecutor stated:

> I'm going to tell you little facts and
> maybe be more specific about what happened in
> the house, what happened before, and what
> happened afterwards.  But I want to tell you
> this caveat beforehand.  You can disagree on
> some of these, and reasonable minds probably

---

[7] Although appellate counsel called the Appellate Division's attention to the Rivera case in petitioner's State reply brief, the Appellate Division did not cite Rivera in its opinion.

> can as to the order.  For example, you might
> find that he shot her in the chin first.  You
> might find he shot her in the nose first.
> (11T53-18 to 21) (emphasis supplied).

At the end of her summation, "I hope what I said makes some sense to you.  To the extent that, as I stated, <u>some of the little facts differ</u> in your mind, from your mind to your mind, don't get lost on the little pieces." (11T104-10 to 14) (emphasis supplied).

These two passages mark the intent on the prosecutor to manipulate, misstate and distort the evidence adduced at trial in her closing statement.  When the prosecutor states "be more specific about what happened, she is laying the groundwork for the lies/alterations she is going to perform.  She is going to tell the jury more than what was testified/presented during the course of the trial.  She acknowledges that "some of the little facts differ."  In this way, the prosecutor conditioned the jury to be biased against petitioner resulting in the guilty verdict.

In its closing statement the State made multiple comments that constitute gross misconduct.  Counsel objected minutes into the summation when the prosecutor stated:

> . . . He was not the one who looked down the
> barrel of a gun; she was.  And she looked
> down the barrel of the gun and she looked him
> in the eye and she saw it and she knew it.
> And I don't know if he said anything to her.
>  But the reason he didn't shoot her in the
> foyer, because he wanted to confront her,
> because he wanted to look at her when he did
> it.  He let her go upstairs.   And he
> probably did talk to her, and he probably
> said, you know what, if I can't have you

36

> nobody can.  And I don't know if she said
> anything, but common sense would tell you
> that she begged for her life, that she said
> don't, I'll go have the cake with you, we'll
> be friends -- (11T58-7 to 19).

Defense counsel objected:

> MR. IACULLO: Judge, I have to object.
> There's nothing in the evidence whatever
> about anything with respect – I didn't want
> to object, Judge, but –
> THE COURT: Save your objections for
> after, please. (11T58-20 to 25).

In accordance with the Court's admonition, defense counsel refrained from objection again until after the summation was complete.  By the time the trial court heard petitioner's arguments and request for a mistrial the proverbial damage had been done and the prejudice was far past the point where a curative instruction was possible to remedy the error.

An integral part of the analysis must be that this was an experienced prosecutor who took advantage of the Court's admonition to defense counsel.  With counsel's hands tied and mouth gagged the prosecutor embarked on a number of improper comments without the threat of objection until much later.

To determine whether the prosecutor's comments were inappropriate, we must inquire whether the prosecutor's legal or factual assertions were accurate and whether the comments were confined to the evidence revealed during the trial and the reasonable inferences to be drawn from that evidence.

A court must consider the allegations of misconduct in light of the totality of the trial.  It is undisputed that this was a

37

highly charged, emotional, trial for all.  Any review of the

record must be viewed through that prism and through the

cumulative effect of the myriad of improper statements.  Many of

these statements cross over between the categories of misconduct

and should not be construed as confined within one category but

rather as a piece of the mosaic of misconduct.

A.    THE "CALL TO ARMS" Statements

Many of the slides included inflammatory material befitting

of what the reviewing courts of New Jersey have deemed a "Call to

Arms" argument.  In United States v. Repak, 852 F.3d 230 (3d Cir.

2017) the Court cited United States v. Riley, 621 F.3d 312, 339

(3d Cir. 2010) for the principle that "[t]here is not per se rule

against invitations to a jury to 'send a message.'"[8]  The

Repak Court explained: "[i]n the context of a 'send a message'

comment, we have observed that '[t]he type of counsel misconduct

that warrants granting a new trial is not generally a single

isolated inappropriate comment, but rather repeated conduct."

Repak, supra, 852 F.3d at 261.  There is no doubt that such

improper statements were offered by the State in petitioner's

trial and, in this case, the "repeated conduct" warned against in

---

[8] In numerous decision, New Jersey courts have sanctioned
prosecutors for urging juries to return convictions "in order to
protect the community and send a message to the criminals." State
v. Morais, 359 N.J. Super. 123, 132 (App. Div.), certif. denied,
177 N.J. 572 (2003); see also State v. Hawk, 327 NJ. Super. 85,
89 (App. Div. 1994) (prosecutor's comment that the jurors could
"make a difference in [their] community" was a "call to arms"
intended to promote partisanship incompatible with the duties of
the jurors);

<u>Repak</u> exists.  Prosecutors are constrained from making
"Inflammatory and highly emotional appeals which have the
capacity to defer the jury from a fair consideration of the
evidence of guilt."[9]  The State's PowerPoint presentation was
neither provided to the trial court nor defense counsel prior to
its being shown to the jurors. (PowerPoint presentation at 36a-
128).

The State's summation was replete with comments and
PowerPoint slides calculated to stoke the emotions of the
jurors.  This began almost from the outset of the closing
argument when the State initially invited jurors to "put yourself
in her shoes," referring to Allison when she encountered
petitioner at the threshold of her door: "[Allison] did let him
in.  And you know why?  Because they were friends, because she
trusted him . . . She's a 22-year-old girl and she's known him
for a long time.  Put yourself in her shoes.  She said, no, he's
not going to do anything." (11T57-16 to 22).

The Appellate Division erred in concluding:

> While emotional and personalized arguments

---

[9] <u>State v. W.L.</u>, 292 <u>N.J. Super.</u> 100, 111 (App. Div. 1996)
(prosecutor's opening remarks, in prosecution for sexual assault
and endangering the welfare of a child, that consisted almost
entirely of a flagrant appeal for sympathy for the victim and a
flagrant attack on defendant's character and credibility and
prosecutor's closing remarks that defendant's actions were "so
unlike what we like to think of as being real and being human,
that victim had given a "blood curling scream," that defendant
had taken victim out of country without permission, that such
action displayed a lack of compassion and humanity, and that
defendant cheated on his wife were improper and substantially
prejudicial to defendant's fundamental right to a fair trial).

inviting jurors to consider how they would
respond to a particular situation are clearly
improper, see State v. Blakney, 189 N.J. 88,
95 (2006), we discern no basis to find this
isolated statement impermissibly inflamed the
jury. (Tedesco at 10; 200a).

### THE STATE'S ANSWER

The prosecutor stated:

As to the "call to arms" comments . . .
[w]hile emotional and personalized arguments
inviting jurors to consider how they would
respond to a particular situation are clearly
improper, this isolated incident did not
impermissibly inflame jurors. (RA17).

### REASONS FOR GRANTING WRIT (THE CALL TO ARMS)

See United States v. Solivan, 937 F.2d 1146 (6th Cir. 1991)

(unanimous reversal due to appeal to community conscience);

B.    THE IMPERMISSIBLE USE OF RELIGIOUS IMAGERY

The State made several religious references for no

legitimate reason other than to incite the fury of the jurors:

The prosecutor stated that petitioner ran away from the

house clutching his cross necklace:

And as he ran, I submit to you, ladies
and gentlemen, that he ran with his bleeding
left hand at some point clutched to his
chest, because we had -- you remember we had
– this is his blood and on his cross was his
blood.  And he ran holding it.  And I don't
think he was praying for her life. (11T74-10
to 15).

This improper statement by the prosecutor was further

emphasized in a slide. (69a).  This slide has the title: "Ran

holding cross with left hand" and above a photo of his shirt the

words "His blood upper left" and above a photo of the cross

40

necklace the words: "His blood back of cross." (69a).

The Appellate Division erroneously stated:

> Defendant next challenges the following statement commenting on defendant running from Allison's house:
>
>> And as he ran, . . . he ran with his bleeding left hand at some point clutched to his chest, because we had—-you remember we had – this is his blood[,], and on his cross was his blood.  And he ran holding it.  <u>And I don't think he was praying for her life</u>. [(11T74-14).] (Emphasis supplied).
>
> Defendant contends this religious imagery had no legitimate use other than to incite the jurors . . . <u>To the extent the religious imagery crossed the line of proper arguments, we do not find this isolated reference denied defendant a fair trial</u>. (<u>Tedesco</u> at 10; 200a; emphasis supplied).

C.   <u>THE IMPERMISSIBLE POWER POINT SLIDES</u>

As reflected with the improper use of religious imagery by the State, (made all the more egregious by utilizing this cross necklace as part of the power point presentation), the visual power of the PowerPoint presentation was fully harnessed by the State in its creation and dissemination of incendiary slides beyond the bounds of any fair comment.  These slides included an enlargement of a picture the barrel of petitioner's gun positioned to be as if it was pointed directly at the jury. (98a).

Also presented was a slide depicting a recently posted photograph of Allison coupled with bullet points describing

traits of Allison including that she was educated, employed, had a new boyfriend and was "wonderful"; specifically, "TCNJ – CAREER – DAUGHTER – NEW BOYFRIEND - WONDERFUL." (44a). None of these were at issue in the matter and are completely irrelevant and outside the scope of any inferences or fair comment and clearly targeted to evoke a visceral reaction from the jury.

The prosecutor stated: "And [Allison] got to die alone in the foyer of her home. And her mother got to go home and find her head." (11T61-2 to 4). This was yet another attempt to elicit sympathy from the jury. It is also an inaccurate statement, since by the time Allison's mother returned from Atlantic City, the police had blocked off the street. The police took Allison's parents to the police station where they were notified (confirmed in the police log).

There was another photo of the gun with an on screen title, "The Murder Weapon." (54a).

The most egregious slide may be the one presented second to last and entitled, "The Truth". This slide had a photo of petitioner in the hospital with the caption, "THE LIVING" across from a photo of Allison in her final resting position with bullet wounds in her face under the caption, "THE DEAD." All of these instances are calculated attempts by the State to distract the jury from its duty through appeals for sympathy and emotion and constitute clear incidences of misconduct by the State.

The Appellate Division unreasonably applied establish

42

federal law (including <u>Brecht v. Abrahamson</u>, <u>Donnelly v.</u>

<u>DeChristoforo</u>, <u>Darden v. Wainwright</u>, <u>Caldwell v. Mississippi</u>, and

<u>Berger v. United States)</u>, when it concluded:

> Defendant contends specific slides, and the
> prosecutor's accompanying statements,
> contained inflammatory material constituting
> an impermissible "call to arms."  We
> disagree.
>     &ast;    &ast;    &ast;
> We find these slides were not unduly
> inflammatory or prejudicial.  The jury had
> already seen photographs of Allison's wounds
> and heard testimony regarding defendant's
> hand wound.  Defendant noted Allison was
> "wonderful" and the jury heard she was a
> college graduate during trial.  Furthermore,
> the trial court found the "murder weapon"
> slide was proper, as the State did not over-
> simplify the law, nor was there a basis to
> conclude these slides had an impermissible
> impact on the jurors. <u>See</u> <u>State v. Michaels</u>,
> 264 <u>N.J. Super.</u> 579, 641 (App. Div. 1993)
> ("There is no basis on which to conclude that
> placing the word 'guilty' on a board had . .
> . an immediate impact upon the
> jurors . . ."), <u>aff'd</u>, 136 <u>N.J.</u> 299 (1994).
>
> (<u>Tedesco</u> at 10-11; 199a-200a).

D.   <u>CASTING ASPERSIONS ON THE DEFENSE AND DEFENSE COUNSEL</u>

During the summation, the State was very critical of the

defense put forth by petitioner and counsel.  This criticism went

beyond the scope of permissible inferences or comment on the

actual facts into the realm of name calling and derision.

E.   <u>POWER POINT SLIDE – ETHNIC ASPERSIONS (THE SPAGHETTI</u>
   <u>DEFENSE POWER POINT SLIDE AND SUMMATION ASPERSION</u>

Both petitioner and his trial counsel are Italian-American,

and, revealed in sections E, F, and G, the prosecutor cast ethnic

aspersions at petitioner in numerous nefarious ways.

43

The State played an animation of a slide where terms describing defenses appeared on screen then were shown to be thrown towards a wall with the term "Spaghetti Defense" appearing on screen. (122a).  The State further explains this during the summation, "I like to call it the spaghetti defense." Then concluding the thought with, "Throw it up on the wall and see what sticks":

> The defendant Mr. Tedesco testified in I like to call it the spaghetti defense.  The reckless behavior, the mere fact of carrying the gun in the back is reckless behavior if you believe he did that.  He said, well, you can believe I did it recklessly by doing that.  He said, well, I don't know what happened.  And then he said, oh, it was an accident.  And then he said part of it was self defense.  And then to me, I asked him, one of my first questions, was this a tragic accident or self defense, and he said, oh, it's a little bit of both.  Throw it up on the wall and see what sticks. (11T102-2 to 13) (emphasis supplied).

The Appellate Division erroneously stated:

> Defendant contends the term "spaghetti defense" cast potential "ethnic aspersions" on defendant, who is Italian, and degraded his counsel's trial tactics.
>
> We conclude defendant's argument lacks merit.  In discussing the term 'spaghetti defense,' the judge was not convinced the term was intended as an 'adverse reflection upon individuals of Italian descent or ethnicity.'  Rather, the judge found it was 'a more generic use of the word.' We agree . . ."
> (Tedesco op. at 11; 201a).

The "spaghetti defense" remark, by itself, could arguably be considered a non-ethnic (but just a generally improper)

44

aspersion.   However, when considered with other Italian-American

aspersions the invidious intent of the prosecutor is apparent.

F.    <u>THE SOPRANOS ASPERSION</u>

The following improper <u>Sopranos</u> reference occurred during

petitioner's cross-examination by the State:

> Q    I'll show you what's been marked S-
> 10.  What was your quote associated with your
> Facebook page?
> A <u>It is a quote from the Sopranos.  It says -
> -</u>
>      <u>Q And what does it say?  Read it to us.</u>
> A <u>"I know how to treat people.  Those that
> are nice to me get treats; those who aren't,
> well, I got this severance thing that I do."</u>
>      What does that mean?
>      Q <u>Did you give that severance thing to
> [Allison]?</u>
> A Ms. Pappas, this is a quote from the
> Sopranos, a very popular TV show at the time.
>  It has nothing to do -
>      Q <u>Did you give her the severance thing,
> Joe?</u>
> A No, I -
>      MR. IACULLO: Objection, Your Honor.
> Objection.
>      THE WITNESS: Please.
>      THE COURT: All right.  Sustained.
>      MS. PAPAS: I have no more questions.
> (10T64-11 to 65-5) (emphasis supplied).

The prosecutor utilized this improper questioning during her

summation:

> I asked Mr. Tedesco about his Facebook
> page, and some of you might think that that
> was trivial.  But, you know, those of you who
> have Facebook pages might put pictures of
> your kids up and you might put a, you know, a
> quote that you like.  But, generally, we try
> to put something on our page that reflects us
> and who we are, kind of like for us older
> people our high school yearbook, we put
> something in there.
> He chose that quote.  It's not

> coincidental that the quote he chose is from
> a TV show about killing people.  And it says,
> "I know how to treat people.  Those that are
> nice to me get treats; those who aren't,
> well, I got this severance thing that I do."
> (11T97-19 to 98-7).

The Court stated:

> THE COURT: there was nothing
> specifically mentioned by you as that coming
> from the Sopranos, if I remember correctly.
> MS. PAPPAS: I said that that – I said it was
> not coincidental that he used a quote from
> the Sopranos, which is the show –
> THE COURT: Then I missed that.
> MS. PAPPAS: Yes. (11T120-1 to 8).

The prosecutor admits that she referenced the <u>Sopranos</u>

quote.  The prosecutor, utilizing petitioner's Italian-American

heritage, managed to inveigle organized crime into the case

though petitioner has no connection to organized crime.  Further

proof of the prosecutor subtly bringing organized crime into the

case (where it did not belong) is proven by her baseless

contention that petitioner held the gun "gangster style."

G.   <u>THE STATE'S IMPROPER "GANGSTER STYLE" REFERENCES</u>

The State improperly referred multiple times to the

petitioner holding the firearm, "Like this, gangster style":

> MS. PAPPAS: And holding the gun like
> this sideways.  Remember when he took the
> stand and he showed you and I said how were
> you holding the gun?  Like this, gangster
> style. (11T59-2 to 5).

Later, the prosecutor stated: "He held it gangster style

like he demonstrated to you." (11T70-12 to 13).  The prosecutor,

tying in the "spaghetti defense" and "Sopranos" slurs, continued

46

to invoke Italian organized crime with the bizarre (and
unsupported) "gangster style" handling of the gun.  Petitioner
never testified to such words or actions, and he never
demonstrated holding the gun in that manner.  During petitioner's
direct examination the following occurred:

> Q Okay. Describe for us, and I'll
> utilize this right now, how she
> possessed the gun and what, if anything,
> was done.
> A Well, if you were standing in the
> doorway, she –
> Q Assume in the doorway right now.
> A Right.  I turned around and she had
> the gun basically the way you have it,
> and it was like almost like presented to
> me.
> Q Okay.  And it was in her right
> hand, correct?
> A Correct.
> Q And the S-123 I'm holding in my
> right hand, and the barrel would be
> pointing toward me up against the thumb
> area?  Is that fair to say?
> A Correct. (9T96-2 to 16).
>
> *          *          *
>
> A Like I said, I told her that I
> was going to Hoboken, that, you know, I
> was taking the gun with me, and just to
> – you know, if I could have it back.  So
> as I was saying this, I was walking
> towards her.  And I went to go grab it
> from her hand like this, and, you know,
> she kind of put like a little bit of a
> grip into the gun.  And I came back, and
> the gun went off when I tried to pull it
> out.  And it looked like it struck her
> in the hand, or you know, somewhere.
> Q All right.  Let's stop that there
> one second, okay?  Did you plan at this
> time for the gun to be discharged.
> A No, I did not.
> Q You say that you approached
> [Allison], she has the gun as I

47

> described it, S-123 in her hand that
> way.  You say that you reached to grab
> the gun, and she grabs onto the gun,
> too?
> A That's correct.
>         Q And the gun is discharged at this
> point, correct?
> A Correct. (9T98-9 to 99-4).

There was no "gangster style" indication or reference by the petitioner.  The State claimed during the subsequent mistrial argument that there was a photo in the newspaper of petitioner holding the gun sideways which she named "gangster style."[10] There was no testimony that petitioner held the gun in that manner.  The testimony was that Allison presented the gun to petitioner and when he tried to grab it out of her hand it was sideways and fired.  This is one of countless times where the State made gratuitous and unwarranted comments to smear petitioner in the eyes of the jury.  No legitimate purpose existed for repeatedly using the term gangster style, except to persuade the jury by guile instead of facts and bringing the specter of gangsterism and Italian organized crime into the case.

Even Judge Conforti agreed with the petitioner:

> But the reference to utilizing the
> weapon in a gangster style, as I said before,
> I believe is <u>inappropriate</u> . . . (11T125-4 to
> 6) (emphasis <u>supplied</u>).

The Appellate Division stated:

> Defendant next argues the State erred by
> twice referring to defendant holding his

---

[10] See <u>New Jersey Herald</u> article dated January 7, 2013 (annexed to this Traverse at Ta1-2), which clearly shows the petitioner on the witness stand demonstrating with his hand in a normal manner.

> firearm "gangster style."  The prosecutor
> stated, "Remember when [defendant] took the
> stand and he showed you[,] and I said how
> were you holding the gun?  Like this,
> gangster style."  However, in denying the
> motion for a mistrial, the court ruled that
> it would strike the reference to "gangster
> style" and during the final charge,
> instructed the jury to disregard the comment.
> We find that judge's responses sufficient.
> (<u>Tedesco</u> at 12; 202a).

A picture of petitioner in the January 7, 2013 <u>New Jersey</u> <u>Herald</u> depicts him with his hand reached out and fingers splayed out but not in any "gangster" fashion (this was during his testimony as to when he went to take the gun out of her hand) (article annexed to this brief at Ta1).  The picture shows him with his fingers splayed out and not even in the shape of a gun.

The above are just a few examples from just one day of testimony.  There are no facts in evidence of any of these conversations or that petitioner "wanted to look at her when he did it."  Likewise these are well beyond any inference that can be made from the testimony in the record.

<b><u>THE STATE'S ANSWER</u></b>

The State writes:

> As to the claim of casting aspersions .
> . . The Appellate Court found this argument
> to lack merit.  The prosecutor used that
> terminology to describe throwing everything
> petitioner could think of up in defense and
> "see what sticks." . . . , petitioner claims
> (RA17-18).

H.  <u>POWER POINT SLIDE - "TAILORED TO THE EVIDENCE"</u>
    <u>ASPERSION</u>

The State also attempted to impugn counsel's credibility by

49

including on a slide that the petitioner's version of events was "tailored to the evidence." (77a).  Such comment alleging impropriety by counsel in conjuring a defense based on the evidence is similarly calculated to imbue petitioner with the stain of dishonesty in a matter where the case largely hinged on the jury's acceptance of petitioner's version of events.

The State impugned counsel's credibility (utilizing a conjured defense) by including a slide that defendant's version of events was "tailored to the evidence." (77a). The Appellate Division concluded:

> Defendant also challenges a PowerPoint slide describing his version of events that included a bullet point, "Tailored to fit the evidence."  Contrary to defendant's assertion, we find this slide did not "imbue" defendant with the "stain of dishonesty" or impugn his counsel's credibility.  The "tailored" statement was one bullet point among nine; for example, other points stated the defendant's testimony was "physically impossible" and "medically impossible."  Further, the prosecutor explained in detail the implausibility of defendant's version when evaluated against the largely uncontroverted physical and medical evidence of record.  We conclude this single bullet point, in the context of the entire trial, did not deprive defendant of a fair trial. (Tedesco op. at 11; 201a).

Absent any evidence of impropriety such commentary is inappropriate.  Interference with the jury's right to make credibility determinations deprived petitioner of a fair trial.

I.   VOUCHING FOR THE STATE'S CASE AND WITNESSES

In many of the reported cases cited, supra, the vouching

50

discussed occurs when the prosecutor inserts his or her personal opinion as to the credibility of police officers. Here, the Prosecutor repeatedly and improperly vouched for her entire case and each and every witness, and vouched for Allison while unfairly denigrating petitioner. In the aforementioned photo slide presentation (44a), a slide contained Allison's picture next to the words, "TCNJ – CAREER – DAUGHTER – NEW BOYFRIEND-WONDERFUL." None of these attributes are at issue in the case and are placed before the jury to engender sympathy, juxtapose her with petitioner and vouch for her credibility.

The very next slide has a less flattering photo of petitioner with the deprecatory commentary: "NOT WORKING – GYM, TANNING, PARTIES – "A PLAYER" – IN LOVE WITH [ALLISON] – REJECTED BY [ALLISON]." (45a). While not factually accurate as petitioner was employed at the time of the incident, it is an attempt to smear his character and make an unfair and clearly inappropriate comparison of the worth of the lives of the petitioner and the victim. (45a).

From almost the outset of her summation the prosecutor framed the trial as "25 vs. 1" (with the 25 State's witnesses credible and petitioner's testimony not credible).

J.  INCORRECT AND IMPROPER 25 TO 1 WITNESS COMPARISON AND WITNESS VOUCHING

From almost the outset of her summation the prosecutor framed the trial as "25 vs. 1." The 25 being the number of witnesses who testified in the State's case in chief versus the

purportedly one witness who testified in petitioner's case:
"Over the course of the trial, you heard from 25 State witness."
(11T61-8 to 9).  It should be stated that the "25 to 1"
contention is incorrect as petitioner's mother and step-father
testified in addition to the petitioner (there were three defense
witnesses and not one).  This erroneous and highly prejudicial
State's theme was brought to the fore in the multimedia
presentation which included slides depicting 25 vs. 1 and an
animation of a scale with the State's witnesses on one side
physically tipping the scale towards Murder.  One slide is
captioned "TESTIMONY" above "25 vs 1." (110a).  Even worse, the
second slide is captioned "WEIGHING TESTIMONY" and depicts a
scale with the "STATE EVIDENCE" being much weightier. (111a).

The prosecutor stated: "You also heard from the other side.
And they don't have to present a case.  They don't have to do
anything.  But they chose to.  You heard from <u>one person</u>, the
only person with a reason to lie." (11T61-17 to 20) (emphasis
supplied).  Later, at the end of her summation, she posed it more
directly and repeated this improper "25 to 1" refrain: "It's
either he didn't do it, if you believe the one, or he did do it,
if you believe the 25." (11T102-24 to 103-1).

