**\*\*NOT FOR PUBLICATION\*\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GIUSEPPE TEDESCO, | **Civil Action No. 18-13642 (CCC)** |
| Petitioner, | **OPINION** |
| v. | |
| THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, et al., | |
| Respondents. | |

**CECCHI, District Judge:**

Currently before this Court is Petitioner's ("Petitioner") petition for a writ of habeas corpus. ECF No. 1.  Following an order to answer, Respondents filed a response to the petition (ECF No. 8), to which Petitioner replied (ECF No. 17).  Also before the Court are Petitioner's request to file an addendum to his petition (ECF No. 20), Respondents' motion to dismiss that addendum (ECF No. 21), and Petitioner's response to the motion to dismiss (ECF No. 24).  For the following reasons, the petition is denied, Petitioner is denied a certificate of appealability, and Respondent's motion to dismiss is denied as moot in light of the denial of the petition.

**I.  BACKGROUND**

In its opinion affirming Petitioner's conviction, the Superior Court of New Jersey – Appellate Division summarized the background of Petitioner's conviction as follows:

> In March 2010, [Petitioner] was twenty-four years old and living at home with his mother and stepfather in Hopatcong.  He was on disability leave from his job.  While on leave, he reconnected with high school friends [Jerry] and [David][1] on Facebook.  [Petitioner]

---

[1] The Appellate Division referred to the fact witnesses and victim by pseudonyms, and this Court uses those same pseudonyms throughout this opinion.  *See* ECF No. 14-10 at 2 n.1.

also knew Allison in high school, as they briefly dated in 2007 or 2008 and remained friends.

Weeks before the shooting, [Petitioner] and Allison went to a bar in New York City accompanied by David, Jerry, and Jerry's girlfriend, [Martha].   At the bar, [Petitioner] became highly intoxicated.  According to Jerry, at one point, while they were in the bathroom, [Petitioner] said he loved Allison and would do anything to be with her.  He described [Petitioner] as "mad," adding, "[H]e just wanted to be with her and then he punched the wall" and started crying.  David could not recall any comments from [Petitioner] about Allison that night, but testified he previously heard [Petitioner] "pretty much" proclaim his love for Allison.  Martha similarly testified [Petitioner] was in love with Allison, but noted they were not dating.

On the ride home from the bar, [Petitioner] told Jerry he did not want to live if he could not have Allison, that he had a gun at home, that he wanted Jerry to kill her, and that "he would kill her if he had to."  Martha testified that [Petitioner] said he loved Allison, "he couldn't live without her," and he would "kill anyone if . . . she was with someone else."  Martha noted there were also "a couple of occasions" when [Petitioner] said that "[i]f he found out she was dating someone it would not be a good situation; then he would probably hurt the person that was with her."  When asked about these remarks at trial, [Petitioner] described them as "drunken babble," and said he and Allison later laughed about them.

[Melissa] testified she went to the same middle school as [Petitioner] and met him again through a mutual friend in 2006.  They communicated by instant messages, text, and on Facebook, and met "[a] handful of times."  At some point, "within a year before this incident," [Petitioner] told Melissa that Allison was an ex-girlfriend and that he was trying to get back together with her, but Allison may have been dating someone else or she was not interested.    Another night, they were talking online when [Petitioner] told Melissa that he was trying to contact Allison and that "if she's not going to be with me, she's not going to be with anybody else."  Melissa told him not to say such things and 'signed off."

From March 19 to 21, 2010, [Petitioner] and Allison went to Boston to celebrate his birthday.    [Gary], who never met [Petitioner], believed Allison went there with friends; he called her eight times between 1:35 a.m. and 1:57 a.m. on March 20.  During the drive home that weekend, [Petitioner] learned Gary made these

calls.  [Petitioner] later told Jerry that while they were away, Allison had received a text in the morning "from a guy," that he had confronted her about it, and that he had been "really mad" that someone had texted her.  [Petitioner] also told David that he went to Boston with Allison "to sway her back or something," but had become upset with her.

Around this time, Gary received a "friend request" on Facebook from someone named Mariangela Della Venta. [Petitioner] explained that in late . . . 2009 or early January 2010, he created this fake Facebook page using a fictitious female identity "to get information for people" and to "joke" with his friends. [Petitioner] claimed that on the way home from Boston, Allison asked him to use the fake page to gather information about Gary.

On Tuesday evening, March 23, 2010, Allison went to Gary's home in Livingston.  Allison left around 10:00 p.m., but within minutes, she called Gary to say she had a flat tire.  Earlier that night, [Judy], a friend of [Petitioner]'s since high school, received a phone call from [Petitioner].  [Petitioner] told her he slashed Allison's tires.  On March 26, 2010, Allison again went to Gary's home and parked her car in the same space as three nights before.  She left around 1:00 a.m., but soon discovered two more slashed tires.

On March 27, 2010, Allison's parents were going out for the evening and her mother asked Allison to join them because her daughter "seemed a little upset."  Allison decided to stay home. That same evening, [Petitioner] was at his mother's home preparing to attend a birthday party for Judy at a club in Hoboken.  [Petitioner] planned to go to the party with Jerry and Martha, but around 8:00 p.m., they told [Petitioner] their plans had changed for the evening. Around the same time, David sent a text to [Petitioner] asking if he wanted a ride.  [Petitioner] responded "he would rather go solo," and would "meet up with you guys later."