The prosecutor also improperly referenced Mr. Reckhow:

> They covered this up, too.  And so did Mr.
> Reckhow.  And his one inconsistency, his one
> inconsistency happens to be he tells the
> prosecutor's office a month or two after the
> shooting, oh, yeah, I made a mistake, I
> actually — he told them that he was shot.

52

> And you want to know why?  I'll tell you why
> Mr. Reckhow changed from the first version.
> Because he was <u>the fifth witness</u>.  We hadn't
> heard from Dr. Kutlu yet about the
> directionality of the wound.  We hadn't heard
> a lot of the testimony yet.  Mr. Reckhow was
> continuing the coverup and just providing
> more possibilities for the defendant to come
> up here and tailor his testimony for you
> later.  All he did was expand the
> possibilities. (11T77-24 to 78-13) (emphasis
> supplied).

The prosecutor yet again referenced the "25 State's
witnesses" versus the number of defense witnesses (implicitly and
explicitly improperly shifting the burden of proof contrary to
the Fifth and Sixth Amendments):

> <u>All 25 of the State's witnesses were
> unbiased and believable</u> and supported what
> [Allison's] wounds told you.  And, again, as
> -- although the defendant doesn't have to
> present a case, he did.  In his head, no
> support whatsoever.  And when you weigh the
> evidence and you weigh the testimony, you'll
> see <u>not just in number</u>, but in quality, the
> State's witnesses prevail and that, in fact,
> the defendant is guilty of murder. (11T98-8
> to 16) (emphasis supplied).

This statement is false, inaccurate and completely
misleading to the jury.

A brief summary of the State's witnesses reveals that none
of the State's witnesses directly inculpated petitioner in the
crime for which he was convicted (a far cry from the prosecutor's
false proclamation that 25 witnesses did so): the Parisi's
testified they saw petitioner leave the house (petitioner
admitted he was there) and did not contradict his testimony.  The
ballistics experts only testified that it was petitioner's gun,

53

which petitioner admitted.

Dr. Shaikh was never presented with petitioner's account of events because he testified prior to petitioner.  He could not list which shots came first, though he determined that they were close-in-time shots.  Petitioner testified Allison and he were in close quarters and struggling when the shots were fired.  No reference to petitioner was made in Dr. Shaikh's testimony; nor was any explanation given as to how things occurred.  Dr. Shaikh did not in any way contradict petitioner.

Dr. Kutlu (who treated petitioner on the night he was shot) was also never presented with petitioner's account.  He roughly, not definitively, determined the trajectory wound.  He gave no explanation as to how the shot happened to petitioner or Allison. He admitted that he was not there to collect evidence.  He also did not contradict the petitioner.

The scientific/medical evidence is flawed; not all of blood was tested.  Drs. Kutlu and Dr. Shaikh never testified as to any crime scene particulars (the Prosecutor's distortion of the science/medical testimony is discussed in detail, infra).

Rita Gallo (Detective NJSP) photographed the scene and testified as to nothing else.  She did not contradict petitioner.

Detective Redfern saw petitioner at hospital.  Petitioner said nothing to him.  While he not properly collect evidence (with no full body photographs, improper collection of clothes).  Redfern did not contradict petitioner.

54

Neither "Jerry," "D.D.," "Ma.M." nor "Gary" testified as to what occurred in the house—nobody did; none of these witnesses contradicted petitioner.

The case was about the incidents on March 27, 2010. Instead, the prosecutor turned into a trial about petitioner being drunk in January and Allison getting a flat tire in March, 2010, for which petitioner was blamed.

Judy B. testified to one tire slash but never saw it happen.  She forgot 10½ minutes of the 11 minute conversation. The State admits to not knowing Judy B.'s character.

Gary said he saw Allison drive away on the night that this was alleged to have happened.  The State never investigated Gary's neighbor (despite Gary's claim in the 3/29/10 statement).

The "25-1" claim is inaccurate and prejudicial.  None of the witnesses in case disproved what petitioner stated.

The State in <u>Ground One</u> writes:

> As to the State vouching for witnesses,
> the prosecutor compared its twenty-five
> witnesses with petitioner's testimony.
> Defense counsel objected and requested a
> curative instruction that the determination
> depends on the quality of the witnesses and
> not the quantity. (Exhibit 26, pages 98 to
> 122; 12T98-8 to 122-10).  The trial court
> granted petitioner's request and a curative
> instruction was given. (Exhibit 26, page 140;
> 12T140-6 to 13). (RA18).

While many of the State's witnesses were "fact" witnesses, no State's witness testified as to what took place in the house.

The implied endorsement of credibility of State's witnesses

55

is improper.  Noteworthy is that the State has apparently grouped petitioner's mother and step-father (whom she requested to be treated as hostile) as part of the "State's witnesses" and who believe petitioner "did it."

The Appellate Division found no error in the "25-1" comments:

> During her summation, the prosecutor stated, "All [twenty-five] of the State's witnesses were unbiased and believable and supported what [Allison's] wounds told to you."  She later added, "It's either he didn't do it, if you believe the one, or he did do it, or you, believe the [twenty-rive]."  In response to these statements, at the close of summation, defense counsel asked the court to instruct the jury, "it's not the number of the witnesses, it's the quality."  The court granted defendant's request, instructing the jury:
>
>> It is not the number of witnesses that each party calls in the case that is important. Rather, it is the quality of the testimony that the various witnesses give to you.  That is the important criterion for you to consider and evaluate putting into effect these particular instructions.
>
> We find this instruction sufficient to overcome any prejudice to defendant.  The court should generally give curative instructions immediately, and should specifically address the problematic statements at issue. See State v. Vellejo, 198 N.J. 122, 134-35 (2009).  Although the judge gave this instruction during his jury charge, we find it sufficient to cure any prejudice, and conclude the prosecutor's comments did not deprive defendant of a fair trial. Wakefield, supra, 190 N.J. at 438. (Tedesco at 11; 201a).

<u>THE STATE'S ANSWER</u>

The State writes:

> As to the State vouching for witnesses, the prosecutor compared its twenty-five witnesses with petitioner's testimony. Defense counsel objected . . . The trial court granted petitioner's request and a curative instruction was given . . . The Appellate Division found this curative instruction sufficient to any prejudice and concluded that the prosecutor's comments did not deprive defendant of a fair trial. (Ra18).

## I. <u>THE ALLEGED ACTIONS OF PETITIONER DURING CROSS-EXAMINATION</u>

Almost immediately after the summation began the State referenced comments she attributed to the petitioner that were allegedly made after the jurors had departed for the day and he had finished his testimony.  Specifically, the prosecutor referred to the petitioner as

> The man who several times in his direct and cross-examination said, I never asked for any of this.  The man who, when I asked him as he was standing over her, was he devastated.  He said, yes, and within 30 seconds was talking about how hard it is for him to sit here and be judged by people.  The man who shooed me away when I was done with my cross-examination, <u>who as you were walking out stood up and cuffed his mouth and whispered something to me.</u>  The man who murdered [Allison]. (11T52-9 to 19) (emphasis supplied).

Defense counsel would later object to this:

> The prosecution referenced that when they had left the room that Joe had cupped his hands and whispered something to the prosecution.  That's not part of the

> testimony.  That's not part of the evidence.
>  And that's not something that they said, nor
> something, Your Honor, that I saw Joe do.
> (11T110-11 to 16).

This alleged conversation was completely outside the record of the trial and certainly not properly before the jurors.  The prosecutor went beyond commentary and became a witness vouching for her own version of an off the record conversation designed to impugn the credibility of the petitioner.

The Appellate Division stated:

> The court found that the reference to
> the defendant cupping his hands towards the
> prosecutor was not part of the evidence in
> this case, struck it from her summation, and
> instructed the jury to disregard it.  We find
> this clear curative instruction to the jury
> removed any prejudice to defendant.  Smith,
> supra, 167 N.J. at 182. (Tedesco op. at 12;
> 202a).

Such a comment is well far afield from facts and inferences that flow from it and is itself sufficient misconduct to deprive the petitioner of his Fourteenth Amendment due process right to a fair trial as it placed inadmissible evidence, contrary to the protections of United States Constitution, before the jury.

Other prosecutorial improprieties during the cross-examination of petitioner are as follows:

Defense counsel objected to the prosecutor approaching and yelling at the petitioner while he testified: "I thought we discussed it.  She wasn't supposed to approach the witness.  She wasn't supposed to yell at the witness.  She's supposed to question him from the podium.  You were going to direct him if

58

there was an issue with that.  We're back to yelling and
screaming in front of him.  This is totally improper cross-
examination, Judge." (10T22-3 to 9).  The Court admonished the
Prosecutor "to remain by the desk or by the podium." (10T22-24
to 25).

The following occurred during cross-examination:

> Q Going up the stairs, did you drip any
> blood on the stairs going up there?
> A I don't know.
> Q If you did, it would be in the
> photograph of that, correct?
> MR. IACULLO: Objection, Your Honor.
> THE WITNESS: I'm not sure.
> MR. IACULLO: How can he possibly –
> THE COURT: Sustained. (10T50-6 to 14).

The following occurred during petitioner's cross-
examination:

> Q How do you think [Allison] felt when
> you shot her six times?
> MR. IACULLO: Objection, Your Honor.
> THE COURT: Sustained.  That answer –
> that comment will be stricken.  The jury is
> instructed to disregard it. (10T62-15 to 20).

K.    INACCURACY OF THE PROSECUTOR'S/STATE'S ASSERTIONS

The touchstone of the analysis must begin with a
determination of whether the State's comments were legally and
factually accurate and whether the comments and assertions were
premised on evidence revealed during the trial and proper
inferences drawn therefrom.  Even a generous reading of the
summation indicates that it is replete with both factual and
legal inaccuracies and assertions unsupported by the record.
Perhaps most distressing is that many of these lines of argument

were repeated nearly verbatim at different times of the argument
and emphasized by slides in the multimedia presentation.

Primary among these is the aforementioned commentary by the
prosecutor on comments she alleges petitioner made to her as he
was exiting the witness stand outside the presence of the jury.
This alone violates petitioner's constitutional rights to Due
Process (under the Fourteenth Amendment) and confrontation (under
the Sixth Amendment).  This commentary, barely one page into the
State's summation, is only a harbinger of the State's treatment
of the law and facts throughout the argument.  Almost immediately
thereafter the argument introduced statements attributed to
Allison: "She told him, I don't want to be with you Giuseppe
Tedesco, I want to be with [Gary]." (11T54-15 to 17).  There was
never any testimony regarding this statement.  It was fabricated
by the State to advance its argument that petitioner had motive
to kill Allison.

The March 27, 2010 text messages between petitioner and
Allison were in evidence.  The prosecutor chose (instead of
perhaps arguing inferences) to completely mischaracterize the
content of the text messages: "The text messages said, I don't
want to just be your — I don't want to be your girlfriend, I
don't really want to be your friend, don't talk to me anymore."
(11T56-10 to 13).

The Appellate Division stated:

> Deciding the motion for mistrial, the judge
> found the first statements were speculative

and not grounded in the evidence, and later
instructed the jury to disregard these
comments because they were "not based on
evidence from which reasonable inferences can
be drawn." Although the judge did not
specifically address the texts, we find the
language of the curative instruction
sufficient to cover both statements."
(<u>Tedesco</u> op. at 12; 202a).

Conjuring statements was a theme of the State's summation.

The prosecutor stated: "I don't know what the nature of the
conversation was, but I gather from what his testimony was and
what Mr. Tedesco's answer was that he told her (sic) I just
killed [Allison]. Not, I had a fight with her, not a horrible
accident just happened; I killed [Allison]." (11T75-10 to 15).
Here the State admits that it does not know the contents of the
conversation but proceeds to surmise, without any reason to
infer, that petitioner confessed to killing Allison. There is no
evidence more damaging than a confession from the lips of a
defendant. The petitioner made no pre-trial statements to law
enforcement so the State created a confession to aid its case and
deployed it at a time when the defense was helpless to address
the matter. After stating that all the State's witnesses were
credible the prosecutor attacked the credibility of petitioner's
mother and step-father. She argued, absent any support in the
record and despite her withering cross-examination of her own
witnesses that both Reckhows participated in a "cover up" with
petitioner. The State again fashioned a confession out of whole
cloth asserting that petitioner must have told his mother, "I

61

just killed [Allison]." (11T77-4).  She then said that her
credible witnesses have to account for their actions and charged
that they "covered this up." (11T77-24).  This was another
baseless, inappropriate attack on the credibility of witnesses
related to the petitioner.  The State inserted its version of the
event in question regardless of whether it was supported by any
facts within the bounds of any permissible inferences.  If the
assertions are true the State is claiming that the petitioner's
family committed several criminal acts including Perjury and
Obstruction of Justice.

A review of petitioner's cross-examination by the State
reveals the baseless nature of this comment:

> Q Let me pose another scenario.  Isn't
> it true, Mr. Tedesco, that the reason your
> mother fell to the ground was because you did
> tell her you show and killed [Allison]?
> A No.  That is not true.
> Q Because she was devastated?
> A That is not true.
> Q And at that point she had to decide,
> do I protect my son or do I call the police?
> MR. IACULLO: Objection, Your Honor.
> THE WITNESS: That is not true.
> THE COURT: I'll sustain as to the form
> of the question. (10T59-14 to 60-1).

The Appellate Division stated:

> Contrary to defendant's assertion of falsity,
> the court noted this statement was a
> reasonable inference based on the "dynamics
> of what was taking place at that particular
> point in time," that defendant's parents
> would have asked him how he was shot, and
> defendant would have answered.  As defendant
> admitted to shooting Allison, albeit by
> accident and then in self-defense, we find
> this comment proper as a reasonable inference

from the testimony. (<u>Tedesco</u> op. at 12;
202a).

The prosecutor argued that petitioner had cupped his hand while the jury was present:

> The cupping of the hand happened
> while the jury was here.  I actually
> made a comment about it, <u>not on the</u>
> <u>record</u>, but to the rest of the members
> of my office as it was happening.  He
> stood up right there as they were in the
> jury box funneling out, and he put his
> hand to his mouth and whispered
> something to me.[11] (11T115-18 to 24)
> (emphasis supplied).

Judge Conforti found that the prosecutor's statement about the petitioner cupping his hand was also "inappropriate":

> . . . also the reference to the defendant
> cupping his hands towards the assistant
> prosecutor, that was, according to Ms.
> Pappas, while the jury was exiting the
> courtroom.  That's not a part of the evidence
> in this particular case.  And to the extent
> that both of those comments were made, the
> jury will be instructed to disregard them.
> (11T125-6 to 12).

The prosecutor described its version of events leading to Allison's death attributing thoughts and motivations to petitioner not in evidence.[12]   The Appellate Division stated:

> Defendant contends the State erred by
> suggesting "the reason [defendant] didn't

---

[11] This is a false statement borne out by listening to the audio
(coughing is only detected).

[12]  After numerous objectionable comments by the prosecutor
discussed, <u>supra</u> (11T58-11 to 13; 11T58-15 to 16; 11T58-17 to 19)
were objected to by defense counsel, the trial judge told him to
"[s]ave your objections for after, please." (11T58-20 to 25).
During her summation at 11T58-1 to 19, the entire section is a
false dialogue.  Nobody testified to this false narrative.

shoot her in the foyer [was] because he
wanted to confront her, because he wanted to
look at her when he did it," and that
defendant thought, "if I can't have [her]
nobody can."  She also stated Allison likely
"begged for her life" and said "I'll go have
the cake with you, we'll be friends" when
defendant arrived at her house.  Given the
unexpected appearance of defendant at her
home with a gun and the testimony of
defendant's statements about Allison, we find
the prosecutor drew a reasonable inference
from the evidence in the record in making
these comments. (<u>Tedesco</u> op. at 12; 202a).

THE STATE'S ANSWER

The State writes:

    As to the inaccurate factual and legal
    assertions, petitioner argues that the
    prosecutor attributed statements to Allison
    regarding what she may have said to
    petitioner.  The trial court found the
    prosecutor's statements to be speculative and
    instructed the jury to disregard them as they
    were "not based on evidence from which
    reasonable inferences can be drawn." . . .
    The prosecutor also stated that petitioner
    told his parents he had "killed Allison."
    The trial court found there was evidence in
    the record to support such an inference. . .
    . Finally, the prosecutor indicated that the
    judge would instruct them on the law as to
    murder, aggravated manslaughter, manslaughter
    and other charges, but they would they would
    ultimately find petitioner guilty of murder.
        The Appellate Court found that none of
    these comments deprived petitioner of a fair
    trial . . . The Appellate Court found that
    the curative instruction was sufficient to
    cure any factual errors, and the prosecutor's
    statement of the law was balanced by the jury
    being repeatedly told that the court would
    instruct them on the law. (RA18-19).

L.   <u>PROSECUTORIAL MISCONDUCT DUE TO THE STATE'S DISTORTION
     AND IMPROPER USE OF THE MEDICAL AND SCIENTIFIC TESTIMONY</u>

In summation, the prosecutor improperly interpreted,

distorted, contradicted the facts (and herself) and utilized the medical testimony to create a false narrative that greatly prejudiced petitioner.  This misconduct cannot be overstated--the only read-back (audio playback) requested by the jurors, on day two of deliberations, was Dr. Shaikh's testimony. (Tr. 1/9/13; 8-4 to 5).

The prosecutor again created a false narrative:

> Here's the phone.  She's standing right here near the stairs.  He's right here.  So if he's got the gun, this over there is the sink, he stands right like this to her.  She's not reaching for the phone with her right hand.  She's going to get it with her left hand, unless he puts it up — she puts her hands up, just like this, she grabs it, because instinctively you want to stop the bullet even though you know you can't he puts her other left hand up there, <u>and that's how she gets the gunshot residue on her hands</u>. (11T59-6 to 15) (emphasis supplied).

The State provided no experts/reports or testimony regarding this matter.  Instead, the prosecutor gave her improper "expert" opinion testimony.

Later, the prosecutor contradicted herself when she stated: "This particular case, we knew we were going to find gunshot on her.  She had it.  It was visible.  <u>The test proved nothing</u>." (11T96-11 to 13) (emphasis supplied).  The State's admission that "[t]he test proved nothing" undercuts its argument.  She gives an example of "science" where she uses it to say how something happened, and then later states that it proved nothing.  The

prosecutor stated: "And I don't know whether the bullet stays in her hand because it's a low-caliber gun, or it falls to the ground." (11T59-16 to 18).   The photo in the PowerPoint presentation at 89a shows the entrance and exit wound of the right hand.   The autopsy report states that, as to the "gunshot wound to right hand," the "trajectory was front to back with the hand held in the anatomical position."   Dr. Shaikh's autopsy report states "Evidence of Injury" that "The enumeration of gunshot wounds is random."   Dr. Shaikh did not know the order of shots (though the prosecutor distorted his testimony by "assuming" the order of shots; discussed <u>infra</u>).   He explained the hand injury matched petitioner's testimony.   The State improperly altered that the bullet did not stay in the hand (as proven by the science).

The prosecutor's rendition of the shooting is false:

> She [Allison] immediately falls to the ground, and <u>her headband falls off</u>, and she's trying to crawl and crawl down and get out the front door and maybe live.  She's just got this shot to her hand.  And he grabs her by the sweater, maybe by the arm, and yanks her up.  And, yes, it did take seconds.  And as she's running for her life, she's fleeing for her life, he's holding onto her by the sweater and they're going down the stairs together and he jams that gun straight into her belly and he looks her in the eye and he pulls that trigger.  His eyes weren't closed.
>
> And within a second more than that, he pulls the gun up and he's about to shoot her in the chest, but because of the movement, he shoots himself.  That's how they get all the bullet wounds in the sweater.  It's all bunched up.  He shoots himself through the hand.  And just as they go down to the ground

- he could have left. (11T59-22 to 60-15)
(emphasis supplied).

This is yet another example of the prosecutor testifying to "facts" with no supporting evidence. This involves expert crime scene reconstruction testimony, of which there was none.

The prosecutor later stated: ". . . her headband is knocked off by the shot." (11T71-4 to 5). The prosecutor contradicted herself; first stating the headband fell off, then that it was "knocked off" by the shot. The headband had neither gunshot residue nor a bullet hole, and was not in evidence at trial. The prosecutor stated: "His actions, however, in this house, <u>as exhibited by the blood</u>, tells us what happened. (11T70-8 to 9) (emphasis supplied) is contradicted by her own statement: "And, yes, not all the blood was not tested." (11T70-19). Science was unable to determine whose blood was where (not all blood was tested). No crime scene reconstruction expert testified.

The prosecutor stated:

> And as I said, I don't know if it got stuck in her hand. <u>There's some questions that we're not going to be able to answer. Or whether it fell immediately to the ground and it was kicked down as she was crawling. Because we know it ended up downstairs. But under either theory there would have been a bullet up top. So it doesn't really prove one thing or another, whether or not the bullet was there.</u> (11T71-7 to 15) (emphasis supplied).

The prosecutor stated: "I don't know if it got stuck in her hand." (11T71-8). As stated above, the PowerPoint photograph at 89a, Dr. Shaikh autopsy report ("gunshot wound to right hand" and

"evidence of injury") contradicts this.  The prosecutor directly contradicts herself as the scientific/medical evidence was supposed to tell the story of what occurred.

The prosecutor stated: "He, in turn, has her by the throat . . ." (11T71-25).  Dr. Shaikh's autopsy report states that "the neck was free of injuries."  The prosecutor stated: "And as they go down the stairs, again, I don't know if it's at the top, at the bottom, in the middle, but somewhere during the fall downstairs, he shoots her." (11T72-2 to 5).  The prosecutor admitted to not knowing where or how the incident happened. However, she constantly hides behind the "science/medical."

The prosecutor stated:

> <u>At some point</u> going down the stairs, then, <u>he does it exactly as I said it.</u>  And there's the trajectory of the wound.  There's approximately where the entrance wound was and the exit wound, corresponding to the shots on the sweater, just like this." (11T72-15 to 20) (emphasis supplied).

Now the prosecutor "<u>knows</u>" how the incident occurred.

Dr. Kutlu did not testify as to the trajectory/entrance-exit/corresponding to the shots on the sweater (no mention of a sweater or how bullets came into play in Dr. Kutlu's testimony (or Dr. Shaikh's for that matter).

Nobody testified to any of the above at trial (not petitioner, not Dr. Shaikh, nor Dr. Kutlu).  This is the type of "science and medical" the prosecutor incorrectly relied upon.

The prosecutor's use of the words "At some point" reflects

that she is unclear but later she claims "he does it exactly as I said it." Nobody is saying it happened that way; not Dr. Shaikh nor any other witness. The prosecutor is claiming this without any medical or science backing.

The prosecutor stated: "The bullet going straight through here, and immediately when he shot himself, he dropped his hand down to his pants. That's why his pants have the blood right there on the pant leg." (11T72-20 to 23). Petitioner never testified that he had shot himself. No witness testified that petitioner shot himself. The blood on petitioner's leg was not tested ("science/medical"). The prosecutor stated:

> And you know what, ladies and gentlemen? She's dead. She'd dead there. Dr. Shaikh testified that the wound to the abdomen would have severed her spine, severed her aorta, perforated her stomach. The shot to the chest perforated her lung. She would be instantly paralyzed and within an extremely short period of time, dead. Maybe she was taking her last breath when she was there, maybe. (11T73-5 to 12) (emphasis supplied).

The prosecutor's false claim that Allison "would be instantly paralyzed" is contradicted by the State's own expert witness Dr. Shaikh. During the direct examination by the State of Dr. Shaikh, the following occurred:

> Q In addition, did you order – observe several like nondescript minor superficial injuries?
> A Yes.
> Q And I'll ask you about those a little bit later.
> During the course of your examination, did you also notice blood markings on her

69

body, particularly her arms?
A Yes. (8T19-4 to 12).

So Dr. Shaikh observed other nondescript injuries on

Allison; as he testified:

> A I listed in my report that – in the
> "evidence of injury" section, there were
> multiple gunshot wounds, and there were six
> of them.  <u>And I listed them numerically, but
> the numerical order is not necessarily how
> which (sic) these injuries were sustained.</u>
>      Q In fact, can you even given (sic) us
> any conclusion whatsoever as to the order
> that they were sustained?
> A Yes.  I – could I?
>      Q Yeah.
> A No, I could not.
>      Q So you just listed them as you
> observed them, then?
> A That is correct. (8T20-4 to 18) (emphasis
> supplied).