Before leaving home, [Petitioner] exchanged text messages with Allison.  [Petitioner] asked Allison if she wanted to "get together" for his upcoming birthday, but she declined, stating, "I don't think [I] can.  Sorry.  Have fun . . . ."  [Petitioner] testified he decided to stop at Allison's house before driving to Hoboken because the "texts didn't seem right" and "were very short."  He took his gun, a Beretta, for self-protection, explaining that he was carrying "a lot of money," that he was wearing nice clothes and a "big chain," and that he was driving a "brand new truck."

3

[Petitioner] carried his gun in his waistband between his belt and jeans.

[Petitioner] drove to Allison's house and parked his truck about "a block away," rather than in the vacant space in her driveway.  He left his cell phone in his vehicle, and walked to Allison's house.  Allison opened the front door for him.  Before [Petitioner] left, Allison was shot six times.  A short time later, a passing motorist observed [Petitioner] running out of Allison's house "at full blast," looking "scared to death."

Upon reaching his car, [Petitioner] put his gun in the center console, where he had left his cell phone.  He called his biological father to say he was shot, but did not mention what happened to Allison.  [Petitioner] later explained, "[T]here was nothing that [he] could do for [Allison because] she had passed."  His father told him to go home.

When [Petitioner] arrived home, he parked his car in the driveway and went inside to tell his mother and stepfather that he was shot.  His mother became hysterical, while his stepfather tried to stop the bleeding.  [Petitioner] told his mother that the shooting took place at Allison's house, but did not tell her that Allison was dead.

[Petitioner]'s stepfather drove him to the hospital.  On the way there, [Petitioner] received a call from his mother asking for Allison's address, which he provided.  His mother called 9-1-1 to report that her son was shot in the hand.

At the hospital, [Petitioner] received treatment from Hakan Kutlu, M.D., a surgeon, for a gunshot wound to his left hand.  Dr. Kutlu determined a bullet entered at the base of [Petitioner]'s left thumb and exited at the base of his small finger.

Meanwhile, Patrolmen Ryan Tracey and David Kraus of the Hopatcong Police Department went to [Petitioner]'s home, where [Petitioner]'s mother told them the shooting occurred at the house where her son's friend lived; she further stated her son drove home that night in the Durango parked in the driveway.  Patrolman Tracey observed blood inside the Durango and on the door handle, steering wheel, and driver's seat.

The police then responded to Allison's house, where they observed blood on the walkway leading to the open front door.  Looking inside, they saw a lifeless body at the base of the stairs.

The officers entered and searched the home for other possible victims. Patrolman Kraus later returned to [Petitioner]'s home, where [Petitioner]'s mother told him that her son owned a registered handgun.

At 11:30 p.m. on March 27, 2010, Detectives Rita Gallo and David Monisera of the New Jersey State Police Crime Scene Investigation Unit (CSI) arrived at Allison's house to complete a homicide investigation. They observed no sign of forced entry; they found Allison lying on her back at the bottom of the stairs leading from the landing to the foyer on the lower level.

The detectives recovered six shell casings. Detective Gallo observed Allison had three gunshot wounds through her sweater, and one gunshot wound in her hand, chin, nose and left temple. She noted the chest wounds had fibers from her sweater that were "almost melted," suggesting shots fired at close range; further, the stippling marks caused by gunpowder deposited near the chin wound suggested a round entered her face "at very close range." She explained the blood from a wound near Allison's ear showed "she definitely wasn't upright because the blood isn't running down her face."

Meanwhile, Detective Thomas Redfern of CSI North went to the hospital and spoke with [Petitioner] in the emergency room. Detective Redfern took possession of [Petitioner]'s clothes, noting there were reddish-brown stains on his jeans.

Detective Kenneth Wise arrived at [Petitioner]'s home at approximately 4:38 a.m. on March 28, 2010. Pursuant to a warrant already obtained, he searched [Petitioner]'s bedroom and found a box of fifty Remington 25-caliber rounds with eight rounds missing. He also recovered the 25-caliber Beretta from the Durango's center console. He observed red-brown stains on the Beretta consistent with blood, and found two live rounds in the gun.

On March 28, 2010, Junaid R. Shaikh, M.D., a forensic pathologist with approximately twenty years of experience, performed an autopsy. The autopsy revealed six gunshot wounds, five of which showed evidence of close-range firing from a distance of "18 inches or less." Dr. Shaikh could not determine the order of the shots. All six bullets were "frontal entrance wounds." In his report, he described the entry wounds, the wound tracks, and associated injuries. At trial, Dr. Shaikh testified regarding each wound, noting several of the wounds would have affected Allison's ability to "struggle or fight back." He concluded that the cause of

death was multiple gunshot wounds and that the manner of death was homicide.

The State also presented several experts employed by the New Jersey State Police.  Brett Hutchinson, an expert in DNA analysis, determined the blood on the landing outside the house and on the gun's trigger and slide contained [Petitioner]'s DNA.  Judith Link, an expert in gunshot residue analysis, performed a chemical examination of Allison's sweater and found evidence of nitrites from gunpowder.   Gerard Burkhart, an expert in firearms identification testified the Beretta was operable[, and the parties stipulated that Petitioner's Beretta discharged the shell casings recovered at the crime scene.]  Using Link's findings, Burkhart conducted test firings to replicate the gunshot residue on the victim's sweater, and determined the shot to the lower abdomen was fired from a distance of less than twelve inches, while the two shots to the chest were fired from no further away than five feet, six inches.