So, Dr. Shaikh listed the gunshot wounds in numerical order

and not in the order in which they occurred, as he could not tell

in which order the shots occurred.  During his cross examination,

Dr. Shaik again reiterated that he cannot determine the order of

the shots:

>      Q Now, you used the numbers one through
> six to delineate each individual gunshot
> wound, correct?
> A Correct.
>      Q Now, the first sentence under
> "Evidence of Injury" is, "The enumeration of
> gunshot wounds <u>is random</u>," correct?
> A That is correct.
>      Q <u>So you cannot tell which gunshot wound
> happened first.</u>  So what you do is you go –
> at least in this case you did, from top to
> bottom, and you assign numbers to each wound.
> Is that fair to say?
> A That is correct. (8T50-4 to 15) (emphasis
> supplied).

70

In spite of the fact that Dr. Shaikh explicitly testified that he could not determine the order of the shots (he just placed them in numerical order), the prosecutor intentionally deceived the jury by making it appear that Dr. Shaikh had, in fact, testified to the order of the shots (to fit this in with the prosecutor's narrative that Allison could not done what petitioner testified to since she was immobilized by the first shot).   During Dr. Shaikh's direct examination the prosecutor utilized the word "assuming" to support her false narrative:

> Q And assuming that this was the first
> injury she received, would that affect her
> ability to be mobile, to struggle back?
> MR. IACULLO: Objection to the form of
> the question.
> THE COURT: Overruled.
> THE WITNESS: Yes.   This wound is also
> very significant, as I mentioned.   Any wound
> that traumatizes the brain and lacerates the
> brain can cause very rapid loss of
> consciousness and incapacity.
> BY MS. PAPPAS:
> Q And would this wound alone have caused
> her death?
> A In my opinion, yes. (8T26-24 to 27-12)
> (emphasis supplied).

The prosecutor again asked Dr. Shaikh "assuming that this was the first injury . . ."   This is how the prosecutor sets up the "medically, scientifically, physically" impossibility aspect. Counsel objected because Dr. Shaikh previously had testified that he could not determine the order of the shots.

The prosecutor again used the "And assuming this was the first wound to her" (8T28-12 to 14; emphasis supplied) even though Dr. Shaikh did not know the firing order.

Dr. Shaikh testified:

> Q And does the x-ray accurately
> represent really the angles to the layperson?
> A Not necessarily.  As I've mentioned, the
> reason we do this is just to give us an
> indication as to where the projectiles are.
> But the acid test is to actually do the
> autopsy and find the track because these —
> the — these are not optimal x-rays in terms
> of they being taken post — in a postmortem
> situation and the — it is a portable x-ray
> that is taken, so depending on the angulation
> and which — where the x-ray tube and the x-
> ray film are, you will get different kinds of
> distortions. (8T30-3 to 14).

So the prosecutor asked Dr. Shaikh if the X-Ray accurately represents the angle of the shot.  Dr. Shaikh replied "[n]ot necessarily"; the x-ray depends on the angulation and you will get distortion.  The following occurred:

> Q Now, regarding the fourth gunshot
> wound that you observed, Doctor, I believe
> you stated that was to her chest?
> A Yes. (8T15 to 18).

While the prosecutor asked about "the fourth gunshot wound" she does not ask "assuming" this is the first shot.  She is already planning how she will lie to the jury about the testimony.  The following occurred:

> Q And was there any evidence by
> following the wound track that the projectile
> had hit any major arteries?
> A No.  It essentially went through the lung
> resulting in bleeding in the chest cavity and
> the collapse of the lung itself and some
> aspiration of blood within the lung tissue
> itself.
> Q And what you just testified to, the
> aspiration and bleeding, what does that tell
> you about her state at the time she received
> that wound?

72

A Aspiration is caused, especially of blood
or food, is when a foreign object or liquid
or substance gets into the airways – I'm
sorry, into the air sacs.  So when that
happens, you are still breathing.  The blood
gets sucked into the air sacs or the alveoli,
and you see what we usually describe but I
didn't described in this case what is known
as leopard spotting.  So it indicates to us
that the person was still respiring when the
injury was sustained to the lung.
    Q Does the volume of blood that you find
in there indicate how heavily they were
breathing or not breathing?  Or can you –
A No.  I think that would be making a
stretch.  But it has injured the lung,
resulting in disruption of the blood vessel.
 That's a fairly vascular organ.  And then
there was bleeding as a result of that.
    Q Can you give an opinion within a
reasonable degree of medical certainty as to
how long she lived after receiving that
particular wound?
A I cannot make that determination.
    Q Would that wound alone have killed
her?
A Any wound that causes significant injury to
the internal organs can be potentially fatal,
but if this was the only wound and she was
provided medical – urgent medical attention,
like in a trauma center, and a thoracotomy
would have been performed and probably the
lung would have been either partially
dissected or a lobectomy would have been done
and so survival would be – just by itself -
(8T31-19 to 33-8) (emphasis supplied).

We discover that the "first three shots" that the prosecutor

points to in the head were not in fact the e first three shots.

Dr. Shaikh describes the chest wound and discovers aspiration

which occurs when a person is still breathing.  He also cannot

determine how long Allison lived after receiving the wound.  He

was asked by the prosecutor and replied: "No, I think that would

be making a stretch" and "I cannot make that determination."

73

During the direct examination of Dr. Shaikh the following occurred:

> Q And what did the laceration of that spinal cord do to her?
> A Well, it almost transected the spinal cord. This would result in total paralysis of the <u>lower</u> extremities.
> Q And how quickly?
> A Rapidly. (8T35-6 to 12) (emphasis supplied).

Dr. Sheik here discussed the abdominal wounds.  He spoke about paralysis of the lower extremities, and when the prosecutor asked "how quickly?" he replied "rapidly."  Numerous times in her summation the prosecutor stated that Allison was  "instantly" paralyzed, could not fight back, with the wounds instantly fatal.  Dr. Shaikh did not testify to Allison's inability to struggle, instantly die, or instantly be paralyzed.  He cannot give a time of how long paralysis set in.  It is unknown whether "rapidly" means seconds, or minutes.

The following occurred:

> Q Now, before we actually get into the gunshot wound, did you make other observations about the hand –
> A Yes.
> Q – anything else you discovered on the hand? Can you tell us about that?
> A Yes.  There was evidence of soot deposition and dense stippling around the entrance wound indicating that this was a close-range shot. (8T36-10 to 18).

> *          *          *

> Q And where did you notice the soot deposition you mentioned?
> A Yes.  It was around the wound track, the entrance gunshot wound itself.

74

Q Did you find it anywhere else on her right hand?

A Yes.  On the little finger of the right hand there's presence of soot.

Q And you stated there was stippling. Now, could you tell us a little bit about that wound, which was the – or what is depicted there?  Is that the entrance or exit wound?

A This is the entrance gunshot wound, and since there was stippling, dense stippling around the entrance wound itself indicating a very close-range fire.

Q And I'll show you what's been marked S-87.  Is that a photograph of the entrance and exit wound?

A State's Exhibit 87 is a photograph of the decedent's right hand showing the fingers and the – partially the palm of the hand.  It shows the entrance wound that I have just described, and the exit wound for that entrance wound that I just mentioned.

Q And how do you know that that's an exit wound?  What characteristics about that tell you that's an exit wound?

A Gunshot wounds have characteristics to them usually, but they are always outliers.  The entrance wound has some characteristics and the exit wound has some characteristics. Generally speaking, the entrance wound usually has an abrasion ring around it. There may be presence of soot deposition or stippling which would indicate that there's evidence of close-range firing and the muzzle of the gun was in that proximity.  While the exit wound usually is a lacerated wound. When the bullet exits from the body, it just tears the surface of the skin, so usually there is no loss of tissue.  You can quite often oppose or bring the edges of the wound together and it will approximate properly, while the entrance wound usually there's a loss of tissue because when the projectile enters the surface of the skin, it takes off a little piece of tissue which then goes into the – inside of the body. (8T36-25 to 38-17).

Dr. Shaikh discussed the gunshot wound to the hand of

Allison, and he indicated soot deposition around the entrance of

the hand, with dense stippling, close range firing which coincides with the testimony of the petitioner at 9T96-2 to 99-4).  Nowhere in the testimony is petitioner's account given to dispute.  Dr. Shaikh testified one day prior to petitioner (on December 18, 2012), and never returned to testify in rebuttal. Dr. Shaikh did not give a reconstruction of the events in the house.  Dr. Shaikh was able to prove Allison was alive when the chest shot occurred (like petitioner's testimony at 9T102-5 to 21).  Dr. Shaikh's testimony is 60 pages (8T4-22 to 64-12), yet nowhere in his testimony is petitioner's name mentioned.

Dr. Shaikh cannot testify as to what shot came first (neither in his autopsy nor testimony).  Dr. Shaikh cannot give accurate time estimates with words like "rapidly," "quickly," as to how long Allison lives and paralysis.  He also testified that x-rays can have distorted images.

The prosecutor misstated that Allison would be paralyzed "instantly" (the gunshot also only affected the "lower extremities."  The prosecutor contradicted herself by stating that Allison was "dead, she's dead there" (8T73-6) and her statement moments later "[m]aybe she was taking her last breath when she was there." (8T73-11 to 12).  Dr. Shaikh's testimony shows that Allison was, in fact, alive and had the use of her upper extremities.  This corroborates petitioner's testimony of the incident taking "15 to 20 seconds to happen" (with Allison pointing the gun at him).

76

The prosecutor set up her lies: "<u>assuming</u> this was first shot" then with shots to the hand, chest, and abdomen.  She does not use it.  Then she is proven wrong by Dr. Shaikh: "with aspiration chest wound;" she also states that Allison was finished off with 3 shots to the head (contradicting herself again).  The prosecutor stated in summation: ". . . <u>[s]he's dead</u>, but he's not done.  He's possibly bent over.  <u>I can't say for certain exactly where he is.</u>  But he's standing over her. (11T73-13 to 16) (emphasis supplied).  The prosecutor again contradicted herself as she earlier (after stating "[s]he's dead.  She's dead there" (8T73-6) stated: "[m]aybe she was taking her last breath when she was there, maybe." (8T73-11 to 12).  Thus the prosecutor stated that Allison was dead, then alive, then dead again.  Dr. Shaikh testified that Allison was alive at this point: "So it indicates to us that that person was still respiring when the injury was sustained to the lung." (8T32-11 to 13).  Allison was still alive and Dr. Shaikh could not give an opinion as to how long she lived after receiving this particular wound. (8T32-21 to 24).

The prosecutor also, after stating that she was unsure where petitioner was located in relation to the shot, utilized stippling to claim petitioner was close to her: "And take a look at her wounds right there.  Most of the stippling, less stippling, no stippling.  And he's down over her.  And when do you get the stippling?  From when it's close." (11T73-16 to 19).

77

The prosecutor improperly speculated as fact.  The prosecutor stated: "There's no mystery to the State's theory.  It's supported by the evidence and it's exactly as I stated in the opening." (11T61-5 to 7).  This statement is clearly erroneous due to all of the prosecutor's conflicting comments.

The following improper questioning occurred during petitioner's cross-examination:

> Q Did you hear Dr. Shaikh say she would
> die instantly after the first –
>     MR. IACULLO: Objection –
>     THE WITNESS: No, I did not.
>     MR. IACULLO: -- that is not what the
> doctor said.  The doctor can't say if
> someone died instantly, Ms. Pappas.
>     THE COURT: I'll sustain the objection to
> the form of the question. (10T40-2 to 10).

The prosecutor highlighted its improper interpretation of the medical testimony during summation: "There's no way, physically, medically or scientifically possible that what he said is true." (11T88-21 to 22).  This refers to petitioner's version of events on the stairway.  The State called both medical and scientific experts yet none of them ruled out any of the petitioner's assertions.  This is yet another attempt of the prosecutor to insert her expert opinion that physics, medicine and science rule out all possibilities.  The prosecutor had no basis nor was she qualified to make such a statement which clearly had the ability to prejudice the jury.

The prosecutor also contradicted her own experts' medical and scientific opinions on other occasions, as well.  She

commented that Dr. Shaikh testified that all of Allison's wounds, other than the hand wound, were close contact and would have caused immediate paralysis and death. (11T94-21 to 23).  This was bolstered by a PowerPoint slide stating the same exact thing. (58a).  Dr. Shaikh actually testified that multiple shots were neither contact nor close range shots including both the shots to the temple and to the chest. (8T31-10 to 13).

Dr. Shaikh's testimony and report supports petitioner's version and makes the prosecutor's summation all the more egregious.  Dr. Shaikh corroborates the petitioner's direct testimony as to the hand wound (at 9T96-17 to 99-4); the petitioner's testimony as to the chest and abdomen ("aspiration in air sacs") (9T102-5 to 18); the struggle lasting "[s]econds, 15, 20 maybe" (9T104-13 to 15; 9T110-14 to 15); and the last shots to the head ("aspiration in chest") (9T109-4 to 5).

Dr. Shaikh, Dr. Kutlu, and Redfern all had their testimonies distorted by the prosecutor.  Facts were made up and the science/medical testimony taken out of context.  None of these witnesses disputed petitioner's testimony.  Redfern mishandled evidence, and did not take photographs of petitioner to display all evidence.

Not all blood was tested; this was admitted by the prosecutor in summation ("And, yes, all the blood was not test;" 11T70-19).  The prosecutor stated: "Number 7, because that's the only one that was tested and we know it's her blood.  The problem

is it doesn't explain all this other blood." (11T86-12 to 14).
The prosecutor stated:

>    The other scientific or physical reason
>    why this couldn't have worked, it's only his
>    blood on the gun.  If at any time she had had
>    that gun in her hand the way he described, or
>    at any time she had had it such that she
>    could have pulled the trigger on the way down
>    the stairs, her hand was bleeding, it would
>    have been her blood on there.  It was his on
>    the trigger and it was his on the slide.
>    (11T89-15 to 22).

The prosecutor stated: "The only way that gun operates, one hand on it.  And there was only one hand on it; his." (11T90-8 to 9).

The State's version of how the events occurred conflicted with itself. (11T59-2 to 60-22; 11T70-8 to 74-9; 11T92-3 to 95-16).  The prosecutor stated:

>    On direct, I want you to note, he said,
>    this, he said, when I fell down, he said, I
>    looked over, I saw my hand, I saw a hole in
>    it and I saw the blood.  But when I asked him
>    to draw it, and he did, <u>and then I said to
>    him, Mr. Tedesco, where's the blood, where's
>    the blood from your bloody hand.  You know
>    what his answer was?  Oh, it must not have
>    fallen that way, I had it on my lap, that's
>    right, I had it on my lap tucked in my shirt.
>    He changed his story.  You know why?
>    Because there's no blood in there.</u>  He stood
>    over her with his hand on his pants, shooting
>    her in the face those three times, and within
>    seconds he was out the door. (11T91-10 to 19)
>    (emphasis supplied).

This is contradicted by the earlier statement of the prosecutor in her summation:

>    He reaches for the door with his bloody
>    hand, and <u>you can see the blood and it drips</u>

80

> down.  And following the trail of blood, we
> see them moving from out of the foyer of the
> kitchen, down the stairs to where her body
> was, out the front door with his left hand,
> and then there's his blood leading back up to
> Bergen and to his car. (11T74-3 to 9)
> (emphasis supplied).

The prosecutor again contradicted herself.  On page 91 she stated there was "no blood in there" but, on page 74, there is blood.  Petitioner never stated his hand was "tucked in my shirt."  Petitioner testified that he was cradling his hand; this claim was made up by prosecutor.  Color photos of the foyer where the body lies shows that blood was present.  She ignored, contradicted clear evidence.  The prosecutor stated:

> And what I submit happened to you is
> somewhere down the fall, she had him by the
> neck and the hip.  At some point, she just
> ended up going like this.  It could have been
> down at the bottom, her hand fell here, I
> don't really know.  In the whole struggle up
> in the kitchen he might have come in contact
> with some of the blood where those wipes were
> and grabbed her by one of her arms.  These
> are the little things that you don't have to
> agree upon and you don't have to actually
> fully come to an understanding of. (11T92-14
> to 24) (emphasis supplied).

Petitioner disagrees with this statement.  The prosecutor claimed to use "science" and "medical" evidence to reject petitioner's account but he offers no supporting medical or scientific evidence to explain this.

The Prosecutor contradicted this statement when she stated:

> And, yes, all the blood is not tested.
> He shot her; she fell to the ground.  You see
> the smears, the smears, some more drops and
> the smears, and the drops at 7.  And you see

81

> the path of her as she's trying with her
> right hand, trying, trying, trying to get
> down the stairs after she put her hand up to
> defend herself. (11T70-19 to 71-1).

The prosecutor stated the "smears"/"wipes" indicate Allison was crawling through the blood. In the above statement, the prosecutor has the petitioner coming into contact with the blood, causing the "wipes." The prosecutor's statement "and what I submit happened to you is" ends with her stating "I don't really know." (11T92-14 to 18).

Petitioner disagrees with the statement: "These are the little things that you don't have to agree upon and you don't have to actually fully come to an understanding of" (11T92-21 to 24). The prosecutor clams "medical" and "science" can prove his account wrong but cannot accurately account for what she is saying. Her statement: "I don't really know" conflicts with her medical/science claims.

The prosecutor stated: "That's when <u>he changed his story</u> again. And he had me demonstrate, or I asked him to let me demonstrate sitting up. He said, oh, she was sitting up then, she must have been sitting up at that time." (11T93-2 to 5) (emphasis supplied). This statement is false as revealed during the cross of petitioner:

> Q She was scooched up a little bit? I
> did that re-enactment, correct?
> A Yes. Her head --
> Q No. Mr. Tedesco, could you please
> answer yes or no?
> A Yes.
> Q Was she scooched up a little bit?

82

A A little bit, yes.
        Q And then, ultimately, she found — fell
down like that, correct?
A She was already on the ground.
        Q How far up was her head?
A I didn't measure.  I don't know.
        Q When I did the re-enactment yesterday,
was that about right?
A It's close to.  I'm not exact.  I don't
know. (10T27-5 to 20).

During the cross of petitioner, the following occurred:

        Q And she — so she's kind of slouched up
        against the wall, you're saying?
        A Yes. Her body was more — was more angled
        towards the wall, more flush with this part
        of the wall. (9T265-9 to 13).

Contrary to the prosecutor's statement, the petitioner never

"changed his story."  The State also contended that the wound to

Allison's hand was a defensive wound based on the angle of the

injury. (11T97-12 to 13).

The prosecutor stated:

        And then he went into the explanation
        using the drawing that he made about how he
        put his left hand here.  You'll get these
        pants back there, too.  That's not a bloody
        hand print.  That's just blood from rubbing
        against what we would call transfer blood,
        rubbing against sweat pants, maybe his jeans
        came in contact with her pants, maybe they
        were bunched up, maybe a hand swiped it.
        (11T93-6 to 13) (emphasis supplied).

The prosecutor contradicted herself again when she stated

"That's not a bloody hand print . . . maybe a hand swiped it."

Petitioner submits that the blood tests showed that it was

his blood.  In the photographs of petitioner's hand he had blood

in the entrance and exit wound, not all over his hand.  There

83

does not have to be a "hand print."  The prosecutor did not know
if the pants were "bunched up" which could distort the blood or
"hand print."  There is no "science/medical" proof.  No witnesses
testified to this.  The prosecutor stated:

> Not only, ladies and gentlemen, is his
> story based on common sense preposterous and
> unbelievable and physically unbelievable, but
> it's scientifically and medically
> unbelievable.  Dr. Shaikh told you that of
> those five wounds, all of them would cause
> almost immediate death. (11T94-18 to 23).

In reality, Dr. Shaikh testified on direct that Allison
could have been saved and death was not immediate. (8T33-1 to 33-
8).  Dr. Shaikh reiterated this opinion on re-direct:

> The gunshot wound to the chest, as I'd
> mentioned earlier, if I — even if it
> happened, say, just outside the emergency
> room and the — it's a Trauma Level 1
> facility, they just would take them in, they
> look at it and they open up — do an emergency
> thoracotomy and open up the chest, and that
> could have been done and the person could
> have survived. (8T63-20 to 64-1).

This also was buttressed by a slide claiming the wound was
suffered when Allison put the hand up to defend herself. (48a).

During his testimony, Dr. Shaikh was asked by the State if
the hand wound was consistent with a defensive wound.  He
indicated it was not and he found no evidence of any defensive
wounds. (8T40-8 to 11).

The petitioner consistently testified that the shooting
incident took 15 to 20 seconds.  The prosecutor stated:

> Because Dr. Shaikh told you in fact she could
> not have struggled after this wound, she

could not have struggled after this wound,
she could not have struggled after this one,
and she could not have struggled after this
one, and she could not have after that one.
There was no reason for him to ask because
science doesn't change.  She was unable to
move after that shot to her abdomen. (11T96-
17 to 24).

Dr. Shaikh testified on direct:

A Sure.  I listed it in my report that —
in the "evidence of injury" section, there
were multiple gunshot wounds, and there were
six of them.  And I listed them numerically,
but the numerical order is not necessarily
how which these injuries were sustained.
Q In fact, can you even given (sic) us
any conclusion whatsoever as to the order
that they were sustained?
A Yes. I — could I?
Q Yeah.
A No, I could not.
Q So you just listed them as you
observed them, then?
A That is correct. (8T20-4 to 18).

Dr. Shaikh testified that the shot to the head would be

fatal: "[w]ith this wound, she would collapse almost immediately

and lose consciousness." (8T24-21 to 24).  Dr. Shaikh stated that

the head shots did not occur as the first three shots, since he

found aspiration of blood from the chest wound which means that

Allison was alive: "Aspiration is caused, especially of blood or

food . . . when . . . you are still breathing . . . So it

indicates to us that the person was still respiring when the

injury was sustained to the lung." (8T31-2 to 32-13).  Shaikh

could not determine how long she lived after receiving the chest

wound. (8T32-21 to 24).  As to whether the chest wound was fatal,

he testified:

85

> A Any wound that causes significant
> injury to the internal organs can be
> potentially fatal, but if this was the only
> wound and she was provided medical — urgent
> medical attention, like in a trauma center,
> and a thoracotomy would have been performed
> and probably the lug could have been either
> partially dissected or a lobectomy would have
> been done and so survival would be — just be
> itself . . . (8T33-1 to 9).

Dr. Shaikh testified that the laceration of the spinal cord "would result in total paralysis of the lower extremities." (8T35-6 to 10).  There was no testimony about the upper body not being able to move.  The prosecutor never asked any questions as to Allison's ability to struggle.  Dr. Shaikh never discussed the ability to struggle in relation to the injury.

The petitioner testified on direct: "I was trying to take the gun out of her hand.  I was trying to kind of rip it out. And at that point, you know, I kind of yanked on it hard. You know, I yanked on her hand.  My hand's basically on the outside of her hand. (9T108-7 to 11).  Petitioner's hand was on the outside of the gun when it discharged two shots to the head, the third at the end (at that point the struggle was over).

During petitioner's cross-examination the following occurred:

> Q Did you pull the trigger on those?
> A I did not pull the trigger.  [Allison] had
> the gun in her hand.
> Q Did she shoot herself?
> A We were struggling for the gun.  The
> trigger must have been pulled off twice,
> then. (9T123-7 to 12).

The prosecutor stated: "The angle of the shot tells you that

86

she put her hand up to defend herself." (11T97-12 to 13).  No
witness (lay or expert) testified to this.  Nowhere in Dr.
Sheikh's testimony is this stated.

The prosecutor stated: "The abdomen, she had the severed
spinal cord and unable to struggle and fatal." (11T97-13 to 14).
 Nowhere in Dr. Shaikh's testimony did he state that she could
not struggle after this wound.  In fact, paralysis does not occur
instantly—rather, he says "rapidly," which makes the petitioner's
account possible.  There was an injury only to the lower
extremities, not upper (the ability to hold the gun would still
be present).

The prosecutor stated: "The chest, unable to struggle and
fatal." (11T97-15).  Dr. Shaikh (at 8T31-33) discussed the chest
injury at length.  The prosecutor does not ask if Allison would
not be able to struggle.  Dr. Shaikh testified that Allison was
still alive – the "blood aspiration" explanation.  Dr. Shaikh
does not mention struggle in relation to the injury.  The
prosecutor again made up "medical/science" unsupported theory.