[Petitioner] also testified at trial.  He confirmed his trip to Boston with Allison, claiming she had received a number of phone calls but had ignored all of them.  [Petitioner] denied slashing Allison's tires or telling Judy he did it.  He further denied making any threats against Allison when intoxicated, or knowing Gary lived in Livingston.  [Petitioner] acknowledged posting a picture of his Beretta on his real Facebook page.

[Petitioner] claimed he acted in self-defense on the evening of March 27, 2010.  He said after Allison let him into her house, they sat in the living room and talked and he asked for glass of water.  After he returned the glass to the kitchen, he turned around and saw Allison standing in the doorway holding his gun.  She asked, "[W]hat is this?"  [Petitioner] believed the gun fell out of his pants while they were sitting on the sofa and "somehow the safety got off."

[Petitioner] said he started to walk towards Allison and reach for the gun, but Allison "kind of put like a little bit of a grip into the gun" and it "went off when I tried to pull it out," and a bullet struck her in the right hand.  She stumbled backwards and their feet became tangled in a rug, causing both to fall down the stairs, with the gun discharging "a couple more shots."  One bullet struck [Petitioner] in the hand.  [Petitioner] said the gun was in both of their hands when they fell, with his finger on the trigger and his eyes closed.

After striking his head at the bottom of the stairs, [Petitioner] said Allison "[got] the gun and it was leveled at my head."  As he tried to push the gun away, he twisted her left hand and the gun went

off two more times, striking Allison in the face. [Petitioner] denied pulling the trigger for those two shots. After he felt Allison's hand go limp, he grabbed the gun and fell forward onto the stairs, hitting his arms on a step while his finger was on the trigger. He explained, "I must have pulled the trigger, and that last shot went to I believe the side of her head." He estimated the entire incident lasted fifteen to twenty seconds.

After the shooting, [Petitioner] said he went upstairs into the kitchen, looking for "[a]nything that could help," but did not notice the wall phone. He went back down the stairs and stepped over Allison's body; he shook her shoulder and called her name, with no response. At that point, he realized Allison was dead; scared, he left the house and ran to his car.

[Petitioner] denied planning to hurt Allison, noting she was "a wonderful, non-violent person," she was his friend, and he "cared for her very much." He described the shooting as an "unfortunate . . . set of circumstances." He explained, "I had no problems whatsoever. We were not arguing. We had no bad words. There was no threats." On cross-examination, [Petitioner] acknowledged he violated the law when he took the Beretta to Allison's house, because he did not have a permit to carry the firearm. He also acknowledged that he had firearms training and attended a shooting range.

The State called two witnesses on rebuttal. Gary confirmed the week before the incident he exchanged approximately fifteen messages with "Della Venta," the fake Facebook identity [Petitioner] created. Gary received the last message from "Della Venta" around 5:30 or 6:30 p.m. on March 27, 2010. In these messages, Gary revealed his name, the town where he lived, and information about his relationship with Allison, including that they had dated and were "hooking up a little bit."

Allison's mother testified that she spoke with her daughter on March 26, 2010, about the drive home from Boston the previous weekend. Her daughter said that after she received a text or call during the trip, [Petitioner] grabbed the phone from her hands and started to argue with her.

The next evening, Allison's mother spoke again with her daughter, recalling that she "really looked upset." At that time, Allison expressed concern about the tire-slashing incidents and told her mother she believed [Petitioner] was stalking her. She asked her mother about getting a restraining order against him.

ECF No. 14-10 at 4–15.

Following trial, a jury found Petitioner guilty of first-degree murder, in violation of N.J. Stat. Ann. § 2C:11-3(a), second-degree unlawful possession of a handgun without a permit, in violation of N.J. Stat. Ann. § 2C:39-5(b), and second-degree possession of a firearm for an unlawful purpose, in violation of N.J. Stat. Ann. § 2C:39-4(a). ECF No. 14-10 at 2. The trial judge thereafter sentenced petitioner to a total sentence of seventy years imprisonment. Id. Petitioner appealed, and the Appellate Division affirmed his conviction in an opinion issued on March 6, 2017. Id. Petitioner thereafter filed a petition for certification, which was denied by the Supreme Court of New Jersey on September 11, 2017. ECF No. 14-14. Petitioner did not pursue a post-conviction relief petition, and instead filed this petition in early September, 2018. ECF No. 1.

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." The petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2151 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772–73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  Federal law is clearly established for the purposes of the statute where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 125 S. Ct. 1372, 1376 (2015).  "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.*  Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## B. Analysis

### 1. Evidentiary Claims

In the majority of his claims, Petitioner challenges various evidentiary decisions made by the state trial court and upheld by the Appellate Division.  Because "the Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules," *see Marshall v. Lonberger*, 459 U.S. 422, 438 (1983), claims challenging the admissibility of evidence are normally considered questions of state law which are not cognizable in habeas corpus. *See Keller v. Larkins*, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence"); s*ee also Estelle v. McGuire*, 502 U.S. 62, 67–70 (1991); *Wilson v. Vaughn*, 533 F.3d

208, 213–14 (3d Cir. 2008), *cert. denied*, 556 U.S. 1170 (2009).  A habeas petitioner may therefore raise a habeas claim based on a state law evidentiary issue only where he can show that the admission of the evidence in question denied him Due Process under the Fourteenth Amendment by depriving him of the "fundamental elements of fairness in [his] criminal trial." *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (quoting *Riggins v. Nevada*, 504 U.S. 127, 149 (1992) (Thomas, J. dissenting)).  "In order to satisfy due process, [Petitioner's] trial must have been fair, it need not have been perfect." *Id.* (citing *United States v. Hasting*, 461 U.S. 499, 508 (1983)).  Thus, a Due Process violation will only occur in the context of a state court evidentiary ruling when that ruling was "so arbitrary or prejudicial that it rendered the trial fundamentally unfair." *Scott v. Bartkowski*, No. 11-3365, 2013 WL 4537651, at *9 (D.N.J. Aug. 27, 2013) (citing *Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994)).