During the petitioner's cross the following occurred: "Q She
got two fatal gunshot wounds on the way down, and you're saying a
gun bounced into her left hand?  A Ms. Pappas, these were not
immediate fatal shots. (9T256-10 to 13).  Dr. Shaikh's testimony
at 31-33 contradicts this.  Dr. Shaikh testifies that the chest
injury Allison was still alive.

During cross of petitioner the following occurred:

87

> Q She's dead, Joe.  How did she get the
> gun?
> A She is not dead at that time, Ms. Pappas.
> Q Dr. Shaikh testified she was dead
> after any one of these. (9T257-21 to 24).

Dr. Shaikh testified as to events that took place he testified that she would not have immediately either from either torso shot. (Dr. Shaikh's direct at 31 to 35).

During petitioner's cross: "So here she is.  Dr. Shaikh says she's dead.  You say she's not." (9T23 to 24).  Dr. Shaikh contradicts this in his direct at 31 to 35.

The prosecutor stated: "By virtue of the science and by the physical impossibility <u>we've proven it's not an accident.</u>  And might I also say that we don't have to disprove accident." (11T102-14 to 17) (emphasis supplied).  The prosecutor improperly eviscerated petitioner's legitimate self-defense claim manipulating, distorting and misstating the medical and science expert testimony.

The prosecutor stated: "For the sake of argument, let's say there was just the one.  You might possibly, possibly be able to consider one accidental shot to the abdomen." (11T100-22 to 24).  This statement is puzzling.  Dr. Shaikh could not place "shots" occurred" in any order.  Dr. Shaikh testified this abdomen shot would eventually be fatal.  Why would the prosecutor use this as the first shot?  Especially if she stated this shot is accidental it means Allison would have died accidentally (therefore not murder).  This also shows that the prosecutor does not know what

88

happened and that no "science/medical" was actually applied to any of her argument.

The prosecutor stated:

> You can disagree on some of these, and reasonable minds probably can as to the order.  For example, you might find that he shot her in the chin first.  You might find he shot her in the nose first.  Someone else might feel that he actually texted her while he was sitting outside on Bergen Street.
> The order that any of these events happened in is significant only that it helps you determine what he was doing there. (11T53-22 to 54-5).

This is troubling as the prosecutor sought to utilize medical/science evidence (on numerous occasions) to prove as to how things happened in the house.  Instead, she contradicted herself on numerous occasions; successfully confusing the jury to reach a verdict not on the actual evidence adduced but upon the prosecutor's distortions, misstatements, guile, appeals to prejudice, ethnic bias, and fear.

The Appellate Division stated:

> Defendant further challenges the prosecutor's statements interpreting the medical testimony.  While some comments may have misstated certain details of the expert testimony, we find they were not so inaccurate to constitute reversible error. Moreover, the judge instructed the jury that counsel's statements were not evidence. Therefore, we find these comments did not deprive defendant of a fair trial. (Tedesco op. at 13; 202a).

### M.  THE STATE IMPROPERLY DISTORTED THE JURY INSTRUCTIONS

The State also made several legal entreaties to the jurors

during summation that incorrectly described both legal standards and the obligations of the jurors.  The prosecutor is duty bound to make accurate legal assertions.  The State's summation included an admonition to the jurors that they did not have to consider the lesser included offenses.  The prosecutor stated: "The judge had mentioned to you in the beginning about how he added two charges, and he made it very clear to you just because he did that doesn't mean you're supposed to consider them." (11T98-21 to 24).  This is a clear misstatement of the law.

The prosecutor stated: "And might I also say that we don't have to disprove accident.  And I -- you either believe he didn't do it on purpose or he did." (11T102-15 to 18).  This is a clear misstatement of the State's obligation.  The State is absolutely required to disprove accident by proving a <u>mens rea</u>.

The prosecutor stated:

> And I'm going to tell you right now, that's short compared to the other law that the judge is going to read to you.  But I'm going to make it even shorter.  Purposely caused death.  Don't event worry about knowingly, don't even worry about the serious bodily injury that resulted in her death. He went there purposely to cause her death, and he did. (11T62-4 to 9).

The prosecutor stated: "The reckless behavior, the mere fact of carrying the gun in the back is reckless behavior if you believe he did that." (11T102-3 to 5).

The prosecutor stated:

> By virtue of the science and by the physical impossibility we've proven it's

90

> not an accident.  And might I also say
> that we don't have to disprove accident.
>  And I — you either believe he didn't do
> it on purpose or he did. (11T102-14 to
> 18).

This is problematic as the State does have to disprove accident.  No scientific or medical expert testimony supported the prosecutor's statement.  If they do not disprove accident, petitioner should have been charged with manslaughter or aggravated manslaughter.

The Appellate Division stated:

> Defendant similarly argues the
> prosecutor misstated the law in her summation
> and PowerPoint.  While the prosecutor made
> some minor misstatements, neither the
> comments nor the slides deprived defendant of
> a fair trial.  The prosecutor told the jurors
> the court would instruct them on the law
> about murder, aggravated manslaughter and
> other charges.  The judge later gave these
> instructions; he also told the jurors to
> apply the law to the facts to arrive at a
> fair and correct verdict, and that "you must
> accept the law as given to you by me."  We
> conclude defendant was not prejudiced by the
> remarks. (<u>Tedesco</u> op. at 13; 202a).

N.    <u>REFERENCE TO PETITIONER'S UNEMPLOYMENT</u>

The prosecutor improperly commented upon the petitioner's unemployment:

> He's beginning to realize —- and here's a
> man who's not working.  He's been out since
> October because he saw a pair of legs of a
> woman who was dead.  He's not working.  He's
> not doing anything. (11T55-12 to 15).

The prosecutor again returned to the theme of the petitioner's unemployment: "We learned about Giuseppe Tedesco,

too.  <u>We learned he wasn't working.</u>  We learned that he was into
gym and tanning and girls and parties." (11T62-18 to 19)
(emphasis supplied).

    O.    <u>IMPROPER USE OF THE FAKE FACEBOOK PAGE AND TEXTS</u>

The prosecutor stated:

> By March 27th, 2010, we've also learned that
> he created a fake Facebook page so he could
> figure out what his competition was all
> about.  He did it so that he could sort of,
> in a <u>non-legal</u> way, stalk Gerry Leone and
> <u>determine what</u> his interests were. (11T54-20
> to 24) (emphasis supplied).

The prosecutor incorrectly states that what petitioner did
was "non-legal"—this is false as creating a fake profile on the
Internet is not a crime.  The prosecutor falsely accused
petitioner of committing a crime to his extreme prejudice.

The prosecutor also stated:

> We also heard through testimony about
> the fake Facebook page.  Now, I just want to
> go over real quick what it took to make this.
> He actually had to go on Facebook, create a
> name, go to a separate website, steal a
> woman's picture, put it on there, had to
> actually create a fake e-mail address, too,
> because he said he couldn't use his own e-
> mail address.  Oh, and while we're on the
> subject, I don't know if you remember, I
> asked him a question, I said, did you have
> more than one.  And I was just fishing.  And
> you know what his answer was?  I don't know,
> because he did.  He didn't know whether or
> not I knew.  He did have another one, because
> then he went on to talk about this one and he
> said – he said something like, well, this one
> I did this way.  He had more than one fake
> Facebook page.  But this is the one that we
> know about.
> He had to do the fake e-mail, cut the
> pictures, put them on, go under her website –

go onto [Allison's] fake — real Facebook
page, take her friends, all male friends
because he wanted to make sure that they were
young men who would accept the friendship of
a beautiful young woman.  And whoever this
woman is, she's a very pretty girl.  And he
knew that these guys, 22-year-old men, sure,
beautiful young woman wants to be my friend,
I'll accept her as my friend.  And he went
through all of that just to find out about
[Gary]. (11T64-4 to 65-6).

During direct examination petitioner testified s to the ease

with which one can create a Facebook account:

Q Okay. And you — what's it take to
create a Facebook page, by the way?  Because
I'm not on Facebook, so, I mean, what does it
take to create it?
A Nothing really.  You just — you go onto the
site and, you know, you type in an e-mail
address and then you just start creating an
account.  It takes five minutes, 10 minutes.
(9T50-5 to 11).

The petitioner testified that he created the profile in

November of 2009.  He testified to it and pointed it out during a

slide presentation that the prosecutor gave.  The following is

petitioner's direct testimony:

Q Talk about what you mean by saying
establishing a fake Facebook site.  What are
we talking about?
A It's a term called "catfishing."  And what
it is is you establish a Facebook site with a
different identity and you use it to get
information for people.
Q Okay.  Now, when you said you were
going to do that to goof on your friends,
explain to the jury what you mean by that?
A Basically, you know, I was just going to,
you know, basically rag on them.  You know, I
go out with guys that, you know, they all
think that, you know, any time a girl looks
at them at the bar that, you know, they want
them and stuff like that.  So I was going to

pose as this girl and, you know, basically
say to the people that —
          Q Like joke with them you mean?
A Yeah, joke with them basically saying, oh,
you know, I met you at the bar, I thought you
were great, you know, we should meet up.  And
then, you know, when they finally meet up at
the place I was just going to basically punk
them out.
          Q Okay.  Now, when did you officially,
so to say, endeavor to create whatever you
have to do to create a Facebook page?
A That happened around I would say late
December, early January.
          Q So you're saying late December, earl
January 2010?
A Right.  Late December 2009, early January
2010.
          Q Okay.  So this is when you would have
been creating this Facebook page?
A Uh-huh.  Yes.
          Q Okay.  The fake Facebook page, did you
— I assume if you're going to do this and
joke with friends of yours, you're not going
to put your name on it, correct?
A No, no. (9T48-7 to 49-19).

                 *              *              *


          Q Now, did you go to that site at any
time, if you remember, in February — in
February — prior to your conversation with
[Allison] now I'm talking about.
A No, you know what?  It kind of just flamed
out.  I had created a site.  I thought about,
you know, like I said, contacting, you know,
friends to joke around, but then it never
came to fruition.  I just abandoned it.  It
just petered out. (9T50-12 to 19).

     During the cross examination of petitioner the following

occurred:

          Q This Facebook page already existed,
correct?
A That is correct.
          Q You also testified yesterday that all
of your friends under the page were from her
Facebook page, correct?

94

A That is correct.
    Q So prior to her telling you about
[Gary], you had a fake Facebook page with no
friends?
A Correct. (10T10-14 to 22).

The site's creation/intention was not based on "stalking [Gary]." The prosecutor stated: "I think he referred to himself as a player at one point." (9T62-20 to 21). Petitioner never stated that he was a "player;" the prosecutor distorted his testimony as to what Allison wished for him to discover by way of this fake Facebook account:

        Q What is it that she wants you to find
    out through contacting him?
    A Basically just how genuine he is.  You
    know, he was calling her a lot, you know,
    frequently.  They didn't hang out all that
    much.  They would hang out, you know, a few
    times, you know, just to get coffee, things
    like that.  And he was pursuing a little bit
    too strong and she wanted to find out is he
    like this with all girls, is it just towards
    her, if he's involved with anybody else, if
    he's playing the field, if he's — if he's
    what we would refer to as — young people
    would refer to as a player . . . (10T12-4 to
    15).

The prosecutor stated: "He'd been watching her, you can infer, since they got back from Boston, since he created that fake Facebook page." (11T65-22 to 24).  The transcript references above (at 10T10-14 to 22 and 9T49-4 to 19) prove Facebook was created before the Boston trip.

The prosecutor stated:

        We also know by March 27th, 2010, that
    he's seen with his own eyes that she is with
    [Gary] because he followed there — her there
    on Tuesday the 23rd and on Friday the 26th,

and that's when he slashed her tires. (11T54-
25 to 55-4).

This is a false fact by the prosecutor.  Gary testified:

"so I just walked her to outside the
garage, I saw her get into her car and drive
away." (5T105-23 to 24).  [Gary] testified:
"She called me, I called her right back when
I saw it, probably like ten minutes after she
had originally left and I called her back.
She told me she had gotten a flat tire--.
(5T107-11 to 13).

So Allison drove away with a car in good condition.  Gary

saw this and she breaks down on the highway.  No tires were

slashed.  Gary lived near a highway entrance, making it likely

someone would have seen this if it happened.

The prosecutor stated:

You know what he did?  He looked her
again in the eye and he finished her off is
what he did.  He shot her in the chin and he
shot her in the nose and then he shot her in
the temple with her eyes open looking at him.
And then he grabbed the door and he ran out.
And, yes, he said it on cross and I'll say
it.  He ran home to mommy. (11T60-18 to 24)
(emphasis supplied).

The prosecutor goes into the mind/thoughts of Allison:

So in a last-ditch effort, this last
effort just to make sure and just to gain
some control, he texts her so at the very
least they can still be good friends.  He
texts her, will you spend my birthday with
me, and hears a final no.  Really what she's
saying to him is, Joe, I don't even really
want to be your friend.  But she's nice.  She
says, no, have a good time, though, with a
smiley face.  She's not a mean person.  She
doesn't want to hurt his feelings.  But when
he says, did you give me the brush off, he
knew she was.
It wasn't just the text messages.  The

96

> text messages said, I don't want to just be
> your — I don't want to be your girlfriend, I
> don't really want to be your friend, don't
> talk to me anymore.  And, yeah, he didn't use
> — she didn't use the words that he mentioned,
> go away, leave me alone, because she's nice.
> (11T55-24 to 56-16).

The text messages do not show this.  None of these words were presented on the screen, nor can they be inferred.

The prosecutor stated: "And now he's consumed and he'd (sic) fueled by jealousy, by anger and by rage." (11T56-19 to 20). Again, she presents "facts" by entering petitioner's thoughts.

During cross-examination of "Jerry" (J.D.) the following occurred:

> Q So March 27th, 2010 you actually spoke
> to Joe on the phone.  Do you recall the phone
> call being around 7:59, 8:00 on March 27th,
> 2010 when you spoke to Joe?
> A Yeah, I think it was like one minute.
>      Q Okay.  Short conversation.  You
> actually hear his voice that night at 7:59,
> 8:00 on March 27th, 2010, correct?
> A I believe so.
>      Q Is it fair to say that in you
> conversation with him, albeit a minute, he
> sounded normal just like the way he normally
> did?
> A Yeah. (5T70-12 to 24).

This call coincide timewise with the texts.  The petitioner was fine with no "jealousy," "anger" or "rage."

The prosecutor stated: "the desperate texts, will you spend my birthday with me." (11T103-24 to 25).  Contrary to this statement, the direct and cross-examination of petitioner reveal that there was no "desperation."  Petitioner's actual text was "Hey, you want to get together for my birthday on Monday?" (9T72-

11 to 13).  Allison replied: "I don't think I can.  Sorry.  Have
fun, though" with two dots and parentheses, meaning a smiley
face. (9T73-12 to 16).  When asked: "How do you feel when you get
this text at this point?" petitioner testified: "I didn't really
think much of it.  I just, you know, just seeing what was up.
That was all." (9T73-23 to 74-1).  Petitioner texted Allison
back: "Did I do something wrong?" and "I feel like you're giving
me the brush-off" to which she replied: "No."  (9T74-2 to 11).
When asked "What's your thought process at this time as these
texts are exchanged?" petitioner testified: "I didn't think much
of it.  I asked her, you know, if anything was wrong and she
basically said no." (9T74-14 to 17).  Petitioner texted her: "All
right.  So we will hang again soon no?" and her response was
"Yeah, soon." (9T74-24 to 75-9).  When asked what his thought
process was at this point, petitioner testified: "Nothing.  That
we're going to hang out soon" and he was neither upset nor angry
with her. (9T75-12 to 20).  Petitioner then texted a statement
(not question): "Going out tonight" (meaning "I was going out
tonight." (9T75-21 to 76-2).  When Allison wrote back "no"
petitioner was unsure as to why she did this, as he had not asked
her if she was going out that night. (9T77-3 to 12).  Petitioner
was neither mad nor angry with Allison. (9T77-16 to 20).  There
is no desperation.

The prosecutor cross-examined the petitioner about the texts
in a misguided effort to portray them as threatening:

98

Q You asked her to spend a special day
with you, didn't you?
A It's a birthday.  It's pretty much to me
it's like any other day. (9T193-8 to 11).

            *           *           *

     Q You asked the one person that you
considered to be close to you to spend a
special day with you, didn't you?
     A Yes. (9T193-25 to 194-3).

            *           *           *

     Q Let's go to the next one, please, S-
180 — 187, I believe it is.  Whatever the
next one is.  And she answers back.  What
does she answer back to you?
A She says, "I don't think I can, sorry.
Have fun, though."  And smiley face.
     Q "I don't think I can."
A Correct.
     Q She didn't even give you a reason, did
she?
A No, she didn't.  She doesn't have to.
     Q She just said no.
A She's not obligated.
     Q No.
A No.
     Q Not, I'm busy.  Not, I have plans.
A She doesn't — like I said, she's an adult,
she doesn't have to tell me.  She's not my
girlfriend.  She doesn't have to tell me
anything. (9T194-4 to 20).

            *           *           *

     Q Okay. Let's see the next one.  And
that is — read that for us, will you?
A It said, "Did I do something wrong,
question mark?  I feel like you're giving me
the brush-off."
     Q Now, you must have thought she didn't
want to be with you, correct?
No, not at all.  I felt that [Allison], when
she normally texted me, it was in length
and, you know, to see a brief kind of, you
know, message was out of the — you know, it
was not consistent with, you know, the way
she texts me.  So I assumed from there that,

99

you know, maybe she was — you know, something
had been up, wrong.  I know I talked to her
the previous day on — or the previous days on
the 24th.  I knew she was upset.  She had run
over something.  She had flattened her tire.
 And it was more money that was coming out of
her pocket, so I knew she was a little bit
bummed out. (9T195-4 to 21).

                    *          *          *

     Q Obviously, you thought you did
something wrong.
A No, I didn't.
     Q Maybe she found out about —
A No. I asked —
     Q — the tire slashing?
A — did I do something wrong —
     MR. IACULLO: Argumentative now, Judge.
     THE COURT: Well, I'll sustain as to the
form of the last question.
BY MS. PAPPAS:
     Q And what was her answer?
A I don't —
     Q Go on to the next text.
A "No."  I did nothing wrong.
     Q No?
A That's what it says.
     Q Now, she didn't write to you, oh, no,
Joe, don't worry about it, I'm just tired.
She wrote, "No."
A Okay.
     Q She did not want to text with you that
night, did she?
     MR. IACULLO: Objection, Your Honor.
     THE WITNESS: I can't —
     THE COURT: Sustained as to the question.
BY MS. PAPPAS:
     Q She said, "no."  No explanation again,
did she?
     A Right.  There's — it just says, "No."
 I did not do anything wrong.  I asked a
question; she responded.
     Q And at this point, you're feeling a
little desperate.  You finally realized you
lost her.  And what do you ask her next?  Can
we go to the next text?
A All right.
     Q You want to make sure, right?
A No.  I'm just checking on my friend.  Are

                         100

we going to hang out soon or no. (9T196-13 to
197-25).

After overruling a defense objection, the following

occurred:

> Q And what was her answer to that?  The
> next is S-1 —
> A It says, "Yeah, I assume."
> Q I assume?
> A Uh-huh.
> Q Not like, oh, we'll hook up later that
> week, or — no explanation again to you, is
> there?
> A Again, I don't know her schedule.  She
> says, yeah, I assume.  These are basic
> questions.  These are not — I'm not asking,
> do you have a problem with me, do you have
> this, do you — and she's saying, yes, I have
> a problem.  These are just basic questions.
> What you're reading on the screen is the
> questions that are being asked.  There's no
> underlying cynicism there. (9T199-1 to 14).

The prosecutor distorted the texts, which were non-

threatening nor "desperate."  Her interpretation was false, and

her questioning rebuked by the judge.  Defense counsel had to

object throughout the trial.  The prosecutor has a right to probe

via legitimate cross-examination but not to this extent.

P.   OTHER EXAMPLES OF MISCONDUCT IN THE SUMMATION

The prosecutor stated, concerning the gun:

> Puts the safety on, and puts it in his
> pocket.  He doesn't put it in his belt.  He
> doesn't put it in the ankle holster because
> he needs easy access to it.  When he put that
> gun in his pocket, he knew he was going to
> kill her. (11T56-24 to 57-3).

Petitioner testified numerous times on both direct

examination and cross that the gun was in his belt (no proof

supports the prosecutor's statement).

The prosecutor stated:

> . . . and he drove past that open driveway,
> he drove past open Metro, and he went down on
> Bergen because he heard that Durban is a very
> well-traveled road and he didn't want anybody
> to see his car. (11T57-8 to 12) (emphasis
> supplied).

Petitioner testified that there was a car parked on Metro.

He also testified that there was no parking on Durban:

> There were about three cars in the
> driveway, and I think the jeep was parked
> somewhere on the lawn. (9T80-16 to 17).
>
> Q Let me stop you right there.  There's
> three cars in the driveway and there's one on
> the lawn.
> A Yes.
> Q Now, if there's three cars in the
> driveway, then there would obviously be a
> spot or an area open where I guess you could
> pull the Durango in.  Why did you not pull
> into [Allison's] driveway on March 27, 2010,
> as you approached her house?
> A Because, you know, judging by what I saw,
> you know, all the cars out there, all the
> lights on, I thought that maybe somebody was
> in the spot and they had just run out real
> quick to get something.  So I wasn't going to
> park in that spot.
> A Right. (9T80-20 to 81-7).
>
> Q Okay.  Why not stop and park like on
> Durban, like right across the street from her
> house?
> A Durban Avenue is a — although it is a two-
> lane road, it's very narrow.  There is no
> shoulder to pull over and park.  You would —
> if you were to park on Durban Avenue, you'd
> be taking up one lane. (9T81-25 to 92-5).
>
> Q So you don't park on Durban right
> across from the house.  Now, there's a side
> street that's like right across from
> [Allison]' street.  And I'm not good with the

102

names.  It might be Metro.
A That's Metro, correct.
        Q Why didn't you just pull into there
real quick and stop there?
A As I looked to the left and I saw that the-
there was a – you know, the space open in
[Allison]'s driveway, I wasn't going to park
there.  Like I said, I didn't know if
somebody had just left, they ran out to get
something, milk, cigarettes, whatever.  <u>I
looked to the right on Metro and I saw there
was a vehicle parked to the right side, like
almost right up on the curb.  So I just went
ahead one block over and parked on Bergen.</u>
        Q Okay.  And when you parked on Bergen,
was this in any way a plan by you to park at
this particular location for any reason?
A No.  there was just no spots available.
(9T82-15 to 83-9) (emphasis supplied).

A police dash cam video from Sgt. Kmetz of the Hopatcong
Police Department was played in court and confirmed the
following: 1) 3 vehicles parked in [Allison]'s driveway; 2) it
confirmed a car parked on Metro (she said it was open); 3)
confirmed Durban is a narrow two lane road with no parking
available; and 4) Bergen is one block away.  This corroborates
petitioner's testimony about his reason for parking where he did.
 This proves the prosecutor made up the statement that petitioner
"didn't want anybody to see his car."  It should be stated that
the prosecutor (in a contradictory statement) states in
summation: "But when it became very clear through the equipment
in the patrol car that there were only three, he had to come up
with a reason." (9T84-22 to 25).

The prosecutor stated:

        Regarding his explanation about the gun,
he was very, very, very clear on this.  He

103

did not take it to Boston.  He did not take
it to New York City.  The only time he ever
said he carried it when he was alone.  Except
he wasn't going to be alone that night.  He
was going with friends to a private room at a
place in Hoboken. (9T83-11 to 17).

During direct, Jerry testified:

A We were supposed to go out somewhere.  We
were all supposed to go out.  I think it was
really Julie's birthday or something.
     Q And what happened?  Did you go out
that night?
A No.
     Q And why not?
A I changed the plans for — me and my
girlfriend we changed plans.  We decided to
do something else instead.
     Q And you told him that?
A Yes. (5T50-9 to 20).

The following occurred during Ma.M. (Martha's) cross-

examination:

     Q And you were going to travel with Joe
to Hoboken, correct?
A Yes.
     Q But it was you and Jeff that decided
to go to Jeff's brother's house, do you
remember, to watch the fights on Pay-Per-View
—
A Yes.
     Q — Correct?  And you had informed Joe
that you wouldn't be going, correct?
A Yes.  Correct. (5T91-2 to 11).