Petitioner first challenges the admission of evidence regarding the two tire slashing incidents, which he contends were unduly prejudicial examples of prior bad acts, one of which could not be directly connected to him other than through implication.  The Appellate Division rejected Petitioner's challenge to this evidence, finding that the tire slashing evidence was relevant in light of Petitioner's admission to committing at least one of the slashings and went to his state of mind, the two incidents were close in time and similar enough to the ultimate events in question to warrant admission, their was sufficient evidence to support the trial judge's conclusion that Petitioner was the one who committed both slashings, and the evidence was highly probative of Petitioner's guilt or innocence.

The Supreme Court has never held that evidence of prior bad acts – even when they amount to other crimes – must be excluded from criminal trials, nor that a curative instruction or other restriction is per se required for a criminal conviction involving such evidence to survive

constitutional scrutiny.  *See generally Estelle*, 502 U.S. 62; *Greer v. Miller*, 483 U.S. 756 (1987); *Spencer v. Texas*, 385 U.S. 554 (1967); *see also Minett v. Hendricks*, 135 F. App'x 547, 553 (2005).  As with most state court evidentiary decisions, the admission of such evidence will only warrant habeas relief where the admission of the evidence was so unduly prejudicial that it rendered the petitioner's trial fundamentally unfair.  *Glenn*, 743 F.3d at 407; *Minett*, 135 F. App'x at 553.

Petitioner has made no such showing here.  Based on Petitioner's own admission to a third party of having committed at least one of the tire slashing incidents and the similarity between them, the relevance of Petitioner's attitude towards the victim, the admission of the tire slashing incidents was highly relevant and probative of Petitioner's guilt, and was not so unduly prejudicial that it denied him a fair trial in light of the limiting instructions regarding the tire slash incidents given by the trial court.  Likewise, the record evidence strongly supports the factual conclusions of the state courts that Petitioner was involved in both tire incidents, and Petitioner has not shown that the admission of the evidence was based on an unreasonable reading of the facts presented to the state courts.[2]  No habeas relief is therefore warranted as to the admission of evidence regarding the tire slashing incidents.

Petitioner next challenges the admission of his own statements to various witnesses regarding the victim and his desire for her, arguing that those statements were not reliable as he was allegedly drunk at the time he made them, and that he should have received a curative

---

[2] Petitioner's main contention regarding the facts, both here and in the Appellate Division, is that there was "no evidence" connecting him to one of the two tire slashing incidents.  As noted by the Appellate Division, however, witness testimony, credited by the trial court, indicated that Petitioner admitted to committing one of the incidents, and the second incident occurred mere days later, at the same place, and occurred in the same manner, all of which reasonably supports the conclusion that the same person committed both tire slashings.  *See* ECF No. 14-10 at 22.

instruction regarding these statements under state law (notwithstanding his failure to request such a charge at trial). The Appellate Division rejected both claims, finding that Petitioner's own statements were admissible under state court hearsay rules as they were not made to police and were made of his own free will to his friends. ECF No. 10-14 at 37–38. The Appellate Division further found that the omission of the jury charge was ultimately harmless in light of the trial court's general instruction to the jury that, in evaluating credibility, the jury "should consider how the facts were obtained, the witness's ability to recollect the event, and the extent to which each witness was corroborated or contradicted." Id. at 40. As Petitioner's statements to his friends were clearly relevant, made of his own free will, and as the jury was instructed to consider the surrounding facts in determining the credibility of the witnesses at Petitioner's trial, Petitioner has failed to show that the admission of this evidence denied him a fair trial. As he has also failed to present any Supreme Court caselaw which is contrary to the Appellate Division's ruling or which was unreasonably applied, he has failed to show that he is entitled to habeas relief on this ground.

Petitioner next argues that the state courts erred in permitting the State to elicit evidence as to the victim's state of mind from her mother to rebut his own testimony suggesting that the victim's death was either accidental or the result of self-defense on his part. The Appellate Division rejected this argument, finding that Petitioner had placed the victim's state of mind into contention by claiming that the shooting had been accidental and/or the result of self-defense, and the victim's mental state – specifically her fear of Petitioner – was both relevant to whether she was a likely aggressor and as to the likelihood that the shooting had been an accident. Id. at 46. Statements made to establish a victim's contemporary state of mind, where relevant to a fact at issue, are admissible under both state and federal law, *see, e.g., United States v. Gonzalez*, 905 F.3d 165, 201 (3d Cir. 2018). Here, as the victim's state of mind and fear of Petitioner were directly

relevant to Petitioner's assertion that the shooting had been either an accident or the result of aggression on the part of the victim sufficient to support a finding of self-defense, Petitioner has not shown that he was denied a fair trial as a result of the admission of the victim's statement to her mother regarding her fear of Petitioner.  As Petitioner has likewise failed to show any binding Supreme Court precedent which would require the statements be excluded, he has thus failed to show he is entitled to habeas relief based on the admission of the rebuttal state of mind testimony.