The prosecutor stated petitioner would be traveling with

friends, and that he only carried gun alone.  Petitioner, Martha,

and Jerry all testified that he would be traveling alone.  Martha

and Jerry were State's witnesses who the prosecutor contradicted.

Testimony was altered by the prosecutor (everyone was in at

first, change of plans and petitioner was alone). Petitioner

104

testified on direct:

        A Originally, we — I was supposed to
travel down to this birthday party with
[Jerry] and [Martha], and I was going to see
if they were still going, you know, if I
should pick them up or not.  And it was a
very short conversation.  I think it lasted
like maybe like a minute.
        Q Okay.  Now, as a result of this
conversation with [Jerry], did you learn
whether or not — I think you said you were
going to take [Jerry] and [Martha]?
        A Correct.
        Q Did [Jerry] tell you whether or not he
was planning on going to Hoboken that
evening?
A Yeah.  He said there was a change of plans,
that him and [Martha] were going to go to
[Jerry's] brother's house to watch — I think
there was a fight on Pay Per View, something
like UFC, something like that.
        Q So it's [Jerry] that decides not to go
to Hoboken and, therefore, not ride with you
to Hoboken, correct?
        A Correct. (9T67-19 to 68-13).

        Q . . . Getting ready still to go to
Hoboken and you're planning on going,
basically riding down there yourself,
correct?
        A Correct.
        You're going to be riding to Hoboken
yourself.  You're not going with anyone.
        A Uh-huh. (9T70-1 to 7).

        Q Before you leave the house that night,
do you take the .25-calber Beretta with you?
        A I do.
        Q Why do you take it on March 27th,
2010?
A I was no longer traveling with anybody.  I
was going solo.  I'm going down to Hudson
County.  You know, I got a lot of money on
me.  I got — you know, I'm wearing nice
clothes.  I got a big chain on driving a
brand new truck, you know.  It's — you know,
it's always a risk when you go out to places
like that, you know.  You never know who
you're going to run into or encounter. (9T70-

105

11 to 22).

The prosecutor's statement "And the reason is because he never did.  He never carried the gun.  If he did, maybe he put it in the holster in his leg" (11T83-20 to 22) is contradicted by her earlier statement: "When he put that gun in his pocket, he knew he was going to go kill her." (11T57-2 to 3). The prosecutor contradicted herself twice; first, she states petitioner never carried it, but I maybe put it in the holster of my left; second, she earlier stated petitioner put the gun in his pocket.  The prosecutor stated:

> This is not where you're going to put it, between your belt — he even said he's never carried it that way, maybe once or twice.  And the reason he didn't put it in his pant leg in the ankle holster was he said because he was self-conscious. (11T84-1 to 6).

In summation, on page 57 summation the transcript states that the gun is in petitioner's pocket; on page 83 he did not put it in his ankle holster, and did not put it between his belt; and page 84 he did not put it in the ankle holster (the then admitted petitioner carried it once or twice).  It is self-contradictory for an individual with all the scientific, medical, etc. evidence to make such contradictory statements.

The prosecutor also contradicted herself when she stated: "[a]nd I don't know if he said anything to her" (11T58-10 to 11), then "[a]nd he probably did talk to her, and he probably said, you know what, if I can't have you nobody can" (11T58-14 to 16).

106

The prosecutor stated: "Because they were friends, because she trusted him." (11T57-17). This contradicts the prosecutor's statement cited above (11T55-24 to 56-9), particularly her statement "Really what she's saying to him is, Joe, I don't even really want to be your friend." (11T56-4 to 5).

The prosecutor stated:

> I questioned him about his text messages
> to Daisy and Diana about the stress and
> jumping out of his skin. Remember he send
> (sic) that same text message, do you ever
> feel like between the hours of 4 and 8 you're
> really like — I don't remember what he said,
> like hyper or something? And that was a
> strange text. (11T67-5 to 11).

Allison did not get the flat until she got on the highway after 10-11:00 p.m. (per Gary's testimony and phone records).

The prosecutor stated: "And he admitted that he had stated to them, I was jumping out of my skin. Apparently he said he was stressed about being out of work." (11T82-18 to 20). Petitioner was not "out or work" but was on paid leave. The prosecutor acknowledges that petitioner was jumping out of his skin due to his job decision coming up (not that he was antsy about committing a crime he did not commit). Law enforcement failed to investigate the neighbor. 3/29/10 statement.

The prosecutor stated:

> But I assure you, no one has ever said,
> I'm going to kill someone, and then been on
> trial for it later without there being a
> connection between the two." (11T68-2 to 5).

The prosecutor stated, referring to the testimony of Ms.

Parisi: "Not only did Ms. Parisi say that she thought he looked like he had fear in his eyes, she also said that <u>she was afraid of him</u>.  She wasn't going to stop and help him." (11T75-2 to 5) (emphasis supplied).

The prosecutor referred to the petitioner's testimony as "scientifically and medically impossible.  It was self-serving.  He appeared self-absorbed, and then a non-clinical term, narcissistic." (11T79-20 to 23).  The prosecutor diagnosed petitioner as a narcissist which is, in fact, a clinical term utilized by a psychiatrist.  No mental health professional testified at the trial.  These are facts not in evidence and the prosecutor giving a medical opinion with no basis.

Q. <u>INFRINGEMENT ON FIFTH AMENDMENT RIGHT TO REMAIN SILENT AND FALSE NARRATIVE AS TO THE "COVER-UP"</u>

The State's references to petitioner's post-<u>Miranda</u> silence violated <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) and <u>Doyle v. Ohio</u>, 426 U.S. 610 (1976) (Supreme Court held that arguing in summation that post-<u>Miranda</u> silence impeaches a defendant who has testified in a violation of due process).  Petitioner submits that this grave constitutional error alone warrants the granting of habeas relief.  When considered in conjunction with the plethora of prosecutorial misconduct and constitutional violations, habeas relief is mandated.

During cross-examination of petitioner, the following occurred:

Q Of all those things being in a panic,

108

you being shot in the hand and your friend
being dead, which is the most important?
A Oh, absolutely my friend being dead.
    Q And that's the one thing you didn't
talk about, right?
A I was in no position to talk.  That's not
coffee time.  Not — no time for coffee and
tea.
    Q [Allison] was shot in the hand and was
able to fight you and shoot herself two times
in the face, and you can't tell your mother
your friend is dead?
A No.  I'm going in and out of consciousness,
Ms. Pappas.  I can't tell you — you heard Dr.
— actually, you — as a matter of fact —
    Q Yes or no, please.
A What?
    Q Yes or no.
A I never told any — no.
    Q You never told a soul.
    MR. IACULLO: Asked and answered, Judge.
    THE COURT: No, overruled.
    THE WITNESS: I did not tell anybody, no.
 At this point I was in and out of
consciousness.  I was in no position to talk
about anything.
BY MS. PAPPAS:
    Q Let me pose another scenario.  Isn't
it true, Mr. Tedesco, that the reason your
mother fell to the ground was because you did
tell her you shot and killed [Allison]?
A No.  That is not true.
    Q Because she was devastated?
A That is not true.
    Q And at that point she had to decide,
do I protect my son or do I call the police?
    MR. IACULLO: Objection, Your Honor.
    THE WITNESS: That is not true.
    THE COURT: I'll sustain as to the form
of the question.
    MS. PAPPAS:
    Q Did you make your mother cover up for
your murder?
    MR. IACULLO: Objection, Your Honor.
    THE COURT: Sustained.
    MR. IACULLO: Judge, I move to strike
that.  There's no evidence whatsoever in this
record that —
    THE COURT: Yes, I will strike the
comment. (10T58-10 to 9) (emphasis supplied).

109

The prosecutor stated:

> He's so bad he can't tell a soul what
> happened to him, not even worried about that.
> Doesn't tell the doctor, doesn't tell the
> nurses, doesn't tell anyone. He doesn't tell
> the details of that evening because the
> details of the evening were murder. (11T79-3
> to 8).

This is yet another infringement of the petitioner's Fifth
Amendment right to remain silent.

The prosecutor also violated petitioner's right to remain
silent when she repeatedly and improperly (and with no basis in
fact) argued that petitioner and his family engaged in a "cover
up":

> And you want to know why all this
> happened, ladies and gentlemen? And I don't
> want to say that Mrs. Reckhow is a bad person
> because any one of us might do the same
> thing. But when he came home, he told her.
> He didn't say I got shot. That's
> unrealistic. A young man isn't going to do
> that. He wasn't so out of it from this non-
> fatal wound that he couldn't tell his mother
> what happened. He told her, I just killed
> [Allison]. And when she cried and when she
> fell to the ground, according to her and
> according to her husband, it wasn't because
> she was worried about his hand. It was
> because she knew. She knew what was going to
> happen.
> She might not have asked him anymore
> questions. They might have left it at that.
> But I have another point to raise to you.
> When Officer Krause testified, who was
> there at the house? The family members. His
> father drove from wherever it was, Bergen,
> Essex County, presumably on Route 80. He
> didn't get off and go to the hospital to see
> his son, did he? No, he went back to the
> house, because they all had a meeting about
> what to do.

> **He didn't — he wasn't worried about his son's injury.  They're worried about what do we do now to take care of Guiseppe (sic).**
>      **And, again, you might have done the same thing if you were in their shoes.  But they have to account for their actions.  They covered this up, too.**  And so did Mr. Reckhow. (11T76-21 to 77-24) (emphasis supplied).

The prosecutor repeatedly referenced "his [petitioner's] coverup" (11T61-14), "his coverup afterwards (11T101-11) and "Mr. Reckhow was continuing the coverup and just providing more possibilities for the defendant to come up here and tailor his testimony for you later." (11T78-10 to 12).

Neither petitioner, his mother, father, or stepfather were ever charged with any coverup/obstruction of justice, and there was no evidence to support "coverup" theory.  Nobody testified as to the alleged "meeting what to do about Guiseppe."  Petitioner did not ditch the gun.  When asked on direct testimony whether petitioner altered the gun, petitioner advised that he had purchased it legally.  Petitioner's family called 9-1-1 to help Allison.  Petitioner told his parents Allison's address.  He did not erase, destroy or alter any phone texts (petitioner's or Allison's).

The prosecutor stated: "he told you his wound was so bad he couldn't talk to anybody." (11T78-24 to 25).  Petitioner never stated that his wound to his hand was so bad he could not talk to anybody.  Nowhere in testimony; the prosecutor made this up as a way of again violating petitioner's right to remain

silent (by incorrectly claiming petitioner lied about his
injuries as an excuse for not speaking about what occurred).

The prosecutor stated, at the end of her summation:

> . . . and then his silence by not
> telling his parents or anyone at the
> hospital, any of the doctors or the medical
> staff. And the puzzle was put together. And
> the big picture is that he's guilty. He's
> guilty of murder, he's guilty of unlawful
> possession, and is guilty of possession of a
> weapon for unlawful purpose. (11T104-1 to 7)
> (emphasis supplied).

The defense objected and stated to the court:

> And, again, Judge, we get into again the
> right to silence, Joe not saying anything to
> anyone, if this in fact happened he would say
> it to someone. And, again, Judge, that's
> beyond the bounds of — and, again, the whole
> issue of getting into what transpired with
> respect to silence and the way it would be
> utilized. That was in a way that it was
> never supposed to be utilized in this trial.
> (11T112-23 to 113-5).

In her defense, the prosecutor stated:

> The silence, I was trying to be
> extremely careful to make sure that I
> referenced his silence as his failure to not
> tell anyone about this tragic accident as
> opposed to his failure to come forward to
> police. And I made a specific, especially at
> the end, reference that he didn't tell his
> parents and that he didn't tell the medical
> staff. I did not mention at all law
> enforcement and I did not comment on his
> right to remain silent. (11T117-2 to 10).

Petitioner takes umbrage with this claim by the State. His
right to silence does not just apply to law enforcement, but
applies to everyone. The infringement upon petitioner's right
to remain silent was utilized to imply petitioner's guilt.

Petitioner testified truthfully as to his injuries that resulted in his being unable to speak coherently at the time due to his being under pain medication (including morphine). During direct examination, petitioner testified: "I had hit my head on the floor at the bottom. (9T103-2 to 3). The testimony of petitioner, his mother, Dr. Kutlu, Redfern, was that petitioner had hit his head, had a gunshot wound, was dizzy, given morphine, and Lopressor. This is reflected by the cross-examination of Dr. Kutlu (who treated petitioner):

> Q He didn't have any problem — was he prescribed pain medications?
> A Yes.
> Q Do you know what pain medications he was prescribed.
> A I would have to look at the record, but I presume he received Morphine.
> Q And that's standard procedure?
> A Yes. (5T28-18 to 29-1).
>
>           *           *           *
>
> Q Okay. So he was under the influence of narcotics?
> A He had received narcotics, yes.(5T29-15 to 17).
>
>           *           *           *
>
> Q And given general anesthesia.
> A Yes. (5T30-7 to 8).

Dr. Kutlu testified to the following:

> A yes. I see. His blood pressure is 202 over 97.
> Q Does that — would you consider that an elevated blood pressure?
> A Yes.
> Q And he was prescribed medication for that, Lopressor; is that correct?
> A Yes.

> Q To address that blood pressure.
> A Yes. (5T28-2 to 10).

During the direct examination of Redfern the following

occurred:

> A He was laying or sitting up in a bed
> in the emergency room.
> Q And can you describe his appearance for us
> and his demeanor?
> A His demeanor, he was complaining that
> he was — or moaning I should say, not really
> complaining, moaning, and saying that he was
> dizzy.  He was fully clothed at that time.
> (4T85-13 to 20) (emphasis supplied).

The prosecutor stated:

> And while they're in the house, the mother
> testified to that he's crying, oh, God, help
> me.  And you'll recall exactly what was said,
> but he's like saying, help me, help me, help
> me, that he's in such tremendous pain and
> that he's out of it and he's semi-conscious.
> (11T75-20 to 25).

The prosecutor improperly utilized petitioner's silence to

project guilt (after she tolls it into "a cover up."  The right

to remain silent is a lawful right.  Petitioner's remaining

silent was taken out of context.  The evidence presented in the

case is that petitioner "hit head on floor" (his testimony); was

"semi-conscious" (his mother's testimony); was "moaning, dizzy"

(per Redfern's testimony); and had "elevated blood pressure,

prescribed morphine for pain, Lopressor (blood pressure);

anesthesia (for surgery).  Petitioner clearly sustained a

concussion/medical situation due to the gunshot and head injury.

Verified by his mother, petitioner, detective and a doctor.  The

PowerPoint shows petitioner wearing a head compress. (75a).

114

The Prosecutor/State attacked petitioner's Constitutional right to remain silent.  They did this by showing a slide that said that he did not have a right to remain silent to his parents. (76a). This slide states: "Details = Murder" "If you had accidentally shot and killed the woman you loved – *wouldn't you tell everyone* who would listen?" "<u>No constitutional right to remain silent</u> from your parents and doctors treating you." (76a) (emphasis supplied).  There was another slide highlighting his silence in the hospital. (75a).  This slide depicts a picture of the petitioner in the hospital bed with the caption: "<u>NEVER TOLD HOSPITAL STAFF DETAILS OF THE NIGHT</u>." (75a) (emphasis supplied).

**REASONS WHY THE WRIT SHOULD ISSUE AS TO THE**
**FIFTH AMENDMENT AND DUE PROCESS VIOLATION**

"The Fifth Amendment . . . forbids . . . comment by the prosecution on the accused's silence." <u>Griffin v. California</u>, 380 U.S. 609, 615 (1965).  Nor may a defendant be impeached by showing that he remained silent in the wake of <u>Miranda</u> warnings, as such evidence carried "a significant potential for prejudice[.]" <u>Doyle v. Ohio</u>, 426 U.S. 610, 617-19 (1976).  In <u>Doyle</u> the Supreme Court held that arguing in summation that post-Miranda silence impeaches a testifying defendant is a violation of due process. <u>United States v. Hale</u>, 422 U.S. 171. 180 (1975).

In <u>Tedesco</u> there was no reason for the jury to be told that the petitioner Giuseppe Tedesco had exercised his right to remain silent.  If there was any conceivable reason for the jury to know that he had invoked his rights, it was overcome by the

115

severely prejudicial inference the information inevitably raised.
See Hale, 422 U.S. at 180 (defendant "is unlikely to overcome the
strong negative inference that the jury is likely to draw" from
reference to exercise of Miranda rights).

In addition to the Supreme Court decision in Doyle, numerous
federal Circuit Courts have granted habeas relief due to the
prosecutorial misconduct by infringement of the Fifth Amendment
right to remain silent, including the Third Circuit's decision in
Lesko v. Lehman, 925 F.2d 347 (1991) (comment by prosecutor at
penalty phase that defendant should be executed because he did
not say he was sorry violated Fifth Amendment.  Other habeas
grantings include United States v. Roberts, 119 F.3d 1006 (1st
Cir. 1997) (prosecutor's deliberate attempt to call attention to
defendant's failure to testify); United States v. Hardy, 37 F.3d
753 (1st Cir. 1994) (indirectly commenting on defendant's failure
to testify); Floyd v. Meachum, 907 F.2d 347 (2d Cir. 1990)
(references to Fifth Amendment violated Fifth Amendment/due
process); United States v. Johnston, 127 F.3d 380 (5th Cir. 1997)
(reversal warranted as closing statement telling jury not to
consider defendant's silence intended to call attention to
failure to testify); Gravely v. Mills, 87 F.3d 779 (6th Cir.
1996) (prosecutor's repeated references to post-Miranda
silence/Doyle error in cross-examination and summation); United
States v. Cotnam,88 F.3d 487 (7th Cir. 1996) (improper references
to defendant's failure to testify); Miller v. Lockhart, 65 F.3d

116

676 (8th Cir. 1995) (death penalty overturned in part on
defendant never saying he was sorry); <u>United States v. Foster</u>,
985 F.2d 466 (9th Cir. 1993) (reversal due to improper
questioning regarding post-arrest silence; <u>Doyle</u> error).

While the Fifth Amendment protection against self-
incrimination applies to questioning against law enforcement, a
defendant has no obligation to make any statements whatsoever to
anyone.  These slides are certainly, at best, misleading as any
statements made by petitioner to the hospital or his parents
would have been admissible against him so his exercise of his
right to remain silent is not appropriate fodder for the State.
Moreover, this was an issue during the trial as there was
testimony from both petitioner's mother and step-father that
petitioner did not discuss the matter with them subsequently due
to the fact that he was acting on the advice of counsel.

The State successfully utilized petitioner Tedesco's pre-
arrest silence as substantive evidence of guilt in violation of
his due process right to a fair trial (and Fifth Amendment right
to remain silent).  In <u>Tedesco</u> the State courts' handling of the
Fifth Amendment/Due Process errors are contrary to and also
involve an unreasonable application of clearly established
federal law, mandating issuance of the writ.

R.   <u>OTHER ERRORS</u>

The prosecutor (at 11T70-8 to 74-9; 92-14 to 24) give
multiple accounts of how she believes the shooting occurred.  She

117

present it as fact, but contradicts herself.  She uses her own "medical forensic" but none of it makes sense.

During cross-examination of petitioner, defense counsel objected, and, in spite of the prosecutor acknowledged her error, she continued to engage in misconduct:

> MR. IACULLO: I thought we discussed it. She wasn't supposed to approach the witness. She wasn't supposed to yell at the witness. She's supposed to question him from the podium.  You were going to direct him if there was an issue with that.  We're back to yelling and screaming in front of him. This is totally improper cross-examination, Judge. That's not how –
> THE COURT: All right.  Ms. Pappas, I'll give you a chance to respond.
> MS. PAPPAS: You did say that, sir, and I apologize for going up there.  I should not have and I won't.  It was emotion that got to me. (9T22-3 to 15).

The prosecutor improperly utilized inadmissible evidence ordered stricken from the record when she stated:

> The weapons charges are going to be very simple.  There's two of them: Unlawful possession of a weapon, which means he possessed the firearm, and I'm simplifying it, with no permit to carry it, and in fact, he admitted that he was guilty of this.  He didn't use that word, but he said I carried it and I didn't have a permit and I know I was wrong. (11T99-12 to 18).

During the cross-examination of defendant the following occurred:

> Q You put it in your waistband –
> A Correct.
> Q – and you drove to go somewhere.
> A Correct.
> Q You just admitted guilty (sic) to possession – to unlawful possession of a

weapon, correct?
A MR. IACULLO: Objection, Your Honor.
    THE COURT: I'll sustain that to the form
of the question.
    THE WITNESS: Correct.
    THE COURT: The answer will be –
BY MS. PAPPAS:
    Q You did –
    THE COURT: Excuse me, Ms. Pappas.
    MS. PAPPAS: Excuse me, sir.  I
apologize.
    THE COURT: The question is stricken. The
answer is stricken as well.  The jury is
instructed to disregard both the question and
the answer. (9T129-3 to 20).

S.    <u>CUMULATIVE ERRORS</u>

When defense counsel objected very early on to the State's

summation, he was instructed by the Court to wait until the end

of summation to object. (11T58-24 to 25).

The Appellate Division stated:

> Finally, defendant argues the court's refusal
> to permit timely objections made any curative
> instructions insufficient to overcome the
> prejudice of improper comments, and the
> resulting cumulative effects of the
> prosecutor's errors denied him a fair trial.
> We disagree.
>
> As noted, defense counsel initially objected
> to the prosecutor's remarks during summation,
> at which point the judge directed he hold his
> objections until closing.  After the
> prosecutor completed her summation, defendant
> moved for a mistrial.  The judge denied the
> motion, determining he could address the
> matters with curative instructions.
> Defendant contends, however, the delay
> between his objection and the judge's later
> curative instructions rendered them
> ineffective.
>
> Our Supreme Court has held that a motion for
> mistrial immediately after a summation on the
> basis of a prosecutor's improper remarks can

> be "tantamount to a timely objection" and
> provides the judge sufficient opportunity to
> cure the improprieties . . . As noted,
> because we found the judge's curative actions
> sufficient, we do not believe the alleged
> delay, even accounting for the time the
> jurors took for lunch after the summations,
> prejudiced defendant in this matter.
>
> Finally, defendant contends the cumulative
> effect of the prosecutor's errors overcame
> the court's curative instructions.  As a
> corollary to our analysis regarding the
> specific issues previously addressed, with no
> finding of error, we reject defendant's
> argument that cumulative errors deprived him
> of a fair trial.  We find defendant (sic)
> arguments lack sufficient merit to warrant
> further discussion. See R. 2:11-3(e)(2).
> (Tedesco op. at 13; 202a-203a).

In addition to the above, examples of improper questioning,

comments, and conduct by the prosecutor are rampant throughout

petitioner's final day of testimony on December 20, 2013.

Several times, after defense objections, the Court had to

admonish the State for its antagonistic nature during cross

examination: "That was a very long answer, wasn't it?" to which

defense counsel objected and the Court stated: "I'll strike the

comment" (10T12-21 to 23).

The prosecutor stated:

> Going now to the defendant's testimony,
> first of all, as I've stated before, other
> than a few facts here or there, 100 percent
> total lie to you.  It was tailored to fit the
> evidence that was presented.  It was
> physically impossible.  It was scientifically
> and medically impossible. (11T79-16 to 21).

See also 11T89-5 to 12; referenced above.

Neither Dr. Shaikh, Dr. Kutlu nor any other witness ever

120

testified that is was physically, scientifically, or medically impossible.  The science/medical witnesses were not even presented with the events that occurred; Dr. Shaik never once uttered defendant's name in his testimony.

Dr. Kutlu's testimony regarding the entrance and exit wounds to his injuries again, if he were holding the gun like he said there is no way petitioner could have shot himself in the right hand.  Petitioner was shot in the left hand, not the right hand.

 Dr. Kutlu never referenced Allison as referenced above.  Dr. Kutlu testified on December 11, 2012 (8 to 10 days prior to petitioner) and was never presented with petitioner's account.

Dr. Kutlu testified:

> Again, roughly. But bullets can behave in
> very strange manners as well, but in general
> they tend to follow straight lines depending
> on circumstances. (5T22-1 to 3).

During cross-examination, Dr. Kutlu testified as follows:

> Q And you went through during Ms.
> Pappas' examination your extensive training
> as a surgeon.
> A Yes.
>       Q You're not trained as an investigator
> –
> A Correct.
>       Q – or a law enforcement officer.
> A Correct.
>       Q And your role with regard to Mr.
> Tedesco was to treat his injuries; fair to
> say?
> A Yes.
>       Q And you weren't there necessarily to
> collect evidence?
> A Correct. (5T24-17 to 25-4).