Petitioner also challenges the admission of certain portions of the expert testimony of the State's pathologist regarding the effect certain of the bullet wounds would have had upon the victim on the ground that this testimony went beyond the four corners of the expert's prepared report.  The Appellate Division rejected this claim as the testimony in question was within the scope of the doctor's expertise, was related to the doctor's conclusion that the victim died as a result of homicide as it amounted to facts underlying his conclusion of homicide, and was directly relevant to issues before the jury. Id. at 48–49.  This ruling – that a medical expert who has opined on the ultimate cause of death may elaborate on his written findings and offer an opinion as to the effect of each individual shot upon the victim based on his medical expertise and review of the evidence – is eminently reasonable, and therefore did not deny Petitioner a fair trial.  As Petitioner has not otherwise shown that the admission of this expert testimony was contrary to, or involved an unreasonable application of binding federal law, Petitioner has failed to show a valid basis for habeas relief on this claim.

In his final evidentiary claim, Petitioner argues that the trial court erred in admitting evidence regarding his Facebook page and its contents during his cross-examination.  As noted by the Appellate Division, the state did not seek to admit the Facebook page in its case in chief, but instead only sought to admit the page and its contents into evidence on cross-examination after

Petitioner's direct testimony regarding his use of Facebook. Id. at 50. The state was thus entitled to question him on cross-examination regarding his Facebook usage and make fair comment upon the contents of that page during its summation. The fact that Petitioner, of his own will, chose to publish on that page a quotation from a mob-related television show which suggested violence does not render such questioning and comment unfair. In light of Petitioner's opening the door regarding Facebook during his direct examination, the admission of the contents of Petitioner's own Facebook page did not deprive Petitioner of a fair trial. As Petitioner has not shown the admission of this evidence was contrary to, or an unreasonable application of, any applicable Supreme Court precedent, Petitioner is not entitled to habeas relief on this basis.

**2. Prosecutorial Misconduct Claims**

Petitioner next makes several claims in which he asserts that the prosecutor denied him a fair trial through various forms of alleged misconduct. The duty of a prosecutor in a criminal proceeding is to see that justice is done rather than to secure convictions, and as such prosecutors must "refrain from [the use of] improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also United States v. Bailey*, 840 F.3d 99, 124 (3d Cir. 2016). While a prosecutor "may strike hard blows [during his summation], he is not at liberty to strike foul ones." *Berger*, 295 U.S. at 88; *Bailey*, 840 F.3d at 124. A criminal conviction, however, "is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985). Thus, a prosecutor's improper comments will only warrant habeas relief where those comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

14

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *see also Copenhefer v. Horn*, 696 F.3d 377, 392 n.5 (3d Cir. 2012).

Petitioner first takes issue with what he describes as a "call to arms" which occurred when the prosecutor invited jurors to "put [themselves] in [Allison's] shoes" when considering why she allowed Petitioner, a friend, into her home. The Appellate Division found this isolated incident was not so inflammatory as to deny Petitioner a fair trial, and was made only in response to defense counsel's argument that Petitioner had gone to see Allison as a friend and that Allison had let him into her home. ECF No. 14-10 at 27. Having reviewed the statement in the context of the state's entire summation, and given the brief nature of the comment, and the fact that the prosecutor's comment was made in response to defense counsel's argument that Allison had let Petitioner into the home, this comment did not so infect Petitioner's trial with unfairness as to amount to a denial of Due Process, and this claim serves as no basis for habeas relief.

Petitioner next argues that the prosecutor committed error in describing Petitioner's flight from Allison's home, wherein the prosecutor stated that he "clutched" his cross necklace but not to pray for the victim. Petitioner contends this description amounts to improper and inflammatory religious imagery. As noted by the Appellate Division, however, the evidence clearly indicated that Petitioner did flee from the home, and that there was a substance that appeared to be blood on Petitioner's cross. Id. at 28. Given these facts, this comment by the prosecutor was fair comment upon the evidence presented at trial. The comment did not have a tendency to render Petitioner's trial fundamentally unfair, and provides no basis for habeas relief.

Petitioner next argues that the prosecution used improper PowerPoint slides as visual aids during its closing argument. Specifically, Petitioner takes issue with slides that included: pictures of the barrel of Petitioner's gun, positive descriptions of the victim which were largely based on

15

facts regarding the victim and compliments witnesses gave her (including Petitioner himself), references to Petitioner's gun as the "murder" weapon, and a description of the case which stated that the "truth" of the case was that Petitioner was "the living" and Allison "the dead," and included a picture of Petitioner in the hospital and a picture of the victim.  The Appellate Division rejected Petitioner's claim that these visual aids had affected the fairness of Petitioner's trial, finding that the positive descriptors of the victim all were fairly derived from the testimony of the witnesses, the state had a right to construe the gun which had fired the lethal bullets as "the murder weapon," and the jury had already seen the allegedly inflammatory picture of the victim on the "truth" slide. Id. at 29.  Given that the slides in question were drawn from the evidence and testimony produced at trial, the prosecution was entitled to construe the Beretta as a murder weapon in a case where its theory was that Petitioner had used the weapon to kill the victim, and that the jury had already seen the pictures that Petitioner now decries, this Court agrees with the Appellate Division that these slides, though charged, did not deprive Petitioner of a fundamentally fair trial.  Petitioner is therefore not entitled to habeas relief on this claim.