*          *          *

121

Q Now, you testified about him having a
gun shot would to his left hand; is that
correct?
A Yes. (5T25-16 to 18).

Dr. Kutlu testified during direct:

MR. IACULLO: Judge, just give me a
minute, if I could, there's some things here
I don't recall seeing before, Your Honor.
Judge, there's some items in here that
the defense does not have.  I would just like
the opportunity just to take a look at it
before the questioning begins.
THE COURT: Well, do you have a copy of
the report?  Was that provided?
MR. IACULLO: Not this whole packet.  I
have some of the things in here, Your Honor,
some of the things I do not.
MS. PAPPAS: Judge, we go tour (sic)
reports from the hospital.  I provided them
to the defense counsel.  I'm not going to ask
anything beyond what's contained in the
hospital report.
THE COURT: All right.
MS. PAPPAS: It's simply to refresh his
recollection. (5T15-4 to 22).

The following also occurred during Dr. Kutlu's direct:

Q And based on your training and
experience, do you have an opinion, an expert
opinion as to whether or not that's an
entrance or an exit wound?
MR. IACULLO: Judge, I'm going to object.
This was — he was a fact witness, Judge.
We're getting into –
THE COURT: Overruled. (5T18-1 to 7).

The prosecutor utilized Dr. Kutlu outside the scope of his
report.  The Court erred by allowing non-expert testimony.  The
defense was not given all reports. (5T15-7 to 22).

Dr. Kutlu was offered as an expert in the field of medicine;
plastic reconstructive surgery:

MS. PAPPAS: Judge, at this time I would

122

                    like to offer Dr. Kutlu as an expert in the
                    field of medicine; specifically plastic
                    reconstructive surgery.
                         THE COURT: Any voir dire?
                         MR. IACULLO: Judge, I have no voir dire
                    but my understanding is that he would be a
                    fact witness here today.
                         THE COURT: You have a report, I assume?
                         MR. IACULLO: We have an operative
                    report, Your Honor, that' sit.
                         THE COURT: All right.  I will accept the
                    offer by the State given the history and
                    qualifications of the doctor.  (5T10-5 to
                    17).

     This buttresses petitioner's argument that the prosecutor

went beyond the scope of proper questioning.  Dr. Kutlu is not an

expert investigator.  The Court agreed that Dr. Kutlu was a fact

witness but allowed the prosecutor to go out of scope.  The

prosecutor altered Dr. Kutlu's testimony and elicited testimony

outside of Dr. Kutlu's experience and scope.  The prosecutor

falsely stated she would only go by report; after the judge

agreed, he then let her go outside scope of report.  Dr. Kutlu's

report was not provided.  Dr. Kutlu testified before petitioner

testified and never heard his account.  The State presented its

case as if Dr. Kutlu's testimony incorporated and considered

petitioner's account.

     Petitioner did suffer wounds; denied by the prosecutor.

     During petitioner's cross the following occurred:

                    Q Did Dr. Kutlu testify, do you
                    remember, you remember him saying that you
                    suffered no contusions, bruising, that just
                    was minor scratches?
                         MR. IACULLO: Objection to the form of
                    the question, Your Honor.
                         THE COURT: All right.  What's the basis

                                   123

for the objection?
          MR. IACULLO: Just, the form of the
question.  She's questioning him concerning
testimony that was not elicited from the
doctor.
          THE COURT: Well, restate the question,
          Ms. Pappas. (10T46-2 to 13).

During Dr. Kutlu's cross the following occurred:

          Q Doctor, do you recognize this picture?
     A I do.
          Q And what is it?
     A It's Mr. Tedesco's back.
          Q And is there something in the middle
     of his back?
     A Yes, there appears to be some sort of a
     mark or wound.
          Q So there was something other than just
     the scratches on his torso and the gun shot
     wound.
     A Yes. (5T33-10 to 20).

The prosecutor stated:

          At some point going down the stairs,
     then, he does it exactly as I said it.   And
     there's the trajectory of the wound.  There's
     approximately where the entrance wound was
     and the exit wound, corresponding to the
     shots on the sweater, just like this. (11T72-
     15 to 20).

Dr. Kutlu never testified to this nor did any expert.  A

fictitious forensic "fact." See Dr. Kutlu cross (5T24-17 to 25-4)

and direct examination(22-1 to 3); and petitioner's cross (10T46-

2 to 11).  The following occurred during the direct of Redfern:

          Q . . . were you able to observe him
     completely naked?
     A Completely naked — he had a hospital gown
     on.
          Q Sometimes when you take photographs of
     suspect in a crime you get them naked, is
     that correct?
     A That is correct.
          Q In this particular case you did not.

124

A That is correct. (4T99-1 to 9).

During direct of Redfern the following occurred:

    Q How would you characterize the extent
of his injuries?
A Extremely mild,  He had some scratches on
him.  That was it. (4T100-4 to 7).

                *           *           *

    Q When you looked at that particular
view, did you see any bruises?
A I did not.
    Q No scratches?
A I did not. (4T100-19 to 23).

                *           *           *

A S-10 is a photograph of Mr. Tedesco's right
hand.
    Q And does that in any way show any
injuries to his right hand?
A It shows what appears to be a very small
scratch just adjacent to the thumb. (4T103-14
to 18).

During Redfern's cross the following occurred:

    Q And those pictures depict scratches,
abrasions, whatever type of medical term you
want to use or his back, or his neck, to his
shoulder area; is that fair to say?
A That is correct. (4T114-7 to 11).

During Redfern's cross the following occurred:

    A Disregarding the hand shot, these
injuries that Mr. Tedesco had were extremely
mild.  I'm used to severe abrasions, scrapes,
even broken bones or missing teeth.
Q Did he have any abrasions or injuries or
anything on his legs indicating he might have
fallen?
    A He did not.
Q Anything on his elbows?
    A He did not.
Q On his forearms?
    A Nothing. (4T166-2 to 12).

125

Contrast this with Redfern at 99-1 to 9.

NOTE: As to mishandling of evidence:

> Q Were all the items when they were put
> into the plastic bag individually sealed or
> were they put together in the bag by the
> doctor?
> A They were put together, all together by the
> doctor.
> Q Was there any type of mechanism to
> make sure they didn't touch each other or
> that there would be a transfer of any
> substance?
> A There was not. (4T93-6 to 13).

Redfern testified: "His demeanor, he was complaining that he was — or moaning I should say, not really complaining, moaning, and saying that he was dizzy." (85-17 to 19). Petitioner told his defense counsel on direct that he hit his head. Petitioner's mother testified he was in an out of consciousness. Dr. Kutlu did not conduct any toxicology screen (and any possible concussion of petitioner was overlooked)

The prosecutor simply made up testimony that was never testified to. Redfern contaminated evidence and was not consistent regarding petitioner's injuries.

The prosecutor incorrectly stated: "He said two times to me on cross, as well as on direct, that she was leaning against the doorway." (11T86-6 to 8) (emphasis supplied). The following occurred during the cross-examination of petitioner:

> Q So I want to get — she's like leaning
> against the door sort of casual?
> A Well, she was closer to the door. I wasn't
> — I wouldn't say she was like leaning up
> against it like, you know — it was just more
> she was — her body was more centered towards

126

```
            the –
                 Q Use the laser pointer.  Show us where
            she was.
            A How do I do this, laser?
                 Q Yep.
            A Right here.  She would have been more
            towards like standing right here in this
            doorway, but more towards like right there.
            (9T226-13 to 25) (emphasis supplied).
```

During his direct examination, petitioner testified: "When I place the glass in the sink, I turned around and she was standing in the -- like the doorframe." (9T93-25 to 94-2).

The prosecutor stated: "Then he says that the gun accidentally went off in her hand.  I want you to look at that. I put an arrow through the wounds.  Entrance.  Exit." (11T86-20 to 22) (emphasis supplied).  No forensics expert put an arrow through it, nor did any reconstruction expert.  The prosecutor improperly testified as an expert witness.

The prosecutor stated: "If, in fact, it had happened the way he stated, the gun was right here, the wound would have gotten like this." (11T86-22 to 24).  Again, no one testified as to this medical/scientific testimony.

The prosecutor stated: ". . . and it doesn't explain the cartridge being over here because, as I stated, if she had had the gun in her hand the way he said, it would have ejected right here.  It would have gone this way, right here." (11T86-14 to 19).  The prosecutor previously stated that she did not know how the cartridge "ended up downstairs" but that "it doesn't really prove one thing or another, whether or not the bullet was there."

127

(11T71-9 to 15).  Nobody testified as to how and where the

casings/bullets went.  The prosecutor admitted that it does not

prove anything.  This is not proper scientific analysis.

The prosecutor stated: "But the way he gave the explanation

of her being shot is not consistent with the wound that she

suffered." (11T87-2 to 4).  No medical/scientific expert

testified to this statement.  During petitioner's direct

testimony the following occurred:

> A It's – you have to use your right hand.
> Q My right hand.  I'm sorry.  Thank you.
> A Like this.
> Q Okay.  Now is this correct?
> A That's correct.
> Q MR. IACULLO: Judge, for the record,
> I'm holding S-123 in the palm of my hand.
> BY MR. IACULLO:
> Q This gun basically fits in the palm of
> my hand.
> A Yes.
> Q And would you say –
> MR. IACULLO: And I would say, Your
> Honor, that the barrel is pointing back
> towards me near my thumb area.
> BY MR. IACULLO:
> Q Is that a fair description?
> A Yes.
> Q Okay.  Now, you said that Alyssa is in
> the area where the kitchen meets that landing
> area.  On the top of the stairs we're talking
> about?
> A Correct, yes.
> Q Okay.  Describe for us, and I'll
> utilize this right now, how she possessed the
> gun and what, if anything, was done.
> A Well, if you were standing in the doorway,
> she-
> Q Assume I'm in the doorway right now.
> A Right.  I turned around and she had the
> gun basically the way you have it, and it was
> like almost like presented to me.
> Q Okay.  And it was in her right hand,
> correct?

128

A correct.
        Q And the S-123 I'm holding in my right
    hand, and the barrel would be pointing
    towards me up against the thumb area.  Is
    that fair to say?
    A Correct. (9T95-5 to 96-16).

Petitioner's testimony clearly reveals that the gun went off
in the palm of Allison's hand.  Also see the PowerPoint 58A
(picture of the entrance wound in Allison's hand).

The prosecutor stated:

    There's no possible way to explain what
    happened down the stairs except you shoved
    that gun in her abdomen and you pulled the
    trigger and you killed her. (11T87-25 to 88-
    3).

During Dr. Shaikh's direct examination, he testified to the
following:

        Q Can you give an opinion within a
    reasonable degree of medical certainty as to
    how long she lived after receiving this
    particular wound?
    A I cannot make that determination. (8T32-21
    to 24).

Dr. Shaikh testified:

        Q Would that alone have killed her?
        A This is a wider wound.  She had perforation
    through the stomach with spilling of the stomach
    contents into the abdominal cavity.  The
    laceration of the aorta is very significant
    because that is the major artery that comes out of
    the heart and contains oxygen into blood under
    pressure, and the injury to the spinal cord.  Yes,
    this is a significant wound that would by itself
    be lethal, unless immediate laparotomy was done
    and the aorta was cross clamped and heroic measure
    were undertaken. (8T35-13 to 23).

The prosecutor stated:

        There's no way, physically, medically or

129

scientifically possible that what he said is
true.
       If she has the gun in her hand pointing
this way, and his hand is still on the
trigger, she would have been shot in the
hand, and she couldn't control it, and he
would have had to pull the trigger.  She
would have had three more shots in her hand,
or two more shots in her hand, and none in
her abdomen and none in her chest. (11T88-21
to 89-4).

The direction of gunshots is ultimately decided by where the
barrel of the gun is pointed.  Petitioner testified that they
were both falling down the stairs, the body positions changed.
There is no proof—scientifically or medically---that disproves
petitioner's testimony.

The prosecutor stated: "Again, if she were holding the gun
like he said, there's no way he could have shot himself in the
right hand." (11T89-7 to 9) (emphasis supplied).  Petitioner was
shot in the left hand and not in the right hand. (92a-93a).  He
never testified that he had shot himself and the State never
proved this allegation.  The prosecutor has made this up.

The prosecutor stated: "You see her leg going up?  That's
certainly indicative of someone who has no control over their
legs supporting the paralysis." (11T90-12 to 14).  It is
impossible to tell paralysis simply by looking at photographs.

The prosecutor stated: "—where he says he fell and the wound
on his back.  They're inconsistent.  In other words, if you look
at this, the bird itself, the bars that would have caused
markings are parallel to the circle.  On his back, they're

130

perpendicular.  <u>He didn't fall on that.  I don't know where he</u> <u>got that</u>.  No one knows where he got it.  <u>But he certainly didn't</u> <u>get it from falling on that</u>. (11T90-20 to 91-2).

The prosecutor repeatedly contradicted herself.  She used "science" to explain why or how petitioner did not get the wound, but then says he did not get it from that.  The "science" is also imperfect.  One could photograph at different angles; a vertical line becomes horizontal if the paper is turned.

The prosecutor stated "He texts her, will you spend my birthday with me, and hears a final no.   Really was she's saying to him is, Joe, I don't even really want to be your friend.  But she's nice." (11T56-2 to 5).  The prosecutor stated: "It wasn't just the text messages.  The text messages said, I don't want to be your girlfriend, <u>I don't really want to be your friend</u>, don't talk to me anymore.  And, yeah, he didn't use − <u>she didn't use</u> <u>the words that he mentioned</u>, go away, leave me alone, because she's nice." (11T56-10 to 16) (emphasis supplied).  The prosecutor stated: "And he's right, she did let him in.  And you know why?  Because <u>they were friends</u>, because she trusted him. (1T57-15 to 17).  There is a contradiction as to whether Allison considered petitioner to be a friend.

The prosecutor stated: "if you remember my opening, I said how do you know what's in someone's head, you don't really know." (11T100-3 to 5).

The prosecutor contradicted herself (texts sent).  She

offered a narrative not found in the texts.  She admitted that
the words she used are not words use in the texts.  Her narrative
explained Allison did not want to be friends, then admitted
Allison was petitioner's friend and trusted him.  She later
admitted that she does not know what is in someone's head.

The prosecutor stated:

> At approximately 8:40, he made the phone
> call to his natural father on his drive back
> to his home.  And don't know what the nature
> of the conversation was, but I gather from
> what his testimony was and what Mr. Tedesco's
> answer was that he told her (sic) I just
> killed [Allison].  Not, I had a fight with
> her, not a horrible accident just happened; I
> killed [Allison].
> And what were his father's instructions
> to him?  Go home to your mother.  And, in
> fact, he does go home to his mother. (11T75-8
> to 18).

During petitioner's direct examination, he testified: "No,
we couldn't hear each other.  There was a lot of noise in the
background.  I don't know where he was at the time, but it was
hard to communicate.  I was — I remember telling him — I was
yelling into the phone that I'm shot, I'm shot." (9T114-20 to
24).  During direct examination defendant, when asked "As you
both fall down those stairs, is the gun discharged any further?"
to which he answered "It — I remember hearing two bangs." (9T101-
14 to 16).

As argued by defense counsel:

> And to say that Joe came home that night
> into that kitchen and said, I killed
> [Allison], or that Joe told his biological
> father, I killed [Allison], where's that?

132

> Where is that testimony?  If she wanted to
> ask somebody that, she should have called
> Joe's biological father.  He told his
> parents, I just killed [Allison].  They had a
> meeting as to what they were going to do, and
> they planned a coverup.  Where is any
> evidence, Judge, that anything like this took
> place? (11T112-14 to 22).

The petitioner's father was never called to the witness stand nor did he give a statement to police.  He was never investigated at all.

During petitioner's testimony he never stated that, during his conversation with his father, that "I killed [Allison]."  The prosecutor contradicted herself in her own statement when she said "I don't know what the nature of the conversation was" (11T75-10 to 11).  This "testimony" is altered/made up.

The prosecutor stated:

> In fact, on cross-examination, he would
> not even acknowledge that he heard gunshots.
> It took me probably four questions to get
> him to say, you heard two bangs, I know, Mr.
> Tedesco, you've heard gunshots before, were
> those gunshots.  Four questions, he conceded
> it.
> Then I tried to get him to concede that
> those were shots to her.  That took another
> two minutes.  He said, well, I don't know
> where they went, they could have gone in the
> wall.  He didn't even want to concede that
> those were gunshots or that they went into
> her body.  And finally, when faced with the
> science, he had to admit those two bullets
> going down the stairs went into her body.
> (11T88-4 to 15).

During direct of petitioner the following occurred:

> Q Two bangs.  You hear two bangs as
> you're going down the stairs.  Describe what
> it's like in the falling process so this jury
> can understand what is going on <u>as you're</u>

133

<u>tumbling down</u> the stairs and the bangs go
off.
A Basically, it was — you know, it was scary,
you know.  I mean, I had seen that she had
been shot in the hand.  You know, we were
both falling down the stairs.  You know, I
heard a couple more shots go off.  I don't
know where those shots went, if, you know, if
she was hit, if they went into the floor or
the ceiling.  I don't know.  It's just — you
know, we started tumbling down the stairs and
that was pretty much the —
     Q All right.  After you tumble down the
stairs, you say — at this point as you're
tumbling down the stairs, you don't know if
she's hit or if you're hit or if you're both
hit, correct?
A Correct. (9T101-25 to 102-18) (emphasis
supplied).

Petitioner did acknowledge that Allison was shot.  He did

acknowledge hearing gunshots.  As reflected above, defense

counsel stated: "as you're tumbling . . ." and the prosecutor

mischaracterized petitioner's response, added different context,

and again altered his testimony.

     The prosecutor stated:

          We have proven that he didn't act in
     self defense primarily because he says he
     never pulled the trigger.  The only thing he
     says he did was push that gun away from his
     face.  That's not self defense.  He never
     even by his own version acted in self
     defense. (11T201-19 to 23).

     The prosecutor stated:

          And how did his finger accidentally get
     on the trigger, especially when you've
     handled weapons a lot?  It is a small gun.
     He does have relatively large hands.  Your
     finger doesn't accidentally fall in there.
     (11T87-12 to 16).

     The prosecutor acknowledge petitioner's direct testimony at:

> Q When you turned and it was turned back
> towards [Allison] at this point, what
> happened?  Were you struggling for possession
> of the gun?
> A I was.  I was trying to take the gun out of
> her hand.  I was trying to kind of rip it out
>   And at that point, you know, I kind of
> yanked on it hard.  You know, I yanked on her
> hand.  My hands basically on the outside of
> her hand. (9T108-7 to 11).

>              *           *            *

> Q Did you believe at this point that she
> was going to fire that weapon?
> A I thought she was, yes. (9T108-22 to 24).

The prosecutor stated: "the parking two blocks away."

(11T103-25 to 104-1).  The petitioner testified:

> Q Why didn't you just pull into there
> real quick and stop there?
> A As I looked to the left and I saw that the
> — there was a — you know, the space open in
> [Allison's] driveway, I wasn't going to park
> there.  Like I said, I didn't know if
> somebody had just left, they ran out to get
> something, milk, cigarettes, whatever.  I
> looked to the right on Metro and I saw there
> was a vehicle parked to the right side, like
> almost right up on the curb.  So I just went
> ahead one block over and parked on Bergen.
> (9T82-20 to 83-5).

The prosecutor altered the facts to imply that petitioner

parked further away than he did.  At 55a and 85a (of the

PowerPoint) one can see how close the house is to Bergen Trail.

The prosecutor stated:

> And he probably did talk to her, and he
> probably said, you know what, if I can't have
> you nobody can.  And I don't know if she said
> anything, but common sense would tell you
> that she begged for her life, that she said
> don't, I'll go have the cake with you, we'll
> be friends - (11T58-14 to 19).

135

The prosecutor stated: "I asked him repeatedly, did she say anything; no, never said a word." (11T95-9 to 11).  This is another example of the prosecutor contradicting herself and making up facts.

The prosecutor stated: " . . . and, in fact, his parents and his friends all stated they had never seen him carry it.  And the reason is because he never did.  <u>He never carried the gun.</u>  If he did, maybe he put it in the holster in his leg." (11T83-18 to 22) (emphasis supplied).  During the cross-examination by the defense of Jerry the following occurred:

> Q And when you had gone out with Joe is
> it fair to say, [Jerry] that you didn't
> search Joe when you guys went out did you?
> A No.
> Q You didn't search his vehicle if you
> got in his vehicle did you?
> A No.
> Q Okay.  And you didn't search his
> pockets or his jackets or anything like that,
> correct?
> A No. (5T53-1 to 10).

Petitioner was never asked about the gun nor searched.  The prosecutor contradicted herself in the last sentence.  Also the Facebook page shows picture of petitioner wearing it round his ankle.

The prosecutor stated: "And then the letter from Mr. Iacullo to the prosecutor's office where he said, my client did not witness the shooting.  He said, he's wrong, I did witness the shooting." (11T80-25 to 81-3).  During the direct examination of petitioner the following occurred:

136

> Q Okay.  So you didn't see the actual
> shooting itself, but you saw – after you
> heard this loud bang a minute or so later,
> you come up and look forward and you see
> someone laying in the street, correct?
> A Correct.
> Q And there's people around her,
> correct?
> A Correct.
> Q Okay.  What, if any, conclusion did
> you draw from this at this point?  Even
> though you didn't actually see the shooting
> what, if anything, did you draw?
> A Right.  It just looked like the person
> might have been dead.  There was a lot of
> people screaming.  There was – you know, it
> was a scary situation. (9T20-5 to 18).

If one is at the scene of a crime, one is, by law,

classified as a "witness."  The prosecutor took the testimony out

of context.  Petitioner did not see the shooter bu55t was at the

scene.  Petitioner did see the body.  The prosecutors did want to

speak with petitioner and he told them the same that petitioner

testified to at the trial.  Petitioner never stated that defense

counsel was wrong; this was made up.

The prosecutor stated:

> I'm not even going to spend much time on
> the law in my closing.  Murder's defined as
> purposely or knowingly causing death or
> serious bodily injury that resulted in death.
>  And I'm going to tell you right now, that's
> short compared to the other law that the
> judge is going to read to you.  But I'm going
> to make it even shorter.  Purposely caused
> death.  Don't even worry about knowingly,
> don't even worry about the serious bodily
> injury that resulted in death.  He went there
> purposely to cause her death, and he did.
> (11T62-1 to 10).

It is the judge's job to instruct the jury.  This also

137

directly relates to the "call to arms" impropriety.

The prosecutor stated:

> We also learned about the tire
> slashings.  March 23rd, 2010; it's not a
> coincidence that this was the first night
> after Boston that she was at [Gary]'s house.
>  He'd been watching her, you can infer, since
> they got back from Boston, since he created
> that fake Facebook page.  And he followed her
> that night to Gerry's house and he slashed
> her tires.  And there's some corroborating
> evidence besides just the fact that there was
> the injury to her tire.  She called
> immediately from Route 80, so we know it was
> just a few minutes after she left his house.
> (11T65-19 to 66-4).

At trial, the face Facebook was discovered to have been
created in November 2009.  There was no corroborating testimony
to support prosecutor/Judy B. claims regarding the fake Facebook
page.  The prosecutor's claims are false on many levels.
Petitioner, Barber, and Gary all testified as to tire slashing;
nowhere in anyone's testimony does it state that petitioner
followed anybody, anywhere, at any time.

Gary testified that he walked Allison outside watched her
drive away: "so I just walked her to outside the garage, I saw
her get into her car and drove away." (5T105-23 to 24).  After
this Gary "went inside.  I think I went to the bathroom or
something then I saw my phone.  I had a missed call from her.
She called me, I called her right back when I saw it, probably
like ten minutes after she had originally left and I called her
back.  She told me she had a gotten a flat tire." (5T107-9 to
14).  He never saw "slash tires."  Allison drove away normally.

138

This prior bad acts testimony should have been excluded under 404b.  This is also the date of Judy's call (Verizon).

The prosecutor did not properly investigate this incident.  Barber could not remember her story.  After 2½ years there was no investigation of Gary.  Only one police report related to the slashing.  Petitioner was blamed from day one.

The prosecutor stated: "The second one, Friday, March 26th, again, it's not a coincidence that that's the second night that she's at [Gary's].  I submit to you that he followed her there, also." (11T67-1 to 4).  Prosecutor's claims are false.