Petitioner next argues that the use of the term "spaghetti defense" by the prosecution during its summation amounted to an unjust ethnic aspersion cast at Petitioner and his attorney, both of whom were of Italian descent.[3]  As the Appellate Division explained on direct appeal, however, the spaghetti comment was directly explained by the prosecutor not as an ethnic insult towards the

---

[3] In his reply, Petitioner argues that this issue was "exacerbated" by references and questioning by the prosecutor during Petitioner's cross-examination about Petitioner holding his gun "gangster style" and regarding the mob quote on his Facebook page.  The prosecutor did not connect either of those things to the "spaghetti defense" comment, which was explained almost immediately to be reference to the idiom rather than to Petitioner's nationality.  In any event, as discussed below, neither the commentary on the mob quote nor the gangster style comment, which the trial judge struck from the record and instructed the jury to disregard, denied Petitioner a fair trial, and thus neither provides a basis for habeas relief.

defense, but as an invocation of a common idiom the "[t]hrow it up on the wall and see what sticks." Id. at 30. The comment was not aimed at Petitioner or counsel, but rather at the mix of defenses invoked by Petitioner as explanations for why he should be found not guilty. This comment, in the context of the full summation and in light of the prosecutor's explanation of what she meant to the jury, did not deprive Petitioner of a fair trial, and serves as no basis for habeas relief.

Petitioner also claims error with respect to a PowerPoint slide that described Petitioner's story as "tailored to fit the evidence," a characterization which Petitioner contends amounted to the prosecution impugning his credibility. That slide, however, contained several other bullet point characterizations – including that petitioner's version of events was physically and medically impossible. In context, the slide, and the argument that accompanied amounted to a fair argument regarding the implausibility of Petitioner's testimony in light of the physical evidence and testimony provided at trial. This comment thus did not render Petitioner's trial fundamentally unfair, and does not warrant habeas relief.

Petitioner next asserts that the prosecution at his trial improperly vouched[4] both for its witnesses and case, including by suggesting that, to find Petitioner not guilty, the jury would have to reject the credible testimony of all of the state's witnesses and instead find credible Petitioner

---

[4] Although Petitioner, both here and before the Appellate Division, argued that the prosecutor "vouched" for the credibility of the witnesses, improper vouching occurs not when a prosecutor argues that the state's witnesses are credible, but when the prosecution makes such an argument based not on the evidence but the prosecutor's personal knowledge or other information not in the trial record. See, e.g., United States v. Walker, 155 F.3d 180, 184, 187 (3d Cir. 1998). Although the prosecutor here did argue that her witnesses were credible and Petitioner was not, with the exception of the struck comments regarding Petitioner's comments to the prosecutor, those arguments were based on the testimony and biases of the witnesses as seen in their trial testimony. The comments did not amount to the sort of improper vouching which would be capable of denying Petitioner a fair trial in light of the evidence, testimony, and jury instructions given at Petitioner's trial, and thus do not provide a basis for habeas relief.

alone.  Petitioner also takes issue with the prosecutor mentioning that Petitioner had "shooed" her away, and had "whispered" something to the prosecutor, as well as stating that Petitioner was the "man who murdered" the victim.  The Appellate Division rejected these arguments, finding that the trial court's direct instructions to the jury that they should consider the quality of the testimony, and not the number of witnesses in determining the witnesses credibility, as well as the court's specific instruction striking the prosecutor's comments regarding Petitioner's actions towards her were more than sufficient to cure any prejudice resulting from the prosecutor's arguments. Id. at 32.  Having reviewed the summation in its entirety, and in light of the trial court's direct, targeted instructions to the jury that they should not consider comments outside the evidence and should weigh credibility based on the quality of witnesses, this Court concludes that these comments did not deprive Petitioner of a fundamentally fair trial.  Petitioner is therefore not entitled to habeas relief on this basis.

Petitioner next argues that the prosecutor made several comments which improperly mischaracterized or otherwise misstated the evidence.  The Appellate Division rejected each of these arguments, finding that the trial judge had properly struck those few comments which were not based on the evidence and instructed the jury to disregard them, that most of the remaining comments amounted to fair commentary upon the facts evinced, that references to Petitioner holding his gun "gangster style" were properly addressed when the trial judge struck those comments from the record and instructed the jury to disregard them, that any inadvertent misstatements of the medical record "were not so inaccurate to constitute reversible error" and were properly addressed by the trial court's jury instructions, and that any minor misstatements of the law in the prosecutor's slides were addressed by the full and complete instruction as to the applicable law by the trial court. ECF No. 14-10 at 32-35.  Having reviewed all of the allegedly

inaccurate statements in their entirety, as well as the corrective measures taken by the trial court, this Court finds that none of the alleged misstatements were so severe that they had any propensity to affect the fairness of Petitioner's trial. Indeed, most amounted to fair commentary on the record, and the few which did not were struck by the trial court. These misstatements thus provide no basis for habeas relief.

Petitioner also contends that the prosecutor committed misconduct in commenting on the mob quote on his Facebook page during summation in light of what he suggests was belligerent cross-examination on the issue, as well as by noting Petitioner's failure to explain that he acted in self-defense or that there was an accident that resulted in Allison's death to family or hospital staff prior to any police involvement in the case. The Appellate Division rejected both claims without further comment. As to the mob quote, as discussed above, it was part of Petitioner's own Facebook page, which had been admitted into evidence, and was thus the subject of fair comment during summation. As to Petitioner's silence regarding his version of events with family and at the hospital, Petitioner himself admits that "when there is no government compulsion and the objective circumstances demonstrate that a reasonable person in a defendant's position would have acted differently, [a defendant's pre-arrest silence to family or medical staff] can be used to impeach that defendant's credibility," (ECF No. 1 at 53), but argues that in this case it was instead used as substantive evidence of guilt. In making that argument, however, Petitioner ignores the fact that the entire crux of this case was whether Petitioner was credible in claiming that the shooting of Allison was either an accident or act of self-defense. The state's comments thus went directly to impeaching the *credibility* of his claims, commentary that Petitioner concedes is appropriate. By Petitioner's own standard, and in any event under the applicable federal standard, *see Jenkins v. Anderson*, 447 U.S. 231, 235-38 (1980) (holding that the "Fifth Amendment is not

19

violated by the use of prearrest silence to impeach a criminal defendant's credibility" when used to refute a claim of self-defense), the comment regarding the failure to explain what happened was a permissible attempt at impeaching the credibility of Petitioner's claim that he acted in self-defense during an otherwise accidental shooting. In any event, it is clear that neither of these comments deprived Petitioner a fair trial, and he is therefore not entitled to habeas relief on this basis.