The prosecutor improperly stated about Judy: "And I'll talk about her credibility later, but I'll talk about it now.  We don't know much about her.  We don't know what kind of person she is" (11T66-6 to 8) and "And she may not remember 10 minutes of a conversation from two years ago, but she remembers the important part." (11T66-22 to 24).

The prosecutor vouched for Judy with no supporting evidence.

It is known that Gary believed that a neighbor slashed the tires. (3/29/10 Livingston Police statement).  Sussex County does not investigate and petitioner's name not in report (not mentioned as suspect by Gary or Allison.  There is no mention of petitioner as a suspect in the report. (5T141-10).  Gary suspected "his neighbor may have been the person who punctured his tires" per the police report. (211a).  Though petitioner purportedly "admitted" slashing the tires, Judy invited him to a

139

party four days later. (5T173-15).  She did not report the call
until trial's eve more than two years later at the behest of the
SCPO. (5T169-1).  Petitioner denied slashing the tires and Judy's
statement. (9T54-7; 9T56-9).  The initial flat was not confirmed
a "slash;" Gary never saw the tire in the first incident as
Allison drove away (noticing the flat while on Route 280);
Allison texted defendant on March 24th and not March 23rd (per
Judy) stating: "IDK drove over something" contradicting Judy.

The prosecutor stated:

> And he comes back and he texts her,
> and he says, are you still awake, will
> you talk me to sleep, I just went for a
> drive through Sparta.  He didn't go for
> a drive through Sparta.  He took a drive
> to Livingston and he slashed her tires.
> (11T67-16 to 20).

There is no evidence to support this claim.  No witness nor
phone record.  No proof or basis for this claim.  No proof as to
where petitioner was.

The prosecutor stated: "By March 27th, 2010, we have motive,
intent, and opportunity from [Judy], the threats from [Jerry] and
[David] and [Melissa], [Judy]'s letter. (11T67-21 to 24).
Regarding the texts/letter from Judy, none of them state any
motive, intent, or opportunity.  Again, rather than simply
looking at the texts, the prosecutor goes into double meanings;
no Judy texts/letters even mention Allison in a negative way.

The prosecutor stated:

> . . . She told her mother that she felt like
> he was stalking her.  And she told her mother

140

>that he wanted – she wanted a restraining order.
>        And you saw Mrs. [R.] testimony about that.  And Mr. Iacullo raised the point that that information didn't come forward until right before the trial.  And she explained to you why that was.  And that was because she felt guilty.  <u>She felt like she could have done something, she could have saved her daughter.  If she had stayed there and listened and not go to Pennsylvania, maybe she could have helped her daughter.  But she did come forth with the information, and she did tell us.</u> (11T68-9 to 21) (emphasis supplied).

The timing is a problem; Allison's mother (Mrs. R.) said nothing for 2½ years despite being in constant contact with the prosecutor.  This passage reflects prosecutorial misconduct of improperly eliciting sympathy for Allison and her family.

During the direct examination of Allison's mother, the prosecutor also elicited sympathy:

>        Q Ma'am, first of all you have something in your hair.
>        A Yeah.
>        Q Can you tell us what that is?
>        A I have hearing loss.  I had thyroid cancer and I have nerve damage in my ears so I got this to help here. (2T67-3 to 10).

The prosecutor stated:

>        Remember Detective Burkhart testifying about how the gun operates?  Every single time a new bullet comes up, the slide moves.  Gas I think ejects the bullet, a slide moves, chambering the next one.  <u>If both of their hands are on that gun</u>, and I asked the defendant this on cross, it wouldn't have been able to work.  It would have jammed.  He wouldn't have been able to fire it.  The only way that gun operates, one and on it.  And there was only one hand on it; his. (11T90-1 to 9) (emphasis supplied).

141

This is not true.  Petitioner never testified that both of their hands were on the gun.  Dr. Kutlu testified that bones in petitioner's left hand were broken ("notably he had a fracture of the base of the small finger where the bullet had struck it"; 5T21-18 to 22) and he had no strength in it.  The blood on the slide of the gun had petitioner's blood on it.  This blood came from petitioner's left hand.  If he had a broken hand he would not have been able to move the slide back to jam it.  The prosecutor is wrong and science disproves her theory.

### THE TRIAL JUDGE'S ACTIONS

In <u>Tedesco</u>, there can be no doubt that inappropriate and inaccurate comments were made during summation.  The trial court found the comments to be inappropriate and inaccurate in its decision following the petitioner's argument for mistrial. (11T125-4 to 11T127-14). Specifically, the trial judge stated:

> . . . the reference to utilizing the weapon in a gangster style, as I said before, I believe is inappropriate, and also the reference to the defendant cupping his hands towards the assistant prosecutor, that was, according to Ms. Pappas, while the jury was exiting the courtroom.  That's not a part of the evidence in this particular case.  And to the extent that both of those comments were made, the jury will be instructed to disregard them. (11T125-4 to 12).

The trial judge stated:

> . . . the other statements that were attributed -- or, rather, that Ms. Pappas has attributed to [Allison] after she asserted in her summation that the defendant found out about [Allison] taking one of the calls that

142

she told -- [Allison] told Mr. Tedesco, I
don't want to be with you, Giuseppe Tedesco,
I want to be with [Gary], I'm dating him,
but, Joe, we've been friends a long time, we
can be friends, I'm just not going to be your
girlfriend, I believe that those type of --
those particular statements are in the nature
of speculation and not grounded in terms of
what evidence was offered at that point that
would justify a reasonable inference being
drawn that these particular statements were
made by the — [Allison] to Mr. Tedesco.  So
the jury will be instructed to disregard
those particular comments in summation.
(11T126-23 to 127-14).

It should be stated again that petitioner lodged an

immediate objection once the State introduced statements it

attributed to [Allison] that were outside of the trial record.

(11T58-20 to 23).  The Court cut counsel off and admonished him

to save his objections until after the completion of summation.

(11T25-24 to 25).  Over the rest of the summation the prosecutor

committed numerous acts of misconduct unchecked by the Court

until much later.  By that time, the full damage was done and

petitioner's due process right to a fair trial was denied.

After summation, the Court immediately dismissed the jurors

for the luncheon break prior to even hearing counsel's

objections.  Prior to the break the trial court indicated that

some of the State's comments were "unfortunate" but felt that an

instruction to disregard during the jury instructions was a

sufficient cure. (11T120-20 to 22).  The Court instructed the

parties to go through the break; the Court ultimately agreed with

the defense that inappropriate commentary had been made by the

143

State[13] but denied the mistrial application. (11T123-19 to 24).

The trial court discussed its judgment with respect to the inappropriate comments and determined that it would not separately alert the jurors to the errors and strike them but rather strike them and offer curative instructions in the midst of his jury charge.  Interspersed throughout the charge the Court struck comments from the record.[14]

The jury charge begins by crediting the performance of counsel on both sides. (11T129-7 to 11).  The striking of comments did not happen until well into the instruction.  After mentioning that the comments by attorneys are not controlling, the Court struck the State's comments about "gangster style" and an incident of cupping his hands toward her and instructed the jury to "disregard the references."  As the Court stated:

> . . . Any comments by the attorneys are not controlling.
> In that regard, I'm indicating to you at this time that in her summation, Ms. Pappas made reference to what she described as an incident of the defendant cupping his hands towards her, and she also made reference to a gangster style utilization of the firearm by the defendant.  Both of those references I am striking from her summation, and you're

---

[13] The Court specifically agreed that the comments attributed to Allison, the use of the term gangster style (11T125-4 to 12), highlighting the quantity of witnesses were inappropriate (11T124-16 to 21), as well as finding that comments to the jury on disregarding the lesser included charges, were improper. (11T126-23 to 127-14).

[14] Included in the appendix is the charge to the jury (129a-172a). In the copy of the charge distributed to the jurors there is no mention of the striking of the comments by the State.

144

> instructed to disregard both of those
> references. (11T134-12 to 21).

Later, after instructing on how to judge the credibility of witnesses, the Court commented on the State's attribution of statements to Allison. (11T142-20 to 143-9). The Court chose not to strike the comments but rather instructed the jury to "disregard that aspect of the summation." (11T143-9). The Court failed to instruct the jurors that the prosecutor's emphasis on the quantity of witnesses for the State was improper, instead choosing to simply add a charge that quality of witnesses is the important criteria not the quantity. (11T140-6 to 13).

The failure of the trial court to take appropriate and measured remedial action warrants the granting of habeas relief in this matter. The egregious nature of the misconduct by the prosecutor warranted, at the very least a curative instruction separate and apart rather than nestled into the more than hour long jury charge at the end of a long day.[15]

The defense lodged a timely objection, many of the comments were not stricken, let alone the slides, and the Court delayed in instituting a diluted curative instruction. The Court's admonition to the defense to save its objection until the end of summation served to permit specific, inappropriate comments and visual aids to be presented to the jury, not once but multiple times each. Even disregarding the claims the trial court

---

[15] The charge took so long that the trial court paused twice to permit jurors to take a break and stretch prior to completing it.

determined were appropriate[16] and just looking at the comments that were eventually stricken, every individual comment was referred to by the State in its summation at least twice and in some cases many more times when you factor in the slide presentation.  This compounding of improper comment coupled with the trial court's less than robust rebuke that the misconduct was certainly sufficiently egregious to deprive the defendant of a fair trial.  The trial court's admonition to the jury was woefully insufficient in proportion to the cumulative effect of the prosecutor's comments magnified by repetition and visual aid.

When examining a claim for misconduct the court should look to the cumulative effects.  The errors complained of cannot be sustained and mandate issuance of the writ.  Despite the wide berth granted to the State in summation, the State went well beyond any reasonable bounds of fair comment.  These comments were compounded by the Court's inaction and the State's slide presentation highlighting areas outside the record and fair comment.  The State did not merely tip toe over the line but took a full on running leap over the line and denied petitioner of his due process right to a fair trial.

### THE STATE'S ANSWER (SUMMATION/MISCONDUCT)

The State writes: "The victim customarily placed her dog in another room when petitioner, who was scared of dogs, would

---

[16] Petitioner does not concede that the trial court's determination was proper in this regard.

visit." (Ra17).  The dog was placed in another room because it had bit Allison's co-worker.  There was no testimony that petitioner was ever afraid of the dog.  Mrs. Ruggiero's testimony that the dog did not like petitioner is incorrect.

After writing that "the government must refrain from inflammatory and highly emotional appeals which can easily divert the jury from a fair consideration of the evidence of guilt and result in a trial that is manifestly unfair," (RA15) and "A prosecutor may not attempt to sway a jury towards a guilty verdict by inflaming the jury's passions and prejudices" (RA16), the State concludes:

> In sum, the prosecutor's comments were not "so egregious as to 'undermine the fundamental fairness of the trial and contribute to a miscarriage of justice'" . . . Petitioner has failed to demonstrate that the decision of the state courts on this issue was contrary to, or an unreasonable applicable of, clearly established federal law as determined by the United States Supreme Court. (RA19-20).

### ANALYSIS OF ERRORS

The following Third Circuit cases support petitioner's argument as to misconduct and warrant issuance of the habeas writ.  In <u>United States v. Liburd</u>, 607 F.3d 339 (3d Cir. 2010), the Third Circuit held that the prosecutor acted improperly in introducing evidence that defendant told an airport security officer that the two masses of organic matter in his luggage were cheese and defendant was deprived of a fair trial.

In <u>Molina-Guerva</u>, <u>supra</u>, the Third Circuit unanimously held that the prosecutor's argument in summation that the government

agent who did not testify would have given inculpatory testimony if he had testified violated defendant's confrontation clause rights and was not harmless error beyond a reasonable doubt.

In Lesko, supra, the Third Circuit granted habeas relief based on a comment by the prosecutor at the penalty phase that defendant, who testified at the penalty phase, should be executed because he did not say he was sorry, in violation of his Fifth Amendment rights.  The prosecutor also improperly argued the jury should show defendant the same mercy as he showed his victims.

In United States v. Morena, 547 F.3d 191 (3d Cir. 2008), the government's systematic injection of evidence of drug use and dealing by defendant amounted to prosecutorial misconduct in violation of due process).

In Moore v. Morton, 255 F.3d 95 (3d Cir.2001), habeas was granted due to prosecutor's prejudicial references to race.  The prosecutor argued that the jury could infer that the African-American defendant selected a white woman to rape because his wife was white, that defendant committed the rape because he had his "greatest need for sexual release" while his wife was ill, and that not believing victim would be perpetrating a "worse assault on her."  The habeas was granted in spite of the strength of the evidence and the judge's strong curative instruction).

In Eley v. Erickson, 712 F.3d 837  (3d Cir. 2013), the Third Circuit reversed a district court order denying a habeas petition as the Court found that the state court unreasonably applied

Confrontation Clause law by approving admission of non-testifying codefendant's redacted statement.  The admission of a witness's statements that a non-testifying codefendant admitted to shooting the victim, but that "it was the other two's idea" constituted a Bruton Confrontation Clause violation, even though defendant's name had been redacted and the court gave curative instructions.

### THE "CUMULATIVE UNFAIRNESS" DOCTRINE

Petitioner submits that, even if the errors enumerated above are not considered reversible individually, the cumulative effect mandates granting of the writ.  "The Supreme Court has repeatedly recognized that the cumulative effect of a trial court's errors, even if they are harmless when considered singly, may amount to a violation of due process requiring reversal of a conviction." Taylor v. Kentucky, 436 U.S. 478, 487 n. 15, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978); Chambers v. Mississippi, 410 U.S. 284, 302-03, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).[17]

Footnote 9 of Brecht v. Abrahamson states:

> Our holding does not foreclose the
> possibility that in an unusual case, a
> deliberately and especially egregious error
> of the trial type, or one that is combined

---

[17] In People v. Hill, 952 P.2d 673 (Cal. 1998), the California Supreme Court reversed and remanded a conviction due to pervasive prosecutorial misconduct during summation, with the defendant being released after spending more than ten years on California's death row.  The improper conduct included: 1) misstating evidence, including distorting crucial blood evidence; 2) misrepresenting eyewitness testimony; 3) falsely characterizing a surgical scar as a knife wound; 4) referring to facts not in evidence; 5) misstating he law; 6) making rude and derisive comments about opposing counsel in front of the jury; and 7) intimidating defense witnesses.

with a <u>pattern of prosecutorial misconduct</u>,
might so infect the integrity of the
proceeding as to warrant the grant of habeas
relief, <u>even if it did not substantially
influence the jury's verdict.</u> (Emphasis
supplied).

By any standard, the errors in <u>Tedesco</u> are not "harmless."

<u>THE CURATIVE INSTRUCTIONS IN TEDESCO WERE NOT EFFECTIVE</u>

As Justice Jackson wrote, "The naïve assumption that
prejudicial effects can be overcome by instructions to the jury
[is one that] all practicing lawyers know to be unmitigated
fiction." <u>Krulewich v. United States</u>, 336 U.S. 440, 453 (1949).
Twenty years later, Judge Walter Gewin disputed the idea that
curative instructions were useful: "one 'cannot unring a bell';
'after the thrust of the saber it is difficult to say forget the
wound"; and finally, "if you throw a skunk into the jury box, you
can't instruct the jury not to smell it'." <u>Dunn v. United
States</u>, 307 F.2d 883, 886 (5th Cir. 1962).  Third Circuit Judge
Ruggero Aldisert, a decade later, explained "[a] drop of ink
cannot be removed from a glass of milk." <u>Virgin Islands v. Toto</u>,
529 F.2d 278, 283 (3d Cir. 1976).  Research has demonstrated that
curative instructions are often not only counterproductive, but
actually increase the likelihood that the prejudicial information
would be remembered and relied upon by the jurors. Valerie Hans &
Anthony Doob, <u>Section 12 of the Canada Evidence Act and the
Deliberations of Simulated Juries</u>, 18 CRIM. L.Q. (1975) (Can.)

Courts presume that juries are capable of understanding and
following instructions. As stated in <u>Richardson v. Marsh</u>, 481

U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)

> The rule that juries are presumed to follow
> their instructions is a pragmatic one, rooted
> less in the absolute certitude that the
> presumption is true than in the belief that
> it represents a reasonable practical
> accommodation of the interests of the state
> and the defendant in the criminal justice
> process.

The Supreme Court has observed "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of his failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

Petitioner has demonstrated that the decisions of the state courts on these summation and prosecutorial misconduct issues are contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court (including, but not limited to, Miranda, supra; Doyle, supra; Brecht, supra; Molina-Guerva, supra; Lesko v. Lehman, supra; United States v. Liburd, supra; United States v. Morena, supra, Moore v. Morton, supra; and Ely v. Erickson, supra).

151

## POINT III

### THE TRIAL COURT'S ADMISSION OF PETITIONER'S INTOXICATED STATEMENT TO HIS FRIENDS, THE FAILURE TO GRANT AN EVIDENTIARY HEARING, AND SUBSEQUENT IMPROPER JURY INSTRUCTION VIOLATED PETITIONER'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS

Petitioner relies upon the facts and argument stated in Ground Three of his Petition at pages 59 to 62.  Petitioner also incorporates by reference the legal authorities cited, _supra_.

The State attempted to build motive through statements of the petitioner to his "friends".  These statements, improperly admitted by the trial judge, were made at a time of extreme intoxication and well outside of any temporal proximity to March 27, 2010. (1T24-9 to 26-25).  The testimony indicated that petitioner made statements regarding a desire to harm himself or someone in a relationship with Allison akin to "If I can't have her nobody will."  The State's entire motive argument sprung directly from the alleged drunken words of petitioner.

### THE APPELLATE DIVISION DECISION

The Appellate Division, in rejecting this issue, stated:

> . . . we find the trial judge appropriately denied defendant's request for a N.J.R.E. 104 hearing . . . The judge correctly noted each witness would be available at trial for direct and cross-examination, and that defense counsel could argue the circumstances under which the statements were made suggested they were not believable. (Tedesco op. at 14; 203a).

### THE STATE'S ANSWER

The State writes: "Here, because the trial court's relevancy

determination was neither arbitrary nor irrational, it should not be disturbed." (RA22).

Petitioner incorporates by reference the arguments and legal authorities, <u>supra</u>, and submits that the State's moving to admit this highly prejudicial evidence is consistent with the prosecutorial misconduct discussed throughout this brief.

Petitioner respectfully submits that the habeas writ should issue.

## POINT IV

**THE EX PARTE CONVERSATIONS BETWEEN THE JURY AIDE AND JURORS IMPERILED THE PETITIONER'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL AND SIXTH AMENDMENT RIGHT TO TRIAL BY AN IMPARTIAL JURY MANDATING ISSUANCE OF THE WRIT**

Petitioner relies upon the facts and argument stated in Ground Four of his Petition at pages 62 to 70.

### THE APPELLATE DIVISION DECISION

The Appellate Division rejected this claim:

> We conclude neither of the two incidents identified by defendant denied him a fair trial.  Regarding the first incident, the judge did not abuse his discretion by finding it was unnecessary to voir dire the other juror, based on his thorough inquiry of juror number thirteen. See R.D., supra, 169 N.J. at 561 ("Although the court should not simply accept the juror's word that no extraneous information was imparted to the others, the court's own thorough inquiry of the juror should answer the question whether additional voir dire is necessary to assure that impermissible tainting of the other jurors did not occur.").

> Regarding the second incident, we find the judge thoroughly questioned the aide, and addressed a possible curative charge with counsel.  Defense counsel objected to any special instructions and he apparently did not ask the judge to revisit the issue.  We find the judge conducted an appropriate investigation and did not abuse his discretion in determining the jury could continue as impartial decision-makers. McGuire, supra, 419 N.J. Super. at 153.

> Defendant also contends there is inadequate description of these ex parte conversations in the record in order to permit us to make a determination on the prejudice to defendant. See State v. Basit, 378 N.J. Super. 125, 136-37 (App. Div. 2005). This claim lacks merit,

154

as we find the record fully detailed the
events that transpired. (<u>Tedesco</u> at 16;
205a).

<u>THE STATE'S ANSWER</u>

The State writes:

>      Here, the trial court inquired into both
> juror situations, and all parties had the
> opportunity to formulate a plan of recourse.
>  For the first issue regarding the juror
> feeling uncomfortable about an audience
> member, the court rightly determined that
> there was no prejudice to petitioner based on
> the juror's answer to the court's inquiry and
> because the individual was not part of either
> the government's nor petitioner's case.  The
> court gave no weight to the momentary,
> fleeting amount of time that it took the
> juror to recognize the audience member.
>
>      As to the second issue, again, the trial
> court found that petitioner was not
> prejudiced by the court aide's conversation
> with the jurors.  While the court proposed a
> more curative instruction, defense counsel
> proposed a more general instruction, which
> the court gave to the jury.  Defense counsel
> did not request a mistrial as a result of
> this jury conversation, and the court
> determined that the jury remained capable of
> being fair and impartial. (RA25).

     As the State concedes, the Sixth Amendment guarantees that

"the accused shall enjoy the right to a . . . trial[ ] by an

impartial jury."  As held by the Supreme Court in <u>Irvin v. Dowd</u>,

366 U.S. 717, 722 (1961), this right "guarantees a fair trial by

a panel of impartial, indifferent jurors."  This "impartial jury"

guarantee is applicable to the states through the Fourteenth

Amendment. <u>Duncan v. Louisiana</u>, 391 U.S. 145 (1968).  It is

impossible for the trial judge to anticipate the wide

breadth of subject matter that could arise demonstrating the

155

"troublesome situation" which has repeatedly been determine to be impermissible as a matter of law. <u>State v. Brown</u>, 275 N.J. Super. 329 (App. Div. 1994).  A court is required to hold an evidentiary hearing where extrinsic influence or relationships have tainted the deliberations. <u>Smith v. Phillips</u>, 455 U.S. 209 (1982).

In this case, the conversation with the jury took place inside the jury room, with the evident risk of irregular influences affecting the jury's verdict.  Any communication by the jury with the aide is a <u>de facto</u> communication with the trial court lending enhanced credibility to any statements made by the side.  Jurors are instructed that if any issues arise during their service they are to bring it to the attention of the jury aide.

Because the record here is inadequate, a presumption of prejudice cannot be found to have been lifted as a matter of law. There is neither an "affirmative showing" in the record of an adequate description of the <u>ex parte</u> proceeding, nor presence in the record of what fully occurred in the jury room.  The communications with the jury were not simply unrecorded but were never fully memorialized which appears to be a prerequisite to the "very narrow circumstances" which would rebut the presumption of prejudice.

The Court's failure to develop a complete record based on the totality of the circumstances evident at the time of the violation mandates issuance of the writ.

## POINT V

**REBUTTAL TESTIMONY ABOUT THE VICTIM'S STATE OF
MIND WAS HEARSAY AND DID NOT SATISFY ANY EXCEPTION
MERITING EXCLUSION; PETITIONER'S FOURTEENTH
AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL
WAS VIOLATED WARRANTING ISSUANCE OF THE WRIT**

Petitioner relies upon the facts and argument stated in

Ground Five of his Petition at pages 71 to 73.

### THE APPELLATE DIVISION'S DECISION

The Appellate Division concluded as to this issue:

> We find the judge properly admitted
> Allison's statement to rebut defendant's
> claim the shooting was an accident and in
> self-defense. Defendant argues, although he
> claimed self-defense, his testimony indicated
> the "first several shots were accidental."
> Defendant therefore contends Allison's state
> of mind as to her fear of defendant was
> irrelevant. However, the standard applies to
> claims of accident. <u>Scharf</u>, <u>supra</u>, 225 <u>N.J.</u>
> at 580. Moreover, defendant testified that
> Allison pointed the gun at him, and otherwise
> suggested she was the aggressor. Thus
> evidence of her state of mind was relevant to
> show she "so feared defendant that she was an
> unlikely aggressor." <u>State v. Chavies</u>, 345
> <u>N.J. Super.</u> 254, 273 (App. Div. 2001). We
> find the court did not abuse its discretion
> in admitting this testimony, and any
> potential for prejudice did not outweigh its
> probative value. (<u>Tedesco</u> at 17; 206a).