In the final prosecutorial misconduct claim in his habeas petition, Petitioner argues that the cumulative effect of all of these allegedly improper statements by the prosecutor and the trial court's decision to require Petitioner's counsel to hold his objections until after the summation denied him a fair trial, even if no claim did individually. The Appellate Division rejected this argument, finding that Petitioner's counsel had ample opportunity to make his objections after the summations, and that the trial court, as appropriate, issued proper and effective cumulative instructions, and in any event there was no error warranting reversal in any of Petitioner's individual misconduct claims or when those claims were considered cumulatively. ECF No. 14-10 at 35–37. Although claims of error may warrant habeas relief cumulatively where each claim is individually not so severe as to deprive a petitioner his right to a fair trial, *see, e.g., Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007), having reviewed all of the claims Petitioner has presented in his habeas petition asserting prosecutorial misconduct, and having reviewed the full context of the prosecutions' actions in this matter, the Court finds that Petitioner has failed to show that the prosecutor's actions, individually or cumulatively, deprived him of a fundamentally fair trial, and he is not entitled to habeas relief based on the prosecutor's alleged misconduct. *Darden*, 477 U.S. at 181.

**3.  Petitioner's "Addendum" and Additional Misconduct Claims**

In addition to the prosecutorial misconduct claims raised on direct appeal, on February 7, 2020, Petitioner filed a purported "addendum" to his habeas petition. ECF No. 20.   In that addendum, Petitioner seeks to raise before this Court new claims of misconduct. Petitioner specifically claims that certain statements, which allegedly contain misinformation, made to the press by the prosecution "poisoned" the jury pool, and that the loss of certain trial transcripts (which Petitioner failed to previously request and could not be located when requested in December 2019) amounts to a "continuation" of a prosecutorial axe to grind against Petitioner. *Id.* Respondents moved to dismiss this "addendum" as an improper attempt to assert unexhausted new claims before this Court based on information outside of the trial court record. ECF No. 21. Petitioner in turn argues that he does not believe them to be "new claims" but further "highlights" of the prosecutor's alleged animus against Petitioner.

Regardless of Petitioner's attempt to reframe his "addendum," it undoubtedly contains new claims – assertions of prosecutorial misconduct which are based on newly raised facts completely outside of the state court record of this matter.  That Petitioner previously raised entirely different claims of prosecutorial misconduct does not render them otherwise. Nevertheless, while this Court cannot grant relief on new, unexhausted habeas claims never presented to the state courts, this Court is free to reject any such unexhausted claim on the merits. 28 U.S.C. § 2254(b)(2).  "[E]ven pervasive, adverse publicity . . . does not lead inevitably to an unfair trial," and a juror need not be ignorant of any and all news coverage of a criminal case to be impartial. *Skilling v. United States*, 561 U.S. 358, 380–384 (2010) (internal quotations omitted).  In the absence of a severe, extreme, and pervasive atmosphere "utterly corrupted by press coverage," there is no presumption that a trial was invalid merely because jurors may have been exposed to negative press coverage. *Id.*  In

absence of such an environment, only in cases where the jury selection proceedings indicate actual prejudice to the petitioner should a reviewing court intervene. *Id.* at 386–90.

Petitioner fails to present even allegations of actual prejudice, instead he merely decries the fact that some statements attributed by the press to the prosecution contain characterizations of the evidence presented in Petitioner's pre-trial proceedings with which he disagrees. Petitioner does not contend that any specific juror actually read these few articles, or that any jurors were actually affected by them, and nothing in the record of the jury selection in this case indicates any concern for any such corruption by Petitioner. As there is no evidence of actual prejudice to Petitioner resulting from the press coverage in question, that such coverage existed did not impermissibly bias the jury pool against Petitioner.

Even construed as a prosecutorial misconduct claim, the statements contained in these articles fair no better than any of Petitioner's other allegations of misconduct. Petitioner's argument hinges entirely on minor factual inaccuracies or exaggerations which may well have been the result of the actions of reporters rather than the prosecutor herself. Regardless, in light of the judge's clear instructions to consider only the evidence presented at trial given in this matter, the evidence of Petitioner's guilt, the assurances of impartiality given by the jurors during selection in this matter, it is abundantly clear that the prosecutor's speaking with the press did not deprive Petitioner of a fair trial, and that these articles provide no valid basis for habeas relief.

The lost transcript likewise provides no basis for habeas relief. The fact that a transcript may be lost after the passage of the better part of a decade and after all state court proceedings conclude is hardly misconduct, and certainly had no effect upon the fairness of Petitioner's trial. Petitioner's addendum claims are thus without merit, and are denied as such. Because Petitioner's

claims fail on the merits and this Court rejects them pursuant to 28 U.S.C. § 2254(b), Respondents'

motion dismiss the addendum (ECF No. 21) is denied as moot.