### THE STATE'S ANSWER

The State writes:

> Here, the trial court properly admitted
> the rebuttal testimony about Allison's state
> of mind because petitioner had claimed that
> the shooting was both an accident and done in
> self-defense. (Exhibit 10, page 46). The
> evidence was necessary to show that Allison
> "so feared defendant that she was an unlikely
> aggressor." <u>State v. Chavies</u>, 785 A.2d 1, 12

157

> (N.J. Super. Ct. App. Div. 2001); <u>see</u>
> <u>Government of Virgin Islands v. Fonseca</u>, 274
> F.3d 760, 768 (3d Cir. 2001).  The trial
> court did not abuse its discretion in
> admitting this testimony. (RA28)

Petitioner takes issue with the State's rationale.  Despite the self-defense claims this is not a case where petitioner claimed that Allison was the initial aggressor.  Quite the contrary, he testified that the first several shots were accidental.  Allison's state of mind is not at issue and whether she felt she was being stalked is significantly prejudicial and irrelevant.  Putting this highly charged language in front of the jury as the last thing presented before a two-week break was highly prejudicial.  Allison's mother's testimony that her daughter told her on the day of her death that she was in fear (followed by a tearful recounting of how she blames herself) is disproportionally prejudicial.  A self-defense claim does not provide automatic admission.  As this was the only testimony that indicated Allison feared petitioner, its admission was not harmless.  Mrs. R's testimony was (like Judy's) based on a statement made 2 1/2 years after the March 27, 2010 incident.  Mrs. R. spoke to the police, prosecutors and investigators multiple times and never mentioned Allison's "concern about the tire-slashing incidents," "stalking" nor "a restraining order."

Petitioner incorporates the arguments and authorities in this brief, <u>supra</u>, and submits that this issue is an additional part of the prosecutorial misconduct detailed in this brief.

158

## POINT VI

**THE STATE'S EXPERT TESTIFIED WELL BEYOND HIS REPORT OVER OBJECTION OF PETITIONER RESULTING IN PREJUDICE AND A VIOLATION OF HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL AND SIXTH AMENDMENT CONFRONTATION RIGHT WARRANTING ISSUANCE OF THE WRIT**

Petitioner relies upon the facts and argument stated in Ground Six of the Petition at pages 73 to 76.

### THE APPELLATE DIVISION DECISION

The Appellate Division stated the following:

> Defendant argues the State violated Rule 3:13-3(b)(I), requiring parties to provide in discovery a copy of the expert's report, or, if the expert did not prepare a report, "a statement of facts and opinions to which the expert is expected to testify." This requirement is a continuing obligation. R. 3:13-3(f). Defendant contends the State elicited testimony beyond the "four corners" of Dr. Singh's report without providing proper notice.

> We disagree. N.J.R.E. 705 permits an expert to testify "in terms of opinion or inference and give reasons therefore without prior disclosure of the underlying facts or data, unless the court requires otherwise." Here, Dr. Shaikh's report clearly indicated Allison's "manner of death" was "[h]omicide." A medical expert may opine that a death was a "homicide" in order to rule out the possibility that a victim's injuries were accidental. See State v. Baluch, 341 N.J. Super. 141, 185 (App. Div.), certif. denied, 170 N.J. 89 (2001). Dr. Sheikh testified to his opinions that certain gunshot wounds would have affected the victim's ability to struggle or fight back, and therefore were relevant to determine her cause of death. We find N.J.R.E. 705 permits this testimony, as it constituted the "underlying facts" for his opinion that Allison died by homicide.

Furthermore, we find Dr. Sheikh did not
exceed the scope of his expertise, as
forensic pathologists may testify regarding
the effect of bullet wounds on internal
systems. See State v. Jamerson, 153 N.J. 318,
337-38 (1998) (citing Commonwealth v. Guess,
273 Pa. Super. 72, 416 A.2d 1094 (1979)).  We
therefore decline to reverse on this basis.
(Tedesco 17; 206a-207a).

## THE STATE'S ANSWER

The State writes:

Dr. Shaikh was qualified as an expert in
forensic pathology.  As such, he necessarily
considered forensic evidence in reaching his
medical conclusions regarding both the manner
and cause of death. Fed. R. Evid. 702,
N.J.R.E. 702; State v. Moore, 585 A.2d 864,
883-84 (N.J. 1991).  Dr. Shaikh explained
which parts of Allison's body were damaged as
a result of each wound, and in his medical
expertise, was able to opine as to how that
damage would have affected Allison's ability
to breathe, move, and function. (Exhibit 22,
pages 22 to 39; 8T22-16 to 39-21).  Dr.
Shaikh was able to determine that the three
gunshot wounds to the face were immediately
deadly, while two additional gunshot wounds
to Allison's abdomen would have eventually
caused death without medical intervention.
(Exhibit 22, pages 22 to 39; 8T22-16 to 39-
2).
Other observations of soot, close-range
stippling, and chemical components of firing
a gun were focused on during Dr. Shaikh's
extensive cross-examination. (Exhibit 22,
pages 51 to 61; 8T51-7 to 61-12).  While
these issues were not directly addressed in
Dr. Shaikh's report, he was permitted to
testify to such areas as they were within his
forensic pathology background.
(RA29-30) (emphasis supplied).

Both the Appellate Division and State mischaracterize Dr.

Shaikh's improperly overbroad testimony (far beyond his simple

autopsy report) as to how Allison would not have certain

160

abilities.  As stated by the Appellate Division, Dr. Shaikh
"could not determine the order of the shots" (<u>Tedesco</u> op. at 4;
195a), rendering his "expert opinion" useless (but highly
prejudicial).  During deliberations the jury requested read back
of Dr. Shaikh's testimony (Tr. 1/9/13; 8-4 to 5); petitioner was
convicted the very next day.  Petitioner was given no expert
report (only the autopsy report) and Dr. Shaikh's "expert"
testimony was crucial in the jury returning its guilty verdict.

The only document produced from Dr. Shaikh was the autopsy
report. (23a).  All of his opinions on the matter were contained
therein pursuant to <u>N.J.R.E.</u> 702.  The defense had no reason to
seek its own expert as the autopsy report offered little beyond
measurements and the wounds and wound paths.  The report is
devoid of a conclusion on the resultant effect of each wound.

When the State sought to elicit such opinions, the defense
lodged a timely objection (8T23-24 to 25) based on the ability of
the witness to render the opinion given. (8T24-2 to 3).  Without
explanation the Court simply overruled the objection:

> Q And I'm going to show you the x-ray
> later and you can show us the path.  But
> regarding that particular injury, when she
> sustained that, how would that affect her
> ability to move?
> A Well, this —
>     MR. IACULLO: Judge, I'm going to object
> to that question.
>     THE COURT: Basis?
>     MR. IACULLO: His ability to render an
> opinion with respect to that.
>     THE COURT: Overruled. (8T23-19 to 24-3).

The State sought to elicit if her injuries would have

161

rendered Allison incapable of fighting back.  The defense
immediately objected and was again overruled no explanation:

> Q And assuming that this was the first
> injury she received, would that affect her
> ability to be mobile, to struggle back?
> MR. IACULLO: Objection to the form of
> the question.
> THE COURT: Overruled.
> THE WITNESS: Yes.  This wound is also
> very significant, as I mentioned.  Any wound
> that traumatizes the brain and lacerates the
> brain can cause very rapid loss of
> consciousness and incapacity. (8T26-24 to 27-
> 8). [18]

The State is required to provide defendant a copy of the
report of an expert witness or a statement of the facts and
opinions to which the expert is to testify. R. 3:13-3(a) (11).
This obligation is ongoing. R. 3:13-(f).  The failure to provide
discovery implicates constitutionally guaranteed rights of Due
Process and Confrontation.  The State intended to elicit the
opinions of the specific nature of the injuries and the potential
effects on Allison's physical abilities making the State
obligated to provide the opinions.  The issue here was not solely
petitioner's state of mind.  Allison's physical abilities after
the wounds was a significant issue in the case.

Petitioner incorporates the arguments and authorities in
this brief, supra, and submits that this issue is an additional
part of the prosecutorial misconduct detailed in this brief.
Petitioner respectfully submits that the writ should issue.

---

[18] The State used this evidence as a lynchpin of its summation
arguing that the petitioner's version of the facts was impossible

## POINT VII

**THE COURT IMPOSED AN EXCESSIVE SENTENCE IN VIOLATION OF PETITIONER'S EIGHTH AMENDMENT RIGHTS AND FOURTEENTH AMENDMENT DUE PROCESS RIGHTS**

### THE APPELLATE DIVISION DECISION

The Appellate Division stated:

> Our review of sentencing decisions is governed by an abuse of discretion standard. State v. Blackmon, 202 N.J. 283, 297 (2010). We will modify a sentence only where the judgment of the court is such that it "shocks the judicial conscience." State v. Roth, 95 N.J. 334, 364 (1984) (citing State v. Whitaker, 79 N.J. 503, 512 (1979). We will affirm the sentence so long as the judge properly identifies and balances the aggravating and mitigating factors, which are supported by sufficient credible evidence in the record. State v. Cassady, 198 N.J. 165, 180-81 (2009).

> Here, the judge found aggravating factors one (the act was committed in a heinous, cruel, or depraved manner), three (risk defendant will re-offend), and nine (need for deterrence). N.J.S.A. 2C:44-1(a)(1),(3),(9). Defendant argues aggravating factor one is inapplicable, contending the court "failed to identify any cruel, heinous or depraved act outside of the murder itself," as there was no evidence of torture, or that the crime was a purposeless act. See State v. Ramseur, 106 N.J. 123, 209 (1987) (noting "depravity of mind" refers to people who murder "without purpose or meaning"). However, the judge spoke at length regarding his reasoning, noting defendant's conduct was heinous because the evidence led to "no other conclusion than that this defendant executed [Allison] on the evening of March 27, 2010." We find the trial judge did not abuse his discretion in finding this factor, and we decline to remand for resentencing. (Tedesco op. at 18; 207a-208a).

---

based on the testimony of the medical examiner.

### THE STATE'S ANSWER

The State writes:

> Petitioner argues that aggravating
> factors were weighed improperly.  However,
> the sentencing court issued a lengthy
> statement of reasons that supported each
> aggravating factor tht the court found
> applicable.  The Appellate Court found no
> abuse of discretion in the court's sentence
> and refused to remand for resentencing.
> (RA31).[19]

The sentencing judge weighed heavily on its interpretation
of the evidence applying aggravating factor one (the heinous,
cruel and depraved conduct), aggravating factor three (risk of
re-offense) and aggravating factor nine (need to deter). (12T43-
2).  The Court balanced these against the statutory mitigating
factors of lack of a prior criminal history and age.

Aggravating factor one is inapplicable its imposition is
tantamount to double counting.  Murder is the most serious act
punishable.  That is taken into account in the range of sentence
deemed appropriate.  Here the court failed to identify any cruel,
heinous or depraved act outside of the murder itself.  All
parties concede Allison died very quickly.

There is no evidence here of torture or a cruel act intended
to cause additional pain or suffering. State v. Matulewicz, 115
N.J. 191 (1989).  A finding of depravity indicates that the crime

---

[19] The State also challenges the sentencing argument in Point II
of its Affirmative Defenses: "As a general rule, federal courts
will not review state sentencing determinations that fall within
statutory limits . . . Matters of procedure and sentencing are
generally matters of state law and cannot justify the federal

is committed without any purpose or meaning. <u>State v. Ramseur</u>, 106 <u>N.J.</u> 123 (1987).  The State argued, and the Court adopted in its colloquy that Allison was killed because of jealousy and her spurning of petitioner.  This was not a random act of violence indicating depravity.  This aggravating factor is inapplicable. Absent this factor and petitioner's dearth of prior convictions a sentence near the top end of the permissible range is grossly excessive and itself merits review and modification.

The Appellate Division, in affirming the sentence, stated:

> Here, the judge found aggravating factors one (the act was committed in a heinous, cruel, or depraved manner), three (risk defendant will re-offend), and nine (need for deterrence). <u>N.J.S.A.</u> 2C:44-1(a)(1),(3),(9). Defendant argues aggravating factor one is inapplicable, contending the court "failed to identify any cruel, heinous or depraved act outside of the murder itself," as there was no evidence of torture, or that the crime was a purposeless act. See State v. Ramseur, 106 N.J. 123, 209 (1987) (noting "depravity of mind" refers to people who murder "without purpose or meaning").  However, the judge spoke at length regarding his reasoning, noting defendant's conduct was heinous because the evidence led to "no other conclusion than that this defendant executed [Allison] (sic) on the evening of March 27, 2010."  We find the trial judge did not abuse his discretion in finding this factor, and we decline to remand for resentencing. (<u>Tedesco</u> op. at 18; 208a).

The sentence in this case violates his Eighth Amendment rights (prohibition against "cruel and unusual" punishment) and petitioner's Fourteenth Amendment Due Process rights.

---

intervention of habeas corpus relief. (RA36).

## POINT VIII

**THE INTRODUCTION OF PETITIONER'S FACEBOOK PAGE
AND QUOTE FROM THE SOPRANOS TELEVISION SHOW WAS
ERRONEOUS AND DEPRIVED PETITIONER OF HIS FOUR-
TEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL**

Petitioner relies upon the facts and argument stated in

Ground Eight of the Petition at pages 79 to 83, and in **Point II**

of this traverse brief.

### THE APPELLATE DIVISION OPINION

The Appellate Division stated:

> Here, cross-examination of defendant
> regarding postings on his real Facebook page
> was proper because defense counsel raised the
> Facebook issue on direct examination. The
> prosecution appropriately utilized the
> contents of defendant's Facebook posts to
> counter defendant's testimony he was not the
> aggressor.  Moreover, the defendant put his
> own credibility at issue by testifying.  We
> find the judge did not abuse his discretion
> by permitting introduction of these
> statements. (Tedesco op. at 18; 207a).

### THE STATE'S ANSWER

The State writes:

> Defense counsel admitted and used the
> Facebook page as part of his direct
> examination of petitioner.  At no point
> during the State's case-in-chief was
> petitioner's Facebook account referenced nor
> the television quote.  As a result of defense
> counsel's strategic use of the Facebook page,
> the State had the opportunity to cross-
> examine petitioner as to his reasons and
> justification for creating the Facebook page
> . . . The State properly cross-examined
> petitioner as to his claims that he was not
> the aggressor and that he defended himself
> from the victim on the night of the murder.
> Also, the State properly used items from
> petitioner's own Facebook page, admitted by

his counsel on direct, which petitioner
admitted to creating, to rebut his claims of
having to defendant (sic) against Allison.
(RA32).

At the tail end of cross-examination of the petitioner and
again during summation the State referred to a quote from The
Sopranos television show posted to petitioner's personal Facebook
page.  The following occurred during petitioner's cross-
examination by the State:

> Q   I'll show you what's been marked S-
> 10.  What was your quote associated with your
> Facebook page?
> A It is a quote from the Sopranos.  It says -
> -
> Q And what does it say?  Read it to us.
> A "I know how to treat people.  Those that
> are nice to me get treats; those who aren't,
> well, I got this severance thing that I do."
> What does that mean?
> Q Did you give that severance thing to
> [Allison]?
> A Ms. Pappas, this is a quote from the
> Sopranos, a very popular TV show at the time.
>  It has nothing to do –
> Q Did you give her the severance thing,
> Joe?
> A No, I –
> MR. IACULLO: Objection, Your Honor.
> Objection.
> THE WITNESS: Please.
> THE COURT: All right.  Sustained.
> MS. PAPAS: I have no more questions.
> (10T64-11 to 65-5).

Counsel lodged a timely objection at the time it was first
presented.  The Court overruled the initial objection without any
argument or even discussion.  The State then cross-examined the
petitioner regarding his adoption and implementation of the
quote.  Later, in its summation the State again referred to the

167

<u>Sopranos</u> quote and included the quote in its slide presentation.
(109a).  This slide has the following words (under the standard
Facebook caption: "View Photos of Joey (1)" "Send Joey a Message"
"Poke Joey":

> I know how to treat people, those that are
> nice to me get treats, those who aren't . . .
> well I got this severance thing that I do.
> (109a).

The prosecutor utilized this improper questioning during her
summation:

> I asked Mr. Tedesco about his Facebook
> page, and some of you might think that that
> was trivial.  But, you know, those of you who
> have Facebook pages might put pictures of
> your kids up and you might put a, you know, a
> quote that you like.  But, generally, we try
> to put something on our page that reflects us
> and who we are, kind of like for us older
> people our highschool yearbook, we put
> something in there.
> <u>He chose that quote.  It's not</u>
> <u>coincidental that the quote he chose is from</u>
> <u>a TV show about killing people.</u>  And it says,
> "I know how to treat people.  Those that are
> nice to me get treats; those who aren't,
> well, I got this severance thing that I do."
> (11T97-19 to 98-2) (emphasis supplied).

Unchallenged testimony revealed that the quote was placed on
the Facebook page more than a year prior to the incident in
question.  Absent any temporal proximity or other indicia of
relevance the Court should have excluded this avenue of inquiry
as being prejudicial far beyond any scant probative value, if any
at all existed.  The State merely used this as a vehicle to end
its cross-examination with a dramatic accusatory confrontation
until finally being stopped by the Court.

The State's use of The Sopranos quote as a model for petitioner's behavior is analogous.  The trial court's failure to exclude same likewise merits issuance of the writ.

The Appellate Division ruled on this issue as follows:

> Last, defendant argues the trial court erred by allowing the introduction of evidence from his Facebook page.  The issue arose when defense counsel asked defendant about his fake Facebook page during direct examination.  On cross-examination, defendant acknowledged he had a real Facebook page.  The prosecutor asked defendant about a quote on the page, from the "Sopranos" television show, which read, "I know how to treat people, those that are nice to me get treats, those who aren't . . . well I got this severance thing that I do."
>
> The prosecutor later sought to move printouts from both Facebook pages into evidence, which the court permitted over defendant's objection.  The prosecutor further referenced this quote during her summation, and one of the PowerPoint slides contained this quote.  During defendant's motion for a mistrial after the summations, defendant argued use of the quote was improper.  The trial court denied the motion, explaining, "Here the defendant utilized that phrase himself.  The State had a right to comment on that."
>
> The scope of cross-examination is "limited to the subject matter of the direct examination and matters affecting the credibility of the witness." N.J.R.E. 611(b).  However, "[t]he court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." Ibid.  Because the scope of cross-examination rests in the broad discretion of the trial court, its decision will not be disturbed absent clear error and prejudice. Wakefield, supra, 190 N.J. at 451-52; State v. Messina, 378 N.J. Super. 559, 583 (App. Div.), certif. denied, 185 N.J. 297 (2005).

> Here, cross-examination of defendant
> regarding postings on his real Facebook page
> was proper because defense counsel raised the
> Facebook issue on direct examination.  The
> prosecution appropriately utilized the
> contents of defendant's Facebook posts to
> counter defendant's testimony he was not the
> aggressor.  Moreover, the defendant put his
> own credibility at issue by testifying.  We
> find the judge did not abuse his discretion
> by permitting introduction of these
> statements. (Tedesco at 18; 207a).

The prosecutor's improper cross-examination regarding The Sopranos' quotation from petitioner's Facebook page ("I know how to treat people.  Those that are nice to me get treats; those who aren't, well, I got this severance thing that I do") violated his due process right to a fair trial (particularly when considered in conjunction with the improper reference to the ethnic slur "Spaghetti Defense" in summation).  The prosecutor exacerbated the improper cross-examination as to line from The Sopranos by stating in summation: "He chose that quote.  It's not coincidental that the quote he chose is from a TV show About killing people."

Petitioner incorporates the arguments and authorities in this brief, supra, and submits that this issue is an additional part of the prosecutorial misconduct detailed in this brief.  Petitioner respectfully submits that the writ should issue.

## POINT IX

**GROUNDS ONE, THREE, FIVE, SIX AND EIGHT DO STATE CLAIMS UPON WHICH HABEAS RELIEF CAN BE GRANTED (THIS POINT ADDRESSES <u>POINT I</u> OF THE STATE'S AFFIRMATIVE DEFENSES)**

In <u>POINT I</u> of the State's "AFFIRMATIVE DEFENSES" the State contends that Grounds One, Three, Five, Six and Eight do not state claims upon which habeas relief can be granted. (RA33-34). Petitioner Tedesco disagrees and relies upon the arguments and authorities in this brief, <u>supra</u>.

## POINT X

**PETITIONER'S ALLEGATIONS REGARDING HIS SENTENCE DO NOT FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED (THIS POINT ADDRESSES <u>POINT II</u> OF THE STATE'S AFFIRMATIVE DEFENSES)**

In <u>POINT II</u> of the State's "AFFIRMATIVE DEFENSES" the State contends that Ground Seven fails to state a claim upon which habeas relief can be granted. (RA35-36). Petitioner disagrees and relies upon the arguments and authorities in this brief, <u>supra</u>.

## CONCLUSION

For the foregoing reasons and authorities cited, the petitioner Giuseppe Tedesco respectfully submits that the petition for writ of habeas corpus should be granted.  In the alternative, a certificate of appealability should issue.

Respectfully submitted,

<u>*/s/ John Vincent Saykanic*</u>

Dated: May 29, 2019
John Vincent Saykanic
Attorney for Petitioner
Giuseppe Tedesco

171

# New Jersey Herald

# Tedesco trial wraps up today



New Jersey Herald File Photo — Giuseppe Tedesco testifies in State Superior Court about what occurred the night Hopatcong resident Alyssa Ruggieri was shot.

Posted: Jan. 7, 2013 11:18 pm Updated: Jan. 11, 2013 7:49 pm

By STEVEN REILLY
**sreilly@njherald.com**

NEWTON — Was it a cold blooded murder that took the life of Hopatcong resident Alyssa Ruggieri on March 27, 2010, as the prosecution said? Or was it "an unfortunate set of circumstances" as her accused murderer Giuseppe Tedesco said?

Today, Assistant Prosecutor Seanna Pappas and Tedesco's defense attorney Anthony Iacullo will give their closing arguments before the jury of seven men and seven women.

Closing arguments will be live streamed from the court on www.njherald.com starting at 9 a.m.

After the attorneys finish, two jurors will be dismissed as alternates, and the remaining 12 will review the case that will decide Tedesco's fate.

Tedesco, 27, is charged with first-degree murder, possession of a gun and possession of a gun for unlawful purposes.

If he is found guilty on the murder charge, he could be sentenced to life-plus-20 years in state prison. Tedesco admitted from the witness stand that he was guilty of the weapon charges, but claimed self defense in the shooting death of Ruggieri, 22.

According to Tedesco, he had a gun when he went to Ruggieri's house where she was home alone because he on his way alone to a club party in Hoboken and he was afraid of the area.

When he invited her to go to the party with him, and she said no, he drove to her home with the gun hidden in the small of his back, tucked into his belt, under his shirt, according to his testimony.

Ta1

Ruggieri was shot six times that night, once in her hand, once in her stomach, once in her chest, once in her chin, once in her nose and with one bullet to her temple as she lay at the bottom of the foyer stairs that led to the front door of her family's home.

Tedesco said the shootings happened as the two struggled over the .25-caliber Barretta semi-automatic handgun. The struggle took the pair tumbling down the stairs as the gun went off twice, then Tedesco wrestled the gun away from Ruggieri, who was already shot three times, and shot her three more times in the head, in self defense, he said.

The prosecution has argued that Tedesco killed Ruggieri in a jealous rage because she was dating someone else and she rejected his advances.

Ruggieri's mother told the jury that her daughter became afraid of Tedesco and asked her on the night she was killed if she should get a restraining order against him.

Tedesco's stepfather testified that Tedesco was acting "nervous" in the days leading up to the killing.

Friends of Tedesco testified that he would drive by her home to look for her car. They told the court that during a heavy night of drinking, he made threats to kill her and anyone she was with if he couldn't have her.

One friend testified that Tedesco called her four days before Ruggieri was killed to boast about how he had just slashed her tires in front of her new boyfriend's house in Livingston. Ruggieri's tires were slashed a second time at her boyfriend's house the day she was murdered.

Iacullo told the jury that Tedesco could not have slashed the tires because he was alone, driving his Ford Mustang on the roadways around Sparta when the tire slashing occurred.

Testimony revealed that Tedesco was romantically interested in Ruggieri, when he told the jury about their trip to Boston for a weekend, just days before she was killed. He said they "were intimate" with each other.

Tedesco also testified he found out about Ruggieri's new boyfriend in Boston, and began to contact him with a fake Facebook page.

Tedesco texted Ruggieri repeatedly on the night she was killed to ask her to come out with him, but when she said no, he did not text that he was going to her house, but just showed up with the gun.

According to testimony, he walked up to her home, knocked on the door and waited while she put a dog away. Then they both went into the home where she got him a glass of water. What happened next is the key.

It will be up to the jury to decide.

Ta2