### 4.  Jury-related claims

Petitioner also asserts that he was denied a fair trial because the jury in his criminal case

was exposed to two extraneous factors during his trial.  The first instance involves a juror

recognizing a retired officer in the court room with whom she had some negative association but

who was not connected to either side of Petitioner's case and was merely observing the trial, and

the second instance involves jurors and a jury aide discussing a radio show suggesting individuals

should turn off their Christmas lights on December 19, 2012, in solidarity with the victims of the

Newtown, Connecticut, school shooting.  The Appellate Division rejected both claims, finding that

neither incident denied Petitioner a fair trial in light of the trial judge's discussion with the affected

juror regarding the retired officer, and in light of defense counsel's request that the trial judge

make no specific charge regarding the Newtown discussion, but instead rely on the general jury

instruction that jurors were to decide the case on its merits, and not based on outside factors.  ECF

No. 14-10 at 40–45.

In *Remmer v. United States*, 347 U.S. 227, 229 (1954), the Supreme Court held that, in a

criminal case, "any private communication, contact, or tampering directly or indirectly, with a

juror during a trial about the matter pending before the jury is, for obvious reasons, deemed

presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions

and directions of the court made during the trial, with full knowledge of the parties.  The

presumption is not conclusive, but the burden rests heavily upon the Government to establish . . .

that such contact with the juror was harmless to the defendant."  As the Third Circuit has explained,

however, courts should apply that presumption "only when the extraneous information is of a

considerably serious nature." *United States v. Lloyd*, 269 F.3d 228, 238 (3d Cir. 2001). "In particular, [courts] have tended to apply the presumption of prejudice when a juror is directly contacted by third-parties." *Id.*

In this case, it is clear that the two extraneous incidents were entirely harmless to Petitioner and had no tendency to deprive him of a fair trial. In the first incident, a single juror expressed her distaste for an individual unconnected with the case who was acting as a public spectator, and the trial judge ensured that there would be no issue arising from that distaste. Likewise, the second incident regarded a harmless conversation regarding a matter of public concern not directly connected to Petitioner's trial, and the trial judge gave defense counsel the opportunity to request a specific charge, an option counsel declined. Because there was no direct outside influence on the jury, the presumption of prejudice does not apply in this matter. *Lloyd*, 269 F.3d at 238. Moreover, as both incidents were not connected to the evidence of Petitioner's case, as there is no evidence that there was any direct contact with jurors by outside parties, and as there is no evidence that Petitioner suffered any prejudice as a result of either incident, the Appellate Divisions' rejection of Petitioner's juror related claims was neither contrary to nor an unreasonable application of applicable Supreme Court precedent, including *Remmer* and its progeny. Petitioner is thus not entitled to habeas relief on his jury related claims.

**5. Sentencing claim**

In his final claim, Petitioner argues that he was denied a fair trial insomuch as he received a sentence he believes was excessive. "Absent a claim that a sentence constitutes cruel and unusual punishment prohibited by the Eighth Amendment, or that it is arbitrary or otherwise in violation of due process, the legality and length of a sentence are questions of state law over which [a district court] has no jurisdiction under § 2254." *Figueroa v. Nogan*, No. 17-4093, 2018 WL 4407863, at

24

*4 (D.N.J. Sept. 17, 2018) (citing *Chapman v. United States*, 500 U.S. 453, 465 (1991)).  A court conducting habeas review should therefore generally not re-evaluate a sentence where there is no allegation of a separate constitutional violation and the sentence falls within the statutory limits set by state law. *Perez v. D'Ilio*, No. 16-4767, 2019 WL 3943012, at *19 (D.N.J. Aug. 20, 2019); *see also Chapman*, 500 U.S. at 465; *Jones v. Superintendent of Rahway State Prison*, 725 F.2d 40, 42-43 (3d Cir. 1984).

Petitioner attempts to bootstrap a federal claim into his state law sentencing argument by suggesting his sentence in turn must be a violation of the Eighth and Fourteenth Amendments because it is excessive under state law.  Petitioner's arguments, however, do not turn on questions of federal or constitutional law, but rather merely disagree with the Appellate Division's conclusion that Petitioner's sentence was not excessive under state law.  Petitioner does not argue that his sentence was beyond the range authorized by state law, but instead merely reasserts his disagreement with the trial judge's conclusion, upheld by the Appellate Division, that he committed the murder in a heinous fashion, which constitutes an aggravating sentencing factor under state law.  The Appellate Division, however, already concluded that the trial judge's determination was supported by the evidence and was not in violation of applicable state law, and Petitioner raises no true federal claim.  Petitioner has in no way shown that his sentence was contrary to nor an unreasonable application of federal law, and this Court is otherwise without jurisdiction to reconsider the Appellate Division's determinations of pure state law questions.  Petitioner's sentencing claim therefore provides no valid basis for habeas relief.

## III.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has

"made a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because jurists of reason could not disagree with this Court's conclusion that his habeas petition is without merit, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  Petitioner is therefore denied a certificate of appealability.

## IV.  CONCLUSION

For the reasons stated above, this Court denies Petitioner's habeas petition (ECF No. 1), denies Petitioner a certificate of appealability, and denies Respondents' motion to dismiss Petitioner's addendum (ECF No. 21) as moot in light of the denial of the petition including the claims raised in the addendum.  An appropriate order follows.

**DATE**: January 19, 2021

**CLAIRE C. CECCHI, U.S.D.J.**